**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| PERMICO MIDSTREAM PARTNERS | § | Case No. 20-32437 (MI) |
| HOLDINGS, LLC, *et al.*, | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |

**PERMICO ENERGIA, LLC'S EMERGENCY MOTION TO DISMISS BANKRUPTCY**
**CASES PURSUANT TO 11 U.S.C. § 1112(b)**

[Relates to Doc. No. 1]

**EMERGENCY RELIEF HAS BEEN REQUESTED. A PRELIMINARY HEARING WILL BE CONDUCTED ON THIS MATTER ON TUESDAY, MAY 12, 2020 AT 4:45 PM CT IN COURTROOM 404, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN MAY 12, 2020.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING. AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1(832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554. PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET**

---

[1] The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Permico Midstream Partners Holdings, LLC (6374) and Permico Midstream Partners LLC (7902). The location of the Debtors' corporate headquarters and service address is 9301 Southwest Freeway, Suite 308, Houston, TX 77074.

**CONNECTION. THE INTERNET SITE IS WWW.JOIN.ME. PERSONS CONNECTING BY MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.**
**ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING". THE CODE FOR JOINING THIS HEARING BEFORE JUDGE ISGUR IS "JUDGEISGUR".**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

TO THE HON. MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE:

Permico Energia, LLC ("Energia"), the Manager and a Member of Debtor Permico Midstream Partners Holdings, LLC ("Debtor Holdings"), which is the sole owner of Debtor Permico Midstream Partners, LLC ("Debtor PMP"), and party in interest herein, files this *Emergency Motion to Dismiss Bankruptcy Case Pursuant to 11 U.S.C. § 1112(b)* (the "Motion"), pursuant to Section 1112(b) of Title 11 of the U.S. Code (the "Bankruptcy Code"), Rule 1017 of the Federal Rules of Bankruptcy Procedure, and Local Rule 1017-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of Texas.

## I. Summary of Relief Requested[2]

1. Energia requests that the Court dismiss the above-styled and numbered cases (the "Cases") because the person or persons who caused the Cases to be filed lacked authority to file a petition for bankruptcy on the Debtors' behalf. Therefore, this Court lacks subject matter jurisdiction to adjudicate these Cases.

2. HGC Midstream INV, LLC ("Hanwha") is the interim development financier of, and owner of Series A membership interest in, Debtor Holdings. Hanwha purported to exercise

---

[2] Capitalized terms not defined in the Summary of Relief Requested section of the Motion shall have the same meaning as defined in other sections of the Motion.

its rights under the Company Agreement governing Debtor Holdings to replace the rightful Manager and non-Hanwha members of Debtor Holdings' Board of Directors.  Thereafter, having improperly seized control of Debtor Holdings, Hanwha caused Debtor Holdings to authorize the immediate filing of the Cases.

3.      Hanwha did not have the right to exercise its contractual ability to replace Debtor Holdings' Manager and Board of Directors.  More specifically, Hanwha's exercise of that contractual right was premised upon Debtor Holdings' alleged breach of the Company Agreement resulting from Debtor Holdings' failure to obtain final project financing by April 30, 2020 for a multi-billion-dollar pipeline project, and the associated failure to redeem Hanwha's Series A membership interest.

4.      However, Hanwha's actions were improper due to Hanwha's repeated material, precedent breaches of the Company Agreement, which prohibited it from exercising remedies available to it thereunder.  More specifically, Hanwha repeatedly breached its obligations under the Company Agreement to provide funding for the Pipeline Project.  Said differently, the interim development financier refused to fund the development.

5.      Hanwha's breaches made it impossible for Debtor Holdings to comply with its own obligations to obtain final project financing by April 30, 2020 and redeem Hanwha's Series A membership interest.[3]  Indeed, before these Cases were filed, Debtors filed suit against Hanwha in Texas state court to pursue these breach of contract claims.[4]

---

[3]      As noted in greater detail in Paragraph 45 below, in spite of Hanwha's repeated breaches of its obligations, both Debtors and the Pipeline Project all remain viable.  Shortly before the Cases were filed, multiple agreements had been entered to move the Pipeline Project forward.

