## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| PERMICO MIDSTREAM PARTNERS HOLDINGS, LLC, *et al.*, | § § § | Case No. 20-32437 (MI) |
| Debtors[1] | § § § § | (Jointly Administered) |
| CORPAC STEEL PRODUCTS CORP., | § § § | |
| Plaintiff, | § § | |
| Vs. | § § | Adversary No. _____ |
| PERMICO MIDSTREAM PARTNERS, LLC and HGC MIDSTREAM INV LLC, | § § § § | |
| Defendants. | § § § § | |

## **COMPLAINT**

Plaintiff Corpac Steel Products Corp. ("Corpac") alleges as follows:

### **PARTIES**

1.   Plaintiff Corpac is a Florida corporation with its principal place of business in Florida.

2.   Defendant Permico Midstream Partners LLC ("Permico" or "the Debtor') is a Texas limited liability company with its principal place of business in Texas. Permico filed a

---

[1] The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Permico Midstream Partners Holdings, LLC (6374) and Permico Midstream Partners LLC (7902). The location of the Debtors' corporate headquarters and service address is 9301 Southwest Freeway, Suite 308, Houston, TX 77074.

voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on May 4, 2020.

3. Defendant HGC Midstream INV LLC, on information and belief, is a Delaware limited liability company. Upon further information and belief, HGC's principal office is located at 3040 Post Oak Blvd., Suite 1000, Houston, Texas 77056.

## JURISDICTION

4. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 541, 544 and 550, and by order of the United States District Court for the Southern District of Texas referring to this Court all cases and proceedings in this District arising in or related to a case under Title 11 of the United States Code.

5. This is a core proceeding arising under 28 U.S.C. §§ 157(b)(2)(A), (K), and (O). Corpac consents to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## RELIEF REQUESTED

6. This adversary proceeding seeks four forms of relief. *First*, Corpac requests a determination that approximately 1,759,253 linear feet of steel pipe of various sizes, grades, specifications and coatings and which Corpac originally agreed to sell to the Debtor – but which was never finished, paid for, or delivered – is NOT property of the Debtor's estate, and that title to such pipe remains with Corpac. *Second*, Corpac requests a determination that, because title to such pipe never passed to the Debtor, it is not subject to a security interest claimed by the Debtor's principal partner and lender, HGC. *Third*, Corpac requests a determination that, because approximately 1,396,985 linear feet of steel pipe was specially fabricated to various sizes, grades,

specifications and coatings for the Debtor, Corpac has a valid and first priority lien over the Debtor's pipeline and certain other property under Chapter 53 of the Texas Property Code regardless whether the specially fabricated pipe was ever delivered. *Fourth*, and in the alternative, Corpac requests a determination that, if title to any of the pipe at issue is determined by this Court to have passed to the Debtor, then Corpac holds a valid and first priority materialman's lien on the pipe, the Debtor's pipeline and certain other property under Chapters 53 and/or 56 of the Texas Property Code.

## FACTUAL BACKGROUND

### A. Permico agreed to purchase 1.7 million linear feet of steel pipe from Corpac to build NGL pipelines from West Texas to the Houston area via Corpus Christi.

7. Corpac is in the business of preparing and selling pipeline materials, including line pipe.

8. Prior to the commencement of its bankruptcy case, Permico planned to build a pipeline ("the Pipeline") to transport natural gas liquids (NGLs) from the Permian, Delaware, and Eagle Ford basins in West Texas to a fractionator cite near Corpus Christi, Texas and to one or more production distribution and storage facilities near Markham, Texas and Mont Belvieu, Texas (collectively, "the Project").

9. To construct the Pipeline, Permico needed steel line pipe in various sizes, coatings, and other specifications.

10. In or about May of 2019, Permico and Corpac agreed to certain purchase orders ("the Original Purchase Orders") in which Permico agreed to purchase from Corpac approximately 1,759,253 linear feet of steel pipe of various specifications for use in constructing the Project ("the Pipe"). The purchase price for the Pipe was approximately $95,782,042.