[4]      Those claims were filed as cross-claims in *Edgen Murray Corp. v. Permico Midstream Partners, LLC and HGC Midstream INV, LLC*, No. 2020-16509, in the 234th Judicial District Court, Harris County, Texas ("State Court Suit").

6.      In other words, Hanwha relied on its own wrongful conduct to create the necessary condition to exercise its contractual ability to replace Debtor Holdings' Manager and Board of Directors in order to seize control of Debtor Holdings.  Under well-settled Texas contract law, Hanwha does not get to enjoy the benefits of its own precedent breach of the Company Agreement.  Because the removal of the original Manager and Board of Directors, and the appointment of a replacement Manager and Board, was improper, the reconstituted Manager and Board of Directors had no authority to act on behalf of Debtors, and could not have authorized the filing of these Cases.  Therefore, because the Cases were filed without authority, the Cases should be dismissed.

## II.      Statutory Basis for Relief

7.      The statutory predicates for relief are 11 U.S.C. §1112(b), Bankruptcy Rule 1017, and Local Rule of Bankruptcy Procedure 1017-2.

## III.      Factual and Procedural Background

8.      On May 4, 2020 (the "Petition Date"), each Debtor filed an unauthorized voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Each Debtor continues in possession and management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  To date, no trustee or creditors' committee has been appointed in these Cases.

9.      Prior to the Petition Date, Debtors were in the process of developing a project to build (i) pipelines from the Permian Basin and Eagle Ford shale regions to Corpus Christi, Texas, (ii) two fractionator trains, (iii) an NGL salt cavern storage facility, and (iv) one or more export terminals with spurs to the gas liquids storage and trading hub in Mont Belvieu, Texas (collectively, the "Pipeline Project").  The Pipeline Project has an estimated capital cost of over

three billion dollars to complete the first phase.  When all three phases of the Pipeline Project are completed, the Pipeline Project will have a market value of over eighteen billion dollars.

10.      Debtor PMP required interim development financing to keep the Pipeline Project moving forward, while it negotiated with multiple lenders to obtain final debt and equity project financing for the Pipeline Project.  Debtor PMP ultimately selected the Hanwha Group, a South Korean conglomerate, over several other competitors to provide the interim development financing, in the approximate total sum of $80,000,000.

11.      As of April 30, 2019, Debtor PMP and the Hanwha Group's newly-formed American subsidiary Hanwha entered into a Development Loan Agreement ("Development Loan Agreement"),[5] under which Hanwha would make advances to Debtor PMP in two tranches.  The first $30,000,000 tranche was funded at closing.   The second $6,000,000 tranche was an incomplete equity infusion, funded later.

12.      Also as of April 30, 2019, Debtor Holdings was governed by that certain Amended and Restated Limited Liability Company Agreement ("Company Agreement").[6]  The remaining balance of the $80,000,000 – roughly $44,000,000 – was to be funded via capital calls made on Hanwha under the terms of the Company Agreement.[7]  Hanwha also received Series A convertible membership interests in Debtor Holdings, in connection with the interim development financing and under the terms of the Company Agreement.

13.      The Company Agreement was executed by the Common Members, Permico Energia, LLC and Conquista Energy, LLC, and the Series A Member Hanwha.  Energia was

---

[5]       A copy of the Development Loan Agreement is attached hereto as Exhibit "A."

[6]       A copy of the Company Agreement is attached hereto as Exhibit "B."

[7]       Company Agreement, Section 5.2.

granted two seats on the Board of Directors, Conquista was granted one seat, and Hanwha was granted the other seat.[8]  The Board delegated most day-to-day matters to the Manager – Energia. As part of the Company Agreement, Hanwha was granted the right to replace the Manager and Board of Directors of Debtor Holdings upon the occurrence of certain conditions, one of which was the failure to close on final project financing and redeem Hanwha's Series A membership interest by April 30, 2020.

14.     As noted above, under the Company Agreement, Debtor Holdings had the right to make capital calls on Hanwha.  Hanwha was charged with an obligation to consider capital calls in good faith,[9] as all parties understood that funding the full $80,000,000 was a fundamental requirement to allow Debtor PMP to keep the development activities of the Pipeline Project moving forward, to meet certain agreed-upon development milestones, and to close on final project financing.