> **B. Under the Original Purchase Orders' terms, title to the pipe would not pass from Corpac to Permico until the pipe was loaded on trucks from a DDP pipe yard for transport to Permico.**

11. The Original Purchase Orders specified that "[t]itle to the Goods shall pass to Buyer [i.e., Permico] upon Delivery to Buyer in accordance with this [Original] Purchase Order."

12. The Original Purchase Orders defined certain terms used therein, including certain key terms used in the provision defining when title to the Goods would pass to the Buyer.

13. The Original Purchase Orders set forth detailed specifications for how each piece of the Pipe was to be fabricated and finished before delivery. Among other things, these specifications contained specific requirements including sizes, grades, specifications, quantities, lengths and coating for how the Pipe would need to be finished and coated ready for bending before being delivered to Permico.

14. The Original Purchase Orders defined the term "Goods" as "the goods, materials, equipment, supplies, drawings, data, processes, and all other property and services, including design, expediting, inspection, and testing, specified or required, to furnish the items ordered in the Purchase Order[s]."

15. The Original Purchase Orders defined the term "Delivery" to mean "Seller's successful delivery of the Goods to the agreed delivery location set forth in the [Original] Purchase Order[s] and acceptance of such Goods by the Buyer."

16. The Original Purchase Orders provided that (i) most of the finished Goods would be delivered to Permico "Via Loaded Trucks / Best Available – Per Quote" at a "DDP Coating Yard in Houston, Texas" and at other similar pipe yards; (ii) the remainder (the "bend" pieces) would be delivered "Via Loaded Trucks / Best Available – Per Quote" at "DDP Houston Pipe Benders Yard". The term "Via Loaded Trucks/Best Available-Per Quote" meant that one of the

4

steps of delivery required that Corpac to load the pipe, at one of these pipe yards, onto one or more trucks owned or engaged by or for the Permico account. And as noted above, delivery would not be complete until the Buyer (Permico) also accepted the Goods.

17. Accordingly, for the Delivery to occur, (i) the finished Goods – i.e., the Pipe as coated to the Purchase Order's specifications – had to be loaded onto trucks owned by, or engaged on behalf of, Permico at one of the two designated pipe yards in Houston described above, and (ii) Permico had to accept the finished Goods.

18. None of the events to complete Delivery and acceptance of the Pipe occurred. In particular, much of the Pipe was never finished, coated, or bent such that it became "Goods" as defined in the Original Purchase Orders. The Pipe was never "Delivered Via Loaded Trucks" (or otherwise) to Permico at the "agreed delivery location" as provided in the Original Purchase Orders. And Permico never provided its "acceptance of such Goods" as provided in the Original Purchase Orders.

19. Before any of the events to complete Delivery and acceptance of the Pipe occurred, Permico repudiated the Original Purchase Orders when it informed Corpac in June of 2019 that Permico could not pay for or take delivery of any of the Pipe in accordance with the terms of the Original Purchase Orders.

### C. *Womble Company, a large Houston-based pipe and coating facility, warehoused much of the pipe which Corpac was accumulating to meet Corpac's obligations to Permico*.

20. Corpac, like many sellers of oilfield and line pipe, routinely warehouses its existing inventory of pipe held for sale at third-party yards. Similarly, Corpac, like many other sellers, routinely warehouses pipe accumulated for specific orders at such third-party yards. Many of these pipe yards also provide services such as application of various coatings and bending services.

5

Womble Company, Inc. in Houston Texas is one such company providing warehousing and coating services to pipe sellers like Corpac.

21. At all times relevant to this adversary proceeding, Corpac has been Womble's customer. For a substantial period of time predating the Permico contracts, Womble has routinely warehoused some of Corpac's line pipe inventory held for sale.