15.     As of the execution of the Company Agreement, all parties understood that Hanwha had no personnel who possessed a sophisticated understanding of the American midstream oil and gas industry generally or of projects like the Pipeline Project in particular.  Such expertise and experience is critical in allowing Hanwha to perform the analysis necessary to review, vet and approve capital calls from Debtor Holdings to fund the Pipeline Project.  In other words, retaining a qualified consultant was a prerequisite to Hanwha's ability to fulfill its good-faith obligation to Debtor Holdings.

---

[8]     Company Agreement, Section 4.1(b).

[9]     Company Agreement, Section 5.2(b)(iii) (requiring Hanwha to provide written notice of "good faith disputes" that it has with the requirements of a capital call notice).

16.     Early on, prior to the closing of the Development Loan Agreement, Debtor PMP even offered to connect Hanwha with competent advisors to provide such technical expertise related to the Pipeline Project, which would permit Hanwha to timely meet its funding obligations under the proposed transaction structure.  Hanwha declined that offer, but asserted that it would timely hire advisors with the relevant experience in due course.

17.     A few weeks after the execution of the Company Agreement and Development Loan Agreement, Hanwha replaced the original investment team who authorized the Pipeline Project transaction with a new group, led by Sean Park.  Debtors were introduced to Mr. Park's team on June 7, 2020.  The original investment team was excited by the Pipeline Project, and understood the need to be timely and responsive with Debtor Holdings' requests for funding under the Company Agreement.  Unfortunately, as subsequent events would demonstrate, the new Hanwha team would prove itself to be uninterested in learning about or pursuing the Pipeline Project, and would make it impossible for Debtors to meet the development milestones and timeline to which Debtors had committed themselves.[10]

18.     To that end, Hanwha began to breach its obligations under the Company Agreement.  For example, on June 18, 2019, Debtor Holdings delivered its first capital call notice, in the amount of $22,500,000 ("First Notice").[11]  Every penny of the requested amount was necessary to meet the milestones in the development budget and keep the Pipeline Project moving forward.  Before the introduction of Mr. Park's team on June 7, 2019, Debtors and the original

---

[10]     As an example, Hanwha's original investment team and Debtors' representatives conducted weekly phone calls and/or meetings.  In an early sign of trouble, the new team discontinued the weekly phone calls and/or meetings.

[11]     A copy of the First Notice is attached hereto as Exhibit "C."

Hanwha team had engaged in discussions regarding the first capital call, and no one from the original team had lodged any objections or raised any concerns to the proposed capital call.

19.     The new team led by Mr. Park acted much differently.  Instead of meeting the capital call, Hanwha formally objected to the First Notice, and began a pattern of demanding a never-ending stream of information, purportedly to permit Hanwha to evaluate the First Notice. Moreover, Hanwha demanded that Debtor Holdings withdraw the First Notice altogether, insisting instead that it would for the most part only meet capital calls in arrears, *after* third party invoices had been presented to Hanwha, not on the prospective basis that had been agreed with Hanwha's original development team.

20.     Neither of these actions constituted a "good faith dispute," as required by the Company Agreement.[12]  First, with regard to the request for additional information, Hanwha already had that information in its possession.  More specifically, the Debtors had provided a thumb drive containing due diligence materials to Hanwha, and most of the requests from the new team were for documents already produced in due diligence and saved on the thumb drive.  In fact, Hanwha would ultimately request already-provided information repeatedly, leading to the Debtors' conclusion that no one was actually reading or evaluating the material that Hanwha had been provided previously or the material they were (again) being provided.

21.     Moreover, Hanwha made these repeated demands for information despite its failure to hire a competent consultant that could actually evaluate the data and information provided.  As a result of this failure, Hanwha was not capable of discharging its contractual duties to act in good

---

[12]     Debtors concede that Hanwha objected on a "form over substance" ground that was technically accurate, regarding the form in which Debtor Holdings provided reporting requirements.  Debtor Holdings had been providing Hanwha weekly updates verbally, with no objection or complaint from Hanwha.  However, the Company Agreement required written reports, and Hanwha objected on that basis.  Debtor Holdings promptly corrected this technical error and began providing written reports.

faith in the process of vetting the extensive material supporting the initial capital call for the Pipeline Project.