22. Womble routinely segregates each customer's (e.g., Corpac's) pipe upon Womble's receipt of the pipe. Womble's customary practice is to inspect pipe upon receipt, individually bar code it, and record it on Womble's books and records as it as the customer's property. Womble routinely stores a customer's incoming pipe on racks identified on Womble's books and records as such customer's. Womble routinely issues warehouse receipts for the pipe it stores, including so-called "Receiving Reports," to its customers.

23. When customers of Womble acquire pipe from another Womble customer, the routine practice of Womble's customers is for the selling-customer to notify Womble of the sale. Womble's routine practice is to then enter the transfer of ownership of the pipe from the selling customer to the purchasing customer. This routine practice includes having the warehouse receipts from Womble's selling customer surrendered to Womble and new receiving receipts or warehouse receipts being issued by Womble to the purchasing customer. As alleged below, Permico was never a customer of Womble of any kind, much less a buying-customer.

24. Womble does not have or maintain records identifying why a customer buys or stores items of pipe at Womble's facility. Accordingly, without identification by Corpac provided to Womble, Womble is not able to identify specific Corpac items on the Corpac Racks to fill any particular Corpac-customer's order.

25. Womble's routine practice with respect to Corpac is to release finished goods only

after receiving a request to do so from Corpac. Typically, in the ordinary course of business, Corpac may request that pipe either be delivered to the buyer by rack transfer or that the pipe be loaded on a truck for delivery to the buyer.

26. With respect to the Pipe at issue in this case, Womble stored much of the pipe material that Corpac was accumulating in order to fill Permico's order on racks dedicated to Corpac, which were referred to as "Corpac's Racks." Since Womble identified the pipe material received from or for the account of Corpac as Corpac's in Womble's records. Womble issued warehouse receipts for those materials it stored for Corpac, including so-called "Receiving Reports."

27. After the Original Purchase Orders were agreed to between Corpac and Permico, Corpac took steps to identify existing pipe in its inventory to fill portions of the Original Purchase Orders and to acquire other pipe to fill the Original Purchase Orders. Some of the unfinished line pipe needed to fulfill the Original Purchase Orders was already among pipe held in inventory by Corpac on the Corpac Racks at Womble's yard. Some of this "stock" inventory required additional coating to meet the requirements of the Original Purchase Orders and constitute finished "Goods" under the Original Purchase Orders.

28. Other line pipe for the Original Purchase Orders had to be entirely and specially fabricated or procured by Corpac from third-party vendors, then shipped to Womble for storage on the Corpac Racks, which would have been followed by inspection, barcoding, and processing by Womble to convert the raw line pipe into finished product prior to delivery.

29. At all times relevant to the events in this adversary proceeding, Womble acted as Corpac's bailee with respect to the portions of the Pipe Womble received. Consistent with its routine, Womble did not permit any other party (including Permico) to access, move, transport, or

otherwise control the Pipe or any portion of it. Womble also did not permit Permico to inspect the Pipe or any portion of it. Indeed, as set forth below, Permico never requested to inspect any of the Pipe (or pipe material), and Permico never accepted the Pipe or any portion of it.

30. All of the Pipe or pipe material to be used for the Permico order that was stored at Womble was barcoded by Womble and recorded on Womble's books and records as being owned by Corpac. To this day and at every point since any portions of the Pipe or pipe material arrived at Womble, Womble's books and records have reflected that those portions are and have been owned by Corpac. Consistent with its routine practice, Womble has followed and, going forward, will only follow the express instructions of Corpac with respect to the movement, treatment, disposition, or release of any portions of the Pipe.

31. Womble issued warehouse receipts to Corpac that indicated that the portions of the Pipe and pipe material in Womble's warehouse/yard was being held on behalf of Corpac.