22.     Second, there is no authority in the Company Agreement for the proposition that a capital call must be limited to those costs for which an invoice had already been generated. To the contrary, the Company Agreement expressly provided that capital calls were to be made for Approved Purposes.[13] The definition of Approved Purposes necessarily included costs for which invoices had yet to be generated.[14] An objection does not constitute a "good faith" dispute when it relies on requirements that either do not appear in the Company Agreement and/or are contrary to the actual terms of the Company Agreement.

23.     Additionally, Hanwha's demand to focus almost exclusively on invoices that had already been generated proved anew that Hanwha had no understanding of the midstream project market. In reality, midstream projects like the Pipeline Project are generally funded on a prospective basis. A party in Debtor PMP's position cannot be reasonably expected to incur significant financial obligations by securing goods and services if it does not know that it is going to have funds available to satisfy those obligations.

24.     More importantly, Hanwha's failure to fund immediately placed Debtors behind the eight-ball. Hanwha's insistence on largely limiting capital calls on an arrears basis rather than

---

[13]     Company Agreement, Section 5.2(a) (permitting Debtor Holdings to "request Series A Commitment Contributions from the Series A Member for Approved Purposes").

[14]     Company Agreement, Exhibit B (defining "***Approved Purposes***" to mean "project development activities with respect to the Project undertaken in accordance with the Development Budget, including the development activities described in the Development Budget and other development activities not expressly described in the Development Budget, but reasonably necessary for the development of the Project in accordance with the Development Budget. "Approved Purposes" shall not include any reimbursement of costs of, or for payment of any amounts to, any member of the Sponsor Group or any Related Person, unless approved by Series A Member Approval.).

on a projected need basis injected significant delay into the development process, making it impossible for PMP to meet the development milestone timeline.

25.     Having no real choice, Debtor Holdings acceded to Hanwha's demand to revise the capital call notice, based on Hanwha's assurance that it would promptly review the request for the balance of funds contained in the original capital call notice.  Hanwha funded approximately $6,000,000 of the originally-requested $22,500,000.  Of that $6,000,000, $4,000,000 was to pay submitted invoices, while $2,000,000 was paid as a cushion against projected expenses.  That $2,000,000 was far, far short of the amount necessary to permit Debtor PMP to meet the vendor obligations required to keep the Pipeline Project on track.  Ultimately, Hanwha never funded the balance of the capital call.

26.     During this period, Debtors' principal Jeff Beicker made numerous attempts to liaise with Hanwha's decision-makers, including Taewon Jun, Hanwha's nominee to Debtor Holdings' Board of Directors, and Moon-ghee Ryu, Hanwha's senior manager, regarding the funding issues.  Mr. Beicker repeatedly tried to obtain commitments from Hanwha to honor their obligations under the Company Agreement and provide funding.  Mr. Beicker was assured that Hanwha would promptly respond to Holdings' funding requests and would quickly review all requested information.

27.     At Mr. Beicker's request, the parties met on July 12, 2019, to answer Hanwha's questions and discuss certain required amendments to the development budget.  The hope was to ensure a smooth process going forward with respect to funding future capital calls.  Debtor Holdings answered all of Hanwha's questions, and by all accounts the meeting was a success. Hearing no further comments or questions from Hanwha, Debtors believed that – finally – Hanwha was comfortable with the nature and scope of the funding requests made pursuant to the capital

call process.

28.     To that end, Holdings provided an updated development budget on July 19, 2019 and requested that Hanwha approve the amended budget discussed at the July 12, 2019 meeting. Debtor Holdings subsequently made a second capital call on Hanwha on July 24, 2019, for approximately $12,000,000 ("Second Notice").[15]   Remarkably, as if the meeting had never occurred, Hanwha formally objected to the Second Notice, again demanded extensive additional documentation, and again demanded that Debtor Holdings revise the Second Notice to request funds to pay only invoices in hand.

29.     Debtor PMP responded on July 26, 2019, informing Hanwha that its refusal to fund would force Debtor PMP to demobilize its personnel securing rights-of-way for the Pipeline Project, which would have a negative impact moving the Pipeline Project.  Hanwha did not take any action in response to this email until the August meeting described below.