### D. *In June of 2019 Permico repudiated the Original Purchase Orders, claiming it had no funds to pay Corpac for the Pipe and sought extensions of time to pay and take delivery.*

32. As alleged above, in June of 2019, Permico notified Corpac of the following: (1) Permico lacked the ability to pay for the Pipe on the timeline contemplated by the Original Purchase Orders because of delays in obtaining construction financing, and (2) Permico would not take delivery of the Pipe when scheduled.

33. As a result of its financing problems, Permico requested Corpac agree to delay delivery of the Pipe and delay Permico's obligation to pay for the Pipe. At no time prior to, or after, the foregoing notice and request from Permico's was any of the Pipe delivered to Permico. Similarly, at no time prior to, or after, the foregoing notice and request did Permico accept any of the Pipe. By notifying Corpac that Permico would not be able to pay for any of the Pipe, Permico

anticipatorily repudiated its obligations under the Original Purchase Orders.

34. At no time was Permico granted access to the Corpac Racks, nor was Permico granted permission - by either Corpac or Womble - to remove any of portion of the Pipe from the Corpac Racks. At no time did Corpac authorize, and at no time did Womble record on its books, any transfer of ownership of any portion of the Pipe to Permico.

35. Permico is not and has never been a customer of Womble, nor has Permico had any direct business relationship with Womble. Womble at no time took possession of any property on behalf of Permico. Womble is not and has never been under any obligation, contractual or otherwise, to perform any services for Permico, and Womble at no time exercised dominion or control over any property on behalf of or for the benefit of Permico.

36. Due to Permico's repudiation of the Original Purchase Orders, Corpac never instructed Womble to complete the coating of a substantial portion of the Pipe as required by the specifications in the Purchase Orders. Thus, the lion's share of the Pipe remained unfinished product and was never ready for delivery to Permico.

37. In addition, some of the line pipe material needed to complete the Pipe was never received from Corpac's suppliers.

38. Due to Permico's repudiation of the Original Purchase Orders, the portions of the Pipe intended for bending were never sent to Houston Pipe Benders, as specified in the Original Purchase Orders for those portions.

39. Due to Permico's repudiation of the Original Purchase Orders, none of Corpac, Womble, or Permico, ever made any arrangements for Permico to take delivery of any of the portion of the Pipe at the "DDP Coating Yard" "via loaded trucks," as provided in the Original Purchase Orders, or by any other method. Neither Permico, nor anyone acting on its behalf, ever

supplied any such trucks for loading, and none of the Pipe was never loaded onto any trucks.

40. Permico never paid Corpac any portion of the approximately $95,782,042 purchase price that it had agreed to pay on account of the Original Purchase Orders.

41. Meanwhile, at all relevant times Womble held the portions of Pipe and pipe material in its possession solely on behalf of Corpac. Accordingly, the Pipe was never delivered to Permico, title never passed to Permico, and the unfinished pipe material still sits among Corpac's other unrelated inventory in the Corpac Racks at Womble's yards in Harris County and at other yards.

### *E. Following Permico's repudiation of the Original Purchase Orders, Corpac and Permico agree to amend the Original Purchase Orders to change the terms of delivery and allow Permico more time to perform.*

42. Permico and Corpac have twice amended the Original Purchase Orders to reflect the changed circumstances in light of Permico's inability to pay.

43. In November of 2019, Permico and Corpac agreed to the first amendment to the Original Purchase Orders ("Amendment No. 1"). For sake of clarity, the Original Purchase Orders as amended by Amendment No. 1 are referred to as the First Amended Purchase Orders.

44. In March of 2020, Permico and Corpac agreed to amend the First Amended Purchase Orders ("Amendment No. 2"). For the sake of clarity, the First Amended Purchase Orders as amended by Amendment No. 2 are referred to as the Second Amended Purchase Orders.