30.     Although Debtor Holdings declined to revise the capital call notice this time, it again bent over backwards to provide all documents and materials requested by Hanwha, which as noted above included documents and materials previously provided several times over. Additionally, Hanwha had still not hired a consultant with the necessary expertise to evaluate the material being provided by Debtor PMP.

31.     By this point, the situation had worsened significantly.  Mr. Beicker demanded an emergency meeting of Debtor Holdings' Board of Directors for August 5, 2019 to approve the amended development budget and get the Pipeline Project back on track.  Hanwha asked to postpone the emergency meeting to August 7, 2019, so that Debtor Holdings could meet in the

---

[15]     A copy of the Second Notice is attached hereto as Exhibit "D."

interim with Hanwha's newly-hired third-party consultant, a company named Arup.  Mr. Beicker agreed, on the condition that the amended development budget would be approved at the August 7 emergency meeting.

32.     At long last, Hanwha had finally hired a consultant.  Unfortunately, while Arup had played a significant role in the construction of the Sydney Opera House, it had no expertise in US onshore midstream projects.  Nevertheless, Debtor Holdings was cautiously optimistic that there was now a path forward to get Hanwha comfortable.

33.     Debtor Holdings proceeded to meet with Hanwha and Arup for four hours on August 5, 2019, and answered all questions asked.  Debtor Holdings was informed that the answers were satisfactory and that there were no follow up questions.  Yet Hanwha still refused to approve the amended development budget, claiming that it needed yet more time to internally reflect on the amended budget, and Hanwha did not participate in the emergency meeting on August 7.

34.     Hanwha then requested conference calls with SMBC, Debtor Holdings' senior debt financial advisor, and Macquarie Capital, Holdings' equity financial advisor, to obtain their perspective on the status and progress of the development of the Pipeline Project.  The information discussed on the calls was extremely detailed, and the advisors' responses to questions from Hanwha were consistent with responses previously provided by Debtor Holdings on August 5, including responses in relation to the Development Budget and the need to have the modified budget and milestone schedule approved.  SMBC conveyed the fact that Lummus, the independent engineer for the Pipeline Project, was satisfied with the management of the project and was comfortable that Holdings would be able to close on final project financing on or before the final deadline of April 30, 2020.

35.     Hanwha's representatives appeared satisfied and content with the results of these

calls.  Once again, there were no further questions or concerns raised by Hanwha after the calls. Once again, Debtor Holdings was hopeful that Hanwha had finally been convinced to comply with its funding obligations.

36.     Due to the failure to fund the capital calls, Holdings had invoices that were past due. In order to meet immediate funding needs, Holdings submitted an emergency, informal funding request on August 7, 2019, complete with backup data, which would at least meet the current obligations on invoices received as of that date.

37.     Over a week later, on August 15, 2019, Hanwha responded to the emergency funding request.  Instead of providing the desperately-needed funding, Hanwha stated that it would only agree to meet the emergency funding request if Debtors agreed to amend the transaction documents to include multiple new terms.   Additionally, Hanwha yet again demanded a wide swath of information – all of which had been previously provided to both Hanwha and to Arup. Debtor Holdings nevertheless responded on the same day.   It delivered anew all requested information to Hanwha, updated to account for the time period between August 7 and August 15. However, Debtor Holdings told Hanwha that it could not agree to Hanwha's demands to amend the existing agreements. At the same time, Holdings again advised Hanwha that a significant amount was now past due.

38.     Hanwha failed to fund the emergency request, and has refused to fund anything ever since.  As a result, Debtor Holdings gave written notice to Hanwha of its breaches under the terms of the Company Agreement, in an August 21, 2019 letter.[16]  The entire Pipeline Project, and Debtor PMP's ability to close on final project financing, had effectively ground to a halt because

---

[16]     A copy of the August 21, 2019 is attached hereto as Exhibit "E."  This letter describing Hanwha's breaches of the Company Agreement was delivered well before Hanwha accused Debtors of breaching various obligations in letters delivered in November and December 2019.

of Hanwha's repeated breaches of its obligations to Debtor Holdings under the Company Agreement.