45. The recital in Amendment No. 1 and Amendment No. 2 explained that, "due to delays in the project financing for [Permico's] Companero [sic] and Simpatico NGL Pipeline Project (the 'Project'), [Permico] has been unable to make payments due under the [Original] Purchase Order consistent with the terms of the [Original] Purchase Order." As a result of these delays, the recitals in Amendment No. 1 explained that "the Parties have negotiated and agreed

upon amended payment terms with respect to the [Original] Purchase Order[s]."

46. Amendment No. 2's recitals also acknowledged that, "[Permico] has breached the [Original] Purchase Order[s] and requested that [Corpac] delay delivery of the Goods and delay payments require from [Permico] under the [Original] Purchase Orders until such time as [Permico] has obtained the necessary financing."

47. Amendment No. 2's recitals acknowledged that "since arrival of the Goods at the premises of [Corpac's] bailee [Womble], [Permico] has never performed a review, inspected, counted or otherwise accepted the Goods."

48. Amendment No. 2's recitals stated that "the Goods have not been delivered to [Permico] and possession of and title to the Goods and risk of loss have at all times remained with [Corpac]."

49. Amendment No. 2's recitals explained that "[Corpac] has incurred and continued to incur substantial carrying costs related to the Goods and suffered other damages due to [Permico's] breach of the Purchase Order; and … the Parties have negotiated and agreed upon amended payment terms with respect to the Purchase Order as set forth in this Amendment to allow [Corpac] to mitigate its damages caused by [Permico's] breach of the Purchase Order and to enable [Corpac] to be compensated for its damage including, without limitation, its increased carrying costs for the Goods."

50. In order to cover Corpac's storage and maintenance costs caused by Permico's financing delays and repudiation of the Original Purchase Orders, Permico agreed in Amendment No. 1 to pay Corpac additional interest on its delayed payments. In particular, Amendment No. 1 provided that "[Permico] shall owe additional interest on such unpaid amounts of the Purchase Order[s] at the rate of seven and one-half percent (7.5%) per annum (i.e., 0.625% per month)" and

that "[s]uch interest rate shall increase to the rate of twelve percent (12%) per annum (i.e., 1% per month) beginning on April 1, 2020." Permico was to make these payments "no later than the fifteenth (15th) day of the month following the month in which such Interest Payments accrued."

51.     Amendment No. 1 also provided that Corpac could charge Permico a minimum fee of 20% of the full amounts of the price set forth in Purchase Orders as its "minimum indemnification for any Resale Losses (as defined below) [Corpac] may incur in reselling the Goods to third parties."

52.     Amendment No. 1 set a "Termination Date" of June 30, 2020, providing that if Permico did not make payment in full by that date, Corpac would have "the right, but not the obligation, to immediately terminate the Purchase Order[s] by issuing written notice to [Permico]."

53.     Amendment No. 1 and Amendment No. 2 amended other terms of the Original Purchase Orders regarding "Title and Risk of Loss."  Amendment No. 1 amended Section 16 of the Original Purchase Orders to provide that title would pass "upon Delivery to Buyer" in part as follows:

> Title to the Goods shall pass to Buyer upon payment made by Buyer to Seller for such Goods in accordance with the Purchase Order. For the avoidance of doubt, title to the Goods shall transfer to Buyer in proportion to the payments made therefor by Buyer to Seller (i.e., on a 'pro-rata' basis). Notwithstanding the Delivery or location of the Goods, title to any Goods Delivered under the Purchase Order remains with the Seller until payment for such Goods is made by Buyer to Seller in full in accordance with the Purchase Order.

54.     Amendment No. 2 further amended Section 16 of the Purchase Orders regarding "Title and Risk of Loss" and to add the following language in lieu of the original first two sentences of Section 16:

> Title to any particular Goods shall not pass to Buyer until (i) full cash payment made by Buyer to Seller for such Goods and (ii) Seller's delivery of such Goods to Buyer. Title to any such Goods under the Purchase Order remains with the Seller until both conditions (i) and (ii) above are met. All Prices set forth in the Purchase Order remain firm and shall not be modified except by Change Order executed by

each of the Parties. Delivery of any particular Goods shall not occur until after payment for same.