39.     Realizing that replacement financing was required due to Hanwha's unjustifiable conduct, the Debtors attempted to engage with Hanwha for a takeout on commercial terms.  True to form, Hanwha refused to substantively engage with Debtors in those discussions.

40.     The only proposal that Hanwha ever made to Debtors, made in January 2020, was to demand that Debtors cooperate with Hanwha to file a voluntary bankruptcy petition.  While not ever stated out loud by Hanwha, the unspoken idea was that Debtor PMP would agree that it had taken delivery of approximately $170,000,000 in pipe for which Debtor PMP had executed purchase orders but not paid.[17]  Then the bankruptcy petition would be filed, the pipe would be sold, and Hanwha would recover most or all of the $30,000,000 it had originally advanced, while foregoing recovery of its equity infusion.  Hanwha even offered to pay Mr. Beicker a fee to provide his help in this liquidation.

41.     Of course, by liquidating and selling the pipe that was to be used in the construction of the Pipeline Project, this plan would have resulted in the end of the Pipeline Project.  Debtors rejected Hanwha's "proposal" in favor of maintaining its relationships with its pipe suppliers and attempting to continue negotiating take-out terms for the debt owed to Hanwha.

42.     Hanwha's gambit finally became clear as the April 30, 2020 deadline for final project financing approached.  Debtor PMP had continued its efforts to engage Hanwha in finding a commercial resolution, and Hanwha continued to reject any and all attempts to substantively

---

[17]     At that time, and to this day, there is an active dispute regarding whether delivery of the pipe had occurred under the purchase orders.  That dispute formed the basis for the State Court Suit, where the plaintiff Edgen Murray Corporation sought declaratory relief that delivery had not occurred, and that Hanwha did not have a security interest in the pipe as a result.

engage, or even make counter-offers to either Debtor during the period leading up to the April 30, 2020 deadline.

43.     On April 30, 2020, Debtor PMP sent another proposal that would have resulted in Hanwha receiving $27,500,000, very close to the same amount of money as Hanwha would have purportedly received under its own January 2020 voluntary bankruptcy proposal.   Debtor PMP also provided an executed letter of intent from a third-party financier that would serve as the replacement interim lender and supply the funds to take out Hanwha.

44.     After business hours on Friday, May 1, 2020, Hanwha rejected the proposal and further refused to make a counterproposal.  Hanwha further refused the opportunity to perform any due diligence on the replacement interim lender.  Instead, Hanwha demanded that Debtors bid against themselves and make a new offer by the end of the weekend.  Compounding the illusory nature of this proposal, Hanwha demanded that the interim replacement lender provide proof of its immediate ability to fund, which was functionally impossible over the weekend.  In light of Hanwha's bad-faith conduct, Debtors had no alternative but to bring breach of contract and other claims against Hanwha in the State Court Suit, which it did that evening.

45.     Despite its precedent, material breaches of the Company Agreement, and despite its central role in preventing Debtor PMP from moving the Pipeline Project forward and closing final project financing, on May 4, 2020, Hanwha purported to exercise its right under the Company Agreement to remove the Manager and the non-Hanwha members of Debtor Holdings' Board of Directors, and replace them with Hanwha's designees.  The improperly-named replacement Manager and/or the improperly-constituted replacement Board of Directors then purported to authorize the filing of the bankruptcy petitions that initiated the instant Cases.

46.     To be clear, the rightful Manager of Debtor Holdings – Energia – would not have placed either Debtor into bankruptcy.  Indeed, the Pipeline Project remains a viable project going forward.  As noted above, Debtor PMP has an executed a letter of intent with a replacement interim development financier to take out Hanwha.  Moreover, prior to the filing of the Cases, Debtor PMP had reached terms with a third party on a commercial agreement that, when combined with other commercial agreements that had previously been negotiated and agreed to, would sell enough throughput from the pipeline to make the entire Pipeline Project financially viable.

47.     Finally, Energia would note that Hanwha is significantly over-secured.  Energia believes that Hanwha's goal in the instant Cases is to follow through on the general action plan Hanwha proposed in January 2020.  Energia believes that Hanwha's strategy is to cause the Debtors to assert that (i) Debtor PMP had taken possession of the $170,000,000 in pipe under the terms of the purchase orders, and (ii) Hanwha's security interest attached to the pipe prior to the Petition Date.  If successful, Energia believes that Hanwha then would cause the Debtors to seek authority from the Court to sell the pipe, and, once the pipe is liquidated, Debtors would argue that Hanwha is entitled to the proceeds of the pipe sale until the approximately $31,000,000 that it advanced to Debtor PMP as debt is paid in full.