55. Regarding the schedule for delivery, Amendment No. 2 provided that (1) "the Delivery Dates for the Goods prior to the Initial Payment Date are hereby waived by the Buyer and no Delay Liquidated Damages shall apply to delivery of such Goods." Amendment No. 2 provided that "the delay in financing by the Buyer is a Buyer-Caused Delay under Section 11 of the Purchase Order[s] and the delivery of Goods is hereby suspended until the Initial Payment Date, whereupon at such time the Parties shall revise the Delivery Schedule for the remaining Goods under the Purchase Order[s] pursuant to a mutually agreed Change Order as required under the terms of this Purchase Order[s]."

56. Amendment No. 2 also provided that "the provisions of [Amendment No. 1] (as amended [by Amendment No. 2]) are a full and final settlement and accord and satisfaction of all financial effects of the delay in financing or breach by the Buyer as of the Effective Date and that the provisions of the Amendment (as amended) fully compensate Seller fully [sic] for its damages through the Effective Date for such circumstances."

### F. Out of nowhere, HGC claimed to have a UCC security interest in the Pipe.

57. Although Permico never paid Corpac for the Pipe, the Pipe was never delivered to Permico under the terms of the contracts between Permico and Corpac, and title to the Pipe never passed to Permico, HGC claims to have a UCC security interest in the Pipe.

58. On January 27, 2020, HGC wrote a letter to Corpac and Permico claiming it held a security interest in the Pipe pursuant to a security agreement it claimed to have with Permico purportedly granting HGC a UCC security interest in "all of Permico's right, title, and interest in… all [of Permico's] goods and equipment, whether existing as of the date of the Security Agreement or thereafter arising or acquired."

13

### G. *Corpac sent notice of, and recorded, statutory liens against the Pipe and Permico's Pipeline under state law*.

59. When Permico ultimately failed to pay for the Pipe, Corpac filed and served notice to Permico of claims to statutory mechanic's liens on certain property, including the Pipe and on the Project's pipelines in relation to the Second Amended Purchase Orders. Notice and Affidavits in Support of the Mechanic's liens were filed with the County Clerks in the Texas Counties of Harris, Chambers, Matagorda, Nueces and Ward. Each of the notices and affidavits recited that "Neither Corpac nor Permico believe or maintain that the Pipe has been delivered to Permico under the terms of the [Purchase Order[s]. However, HGC Midstream INV LLC has asserted that the Pipe has already been delivered to Permico" or words of similar effect.

60. Several of the notices and lien affidavits noted that the relevant purchase orders related to "the production of certain specially fabricated pipe material." Under the Texas Property Code, a materialman that contracts to provide specially fabricated material may claim a lien related to the unpaid debt for such material even if it was never delivered.

61. The affidavits asserting Corpac's various liens are recorded in the County Clerk's records as set forth in the following table:

| Texas County | Recording Date | Record Information – Document Number | Lien Amount |
| --- | --- | --- | --- |
| Chambers | March 27, 2020 | 2020-152177 | $65,845,121 |
| Chambers | March 27, 2020 | 2020-152178 | $17,154,639 |
| Harris | March 31, 2020 | RP-2020-138954 | $65,845,121 |
| Harris | March 31, 2020 | RP 2020-138955 | $17,154,639 |
| Matagorda | April 3, 2020 | 2020-1754 | $65,845,121 |
| Matagorda | April 3, 2020 | 2020-1755 | $17,154,639 |
| Nueces | April 7, 2020 | 2020014643 | $65,845,121 |
| Nueces | April 7, 2020 | 2020014644 | $17,154,639 |

| Texas County | Recording Date | Record Information – Document Number | Lien Amount |
|---|---|---|---|
| Ward | April 13, 2020 | 2020-1751 | $65,845,121 |
| Ward | April 13, 2020 | 2020-1750 | $17,154,639 |

## FIRST CAUSE OF ACTION

### (Declaratory Judgment)

62. Corpac realleges and incorporates herein by reference each and every allegation and paragraph set forth previously.

63. Pursuant to the 28 U.S.C. §§2201 and 2202, Court should determine and declare that title to the Pipe did not pass to the Debtor, that it remains Corpac's property, and that none of the Pipe is property of the Debtor's estate under Section 541 of the Bankruptcy Code.