## IV.     Grounds for Relief

48.     Energia, the rightful Manager of Debtor Holdings, requests that the Court dismiss these Cases.  The persons who authorized the Debtors to file for bankruptcy were improperly appointed by Hanwha, and had no authority to authorize the filing of a bankruptcy petition on behalf of either Debtor.  The Manager and the three non-Hanwha members of the Board of Directors of Debtor Holdings were wrongfully removed and replaced, meaning that the replacements had no authority to act.

49.     Although the Bankruptcy Code does not expressly list an unauthorized bankruptcy filing as cause for dismissal, the Bankruptcy Code's definition of "cause" is not exhaustive.  The United States Supreme Court and the Fifth Circuit have long recognized that an unauthorized filing is cause for dismissal because a bankruptcy court lacks subject matter jurisdiction to consider a debtor's petition if those who purport to act on behalf of the debtor are not authorized to file a petition for bankruptcy on the debtor's behalf.[18]  That is a burden that the replacement Manager and Board of Directors cannot carry.

50.     The Fifth Circuit has also recognized that while a company may file a voluntary petition under Chapter 11, the company "can act only if authorized by appropriate agents."[19] Because the Bankruptcy Code does not specify who may file a petition on a company's behalf, "that authority finds its source in local law."[20]  If the petitioners lack authorization under state law, the bankruptcy court "has no alternative but to dismiss the petition."[21]

51.     Accordingly, the sole question for the Court is whether Hanwha's replacement Manager and Board of Directors had the authority to file the Cases under Texas state law.  It is undisputed that Hanwha's authority is solely derived from its purported exercise of its contractual right under the Company Agreement to replace the Manager and the non-Hanwha members of the Board of Directors with its own designees.  Energia respectfully suggests that, using fundamental

---

[18]     *Treen v. Orrill, Cordell, & Beary, LLC (In re Delta Starr Broad., LLC*), 422 Fed. Appx. 362, 368 (5th Cir. 2011) (citing *Price v. Gurney*, 324 U.S. 100, 106, 65 S.Ct. 513, 89 L.Ed. 776 (1945) (finding that bankruptcy petitions on behalf of a corporation may only be filed by those who have authority to act for the corporation under local law, and when such authority is lacking, the bankruptcy court does not acquire jurisdiction); *see also In re Mid-South Bus. Assocs.*, 555 B.R. 565 (Bankr. N.D. Miss. 2016) (holding that if the trial court "finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative to dismiss the petition").

[19]     *In Re Franchise Servs. of N.A.*, 891 F.3d 198, 206-207 (5th Cir. 2018).

[20]     *Id.*, quoting *Price v. Gurney*, 324 U.S. 100, 106, 65 S.Ct. 513, 89 S.Ct. 776 (1945).

[21]     *Id.*, quoting *Price*, 324 U.S. at 106.

principles of Texas contract law, Hanwha cannot validly exercise its contractual rights due to its material, precedent breaches.

52.     Texas contract law on this point is well-settled.  A party to a contract is discharged from performing its own obligations if the other party materially breached the contract.[22]   More importantly, a party that breaches its own obligations under a contract cannot enforce the remaining terms against the other party.[23]   Moreover, a party can breach a contract by making the other party's performance impossible.[24]

53.     Here, Hanwha purported to exercise its contractual right under the Company Agreement to remove the Manager and Board of Director because of Debtor Holdings' failure to obtain final project financing by April 30, 2020.[25]   Hanwha, however, had committed a series of precedent breaches of the Company Agreement.  First, Hanwha made bad faith objections to both capital calls.  Second, Hanwha improperly refused to fund capital calls that were not almost exclusively in arrears and supported by invoices.  Third, Hanwha failed to fund.