## SECOND CAUSE OF ACTION

### (Determination of Validity, Extent and Priority of HGC's Lien and Declaratory Judgment)

64. Corpac realleges and incorporates herein by reference each and every allegation and paragraph set forth previously.

65. Pursuant to 28 U.S.C. §§157, 2201, and 2202, the Court should determine and declare that HGC has no security interest in the Pipe.

## THIRD CAUSE OF ACTION

### (Determination of Validity, Extent and Priority of Corpac's Liens and Declaratory Judgment)

66. Corpac realleges and incorporates herein by reference each and every allegation and paragraph set forth previously.

67. Pursuant to 28 U.S.C. §§157, 2201, and 2202, the Court should determine and declare that Corpac has a valid and first priority statutory lien against certain property of the Debtor's estate (including the Pipeline) under Chapter 53 of the Texas Property Code as a result

of Permico's failure to pay the amounts owed to Corpac for Corpac's fabrication and procurement of specially fabricated material pursuant to the Second Amended Purchase Orders.

68. Alternatively, if the Court determines that title to the Pipe passed to passed to Permico (which Corpac vigorously disputes), then the Court should determine and declare that Corpac has a valid and first priority statutory lien under Chapter 56 of the Texas Property Code on the Pipeline and the Pipe.

## PRAYER FOR RELIEF

Corpac respectfully requests that this Court do the following:

1. Issue a declaratory judgment and determination that title to the Pipe did not pass to the Debtor, that it remains Corpac's property, and that none of the Pipe is property of the Debtor's estate under Section 541 of the Bankruptcy Code.

2. Issue a declaratory judgment and determination that HGC has no security interest in the Pipe.

3. Issue a declaratory judgment and determination that Corpac has a valid and first priority statutory lien against the Pipeline under Chapter 53 of the Texas Property Code with respect to those portions of the Pipe which have been specially manufactured.

4. Issue a declaratory judgment and determination that if title to the Pipe passed to the Debtor (which Corpac disputes), then Corpac has a valid and first priority statutory lien against certain property of the Debtor's estate (including the Pipeline) under Chapters 53 and/or 56 of the Texas Property Code.

5. Grant Corpac such other and further relief to which it is entitled, including judgment for costs.

16

Dated: May 12, 2020.

Respectfully submitted,

/s/ Joseph S. Cohen

_____

Of Counsel:

ROSENTHAL LAW FIRM, P.L.L.C.
Trent L. Rosenthal
Texas Bar No. 17282300
E: trosenthal@rosenthallaw.com
675 Bering Drive, Suite 150
Houston, Texas 77057
T: (713) 647-8177
F: (713) 647-8127

- and -

REESE MARKETOS, LLP
Pete Marketos
Texas Bar No. 24013101
E: pete.marketos@rm-firm.com
Brett S. Rosenthal
Texas Bar No. 24080096
E: brett.rosenthal@rm-firm.com
750 N. Saint Paul Street, Suite 600
Dallas, Texas 75201
T: (214) 382-9810
F: (214) 501-0731

Joseph S. Cohen
Texas Bar No. 04503720
S.D. Texas No. 2495
675 Bering Drive, Suite 150
Houston, Texas 77057
T: (713) 647-8177
F: (713) 647- 8127
E: jcohen@rosenthallaw.com

***Attorney in Charge for Plaintiff
Corpac Steel Products Corp.***