54.     Each of these precedent breaches was material.  The continued development of the Pipeline Project, and Debtors' attempts to reach final project financing, were stopped in their tracks by Hanwha's breaches.  Indeed, Hanwha's funding failures made it impossible for Holdings to obtain final project financing by April 30, 2020.

---

[22]     *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2018.).

[23]     *Interceramic, Inc. v. South Orient R.R. Co.*, 999 S.W.2d 920, 924 (Tex. App.—Texarkana 1999, pet. denied).

[24]     *TLC Hospitality, LLC v. Pillar Income Asset Mgmt.*, 570 S.W.3d 749, 755-756 (Tex. App.—Tyler 2018, pet. denied).

[25]     While Hanwha will claim that it sent Debtor Holdings Notices of Default in November and December 2019 for other purported failings, Hanwha's own breaches occurred well before then.  As a result, the same analysis applies. It is also important to note that Hanwha could have immediately exercised their removal rights to the extent that the other Notices of Default contained legitimate defaults, but chose not to do so until after Holdings' failure to obtain final project financing by the April 30, 2020 deadline.

55.     For those reasons, Hanwha cannot avail itself of any remedies provided to it under the Company Agreement.  Hanwha does not get to breach the Company Agreement by failing to fund, then rely on a state of affairs caused by its own breaches to exercise rights under the same Company Agreement to remove Debtor Holdings' properly-appointed Manager and the Board of Directors.

56.     As a result, because Hanwha's removal and replacement gambit was improper under well-settled Texas contract law, Hanwha's designees were not the properly-authorized Manager and Board of Directors of Debtor Holdings, and any acts that the Hanwha designees purported to take, including authorizing the Debtors to file for bankruptcy, were made without authority.

## V.     Emergency Relief

57.     Emergency relief is requested because these Cases are not properly authorized, and the rightful Manager of Debtor Holdings – Energia – would not have placed either Debtor into bankruptcy.  Moreover, as stated above, the bankruptcy court lacks subject matter jurisdiction to consider a debtor's petition if those who purport to act on behalf of the debtor are not authorized to file a petition for bankruptcy on the debtor's behalf.  The continuation of these improper Cases will have a serious impact on the Debtors' business.

*[Remainder of Page Left Blank Intentionally.]*

**WHEREFORE**, Permico Energia, LLC requests that the Court: (i) grant the relief requested in this Motion; (ii) enter an Order dismissing these Cases; and (iii) grant Permico Energia, LLC such further relief, at law or in equity, to which it has shown itself to be justly entitled.]

**DATED:  May 8, 2020.**

Respectfully submitted,

**REED SMITH LLP**
811 Main Street
Suite 1700
Houston, TX 77002
Phone: (713) 469-3671
Fax: (713) 469-3899

By: */s/ Lloyd A. Lim*

Lloyd A. Lim – SBT # 24056871
Email: Llim@reedsmith.com
Rachel I. Thompson – SBT # 24093258
Email: Rithompson@reedsmith.com

-and-

**DICKINSON & WHEELOCK, P.C.**
7660 Woodway Drive
Suite 460
Houston, Texas 77063
Phone: (713) 722-8118
Fax: (713) 722-7003

By: */s/ Thomas A. Dickinson*

Thomas A. Dickinson – SBT # 08536400
Email: tdickinson@dwlegal.com

**COUNSEL FOR PERMICO ENERGIA, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 8, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices, and also by email to:


Timothy Alvin Davidson, II
Ashley L. Harper
Joseph Peak Rovira
Hunton Andrews Kurth LLP
600 Travis
Ste 4200
Houston, TX 77002
713-220-3810
Fax : 713-220-4285
Email: TadDavidson@HuntonAK.com
Email: ashleyharper@HuntonAK.com
Email: josephrovira@HuntonAK.com

*COUNSEL TO DEBTORS*

Hector Duran, Jr
U.S. Trustee
515 Rusk
Ste 3516
Houston, Tx 77002
7137184650
Email: Hector.Duran.Jr@usdoj.gov

Stephen Douglas Statham
Office of US Trustee
515 Rusk
Ste 3516
Houston, TX 77002
713-718-4650 Ext 252
Fax : 713-718-4670
Email: stephen.statham@usdoj.gov


*/s/ Rachel I. Thompson*
Rachel I. Thompson