**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>PERMICO MIDSTREAM PARTNERS<br>HOLDINGS, LLC, *et al.*,<br><br>Debtors.[1] | § Chapter 11<br>§<br>§ Case No. 20-32437 (MI)<br>§<br>§ (Jointly Administered)<br>§<br>§ |

**HGC MIDSTREAM INV, LLC'S**
**OBJECTION TO PERMICO ENERGIA, LLC'S EMERGENCY**
**MOTION TO DISMISS BANKRUPTCY CASES PURSUANT TO 11 U.S.C. § 1112(B)**

HGC Midstream INV, LLC ("HGC"), as a Series A Member of Permico Midstream Partners Holdings, LLC ("Holdings"), hereby files this objection (the "Objection") to *Permico Energia, LLC's Emergency Motion to Dismiss Bankruptcy Cases Pursuant to 11 U.S.C. § 1112(b)* [Docket No. 22] (the "Motion") and respectfully states as follows:

**PRELIMINARY STATEMENT[2]**

1. The Motion should be denied because, under the governing transaction documents, HGC validly exercised its right to remove Permico Energia LLC ("Energia") as Manager of Holdings based on its numerous defaults, gross mismanagement of the project, and failure to achieve financing by the absolute deadline under such transaction documents. HGC also properly removed directors appointed by Energia and the other sponsor, and appointed replacement directors of Holdings who validly authorized the filing of these bankruptcy cases.

---

[1] The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Permico Midstream Partners Holdings, LLC (6374) and Permico Midstream Partners LLC (7902). The location of the Debtors' corporate headquarters and service address is 9301 Southwest Freeway, Suite 308, Houston, TX 77074.

[2] Capitalized terms used but not otherwise defined in the Preliminary Statement have the meaning ascribed to them herein.

2.      As discussed further below, HGC agreed to provide the bulk of the funding for Holdings' $79.7 million Development Budget, which provides funding for the development (but not construction) of the Project (the "<u>Development Phase</u>") to enable Holdings to achieve Project Debt Financing and Project Equity Financing to complete the Project ("<u>Financial Close</u>" or "<u>FID</u>"). As the secured lender under the Development Loan Agreement, HGC has loaned Permico Midstream Partners LLC ("<u>Permico</u>") $30 million. As a Series A Member under the LLC Agreement, HGC has contributed to Holdings approximately $6.1 million in capital, with a commitment (if all conditions are met) to contribute an additional $39 million. Energia and Conquista, by contrast, have contributed only a combined $10 million in capital, with no further commitment to provide additional capital.

3.      Under Holdings' LLC Agreement, Holdings and Energia agreed to develop the Project in accordance with the Development Budget (and associated schedule) and consistent with the Project Pro Forma. Holdings and Energia also agreed they would not take certain actions, such as making payments, incurring contractual obligations and liens, and purchasing assets that were not in accordance with the Development Budget or the Project Pro Forma. The LLC Agreement and the Development Loan Agreement provide HGC the right to extensive information about the Company and the Project. However, information furnished by Holdings was regularly incomplete and insufficient, raising only more questions than they answered, and Holdings used HGC's requests for clarification and explanation as an excuse to blame HGC for Holdings' delays.

4.      Based on the allegations in the Motion, HGC allegedly soured on the Project approximately six weeks after providing $30 million in funding for no reason whatsoever and then devised a scheme to improperly delay additional funding for over ten months (while at the same time funding an additional $6.1 million and offering to fund a further $6.4 million under certain

conditions) so it could assert that various Removal Events had occurred, thereby allowing HGC to remove and replace Holdings' Board and Manager and file these Chapter 11 Cases. To say this version of events strains credulity is an understatement. In reality, as discussed further below, the Debtors' and Energia's numerous material defaults precipitated the disputed capital calls and eventually led to the removal of Holdings' Board and Manager and the filing of these Chapter 11 Cases.

5.      First, although HGC did not discover the full details until later, in May 2019 the Debtors ordered over $177 million of pipe in direct violation of multiple provisions of the LLC Agreement and the Development Loan Agreement. Thus, the Debtors' first material breach of the LLC Agreement and the Development Loan Agreement—which Energia makes only one oblique reference to fourteen pages into the Motion—occurred almost immediately after the parties entered into the definitive documents and before the Debtors even issued the First Capital Call. For further context, Holdings' LLC Agreement and the Development Loan Agreement included a Development Budget with a total budget of approximately $79.7 million. In other words, the Debtors spent more than double the entire Development Budget on pipe alone, even though the Debtors were obligated to *both* notify HGC and obtain its approval prior to making any modifications to the Development Budget, executing any equipment supply agreement in excess of $5 million, or incurring liens.

6.      Additionally, the Debtors' unexplained changes to the Development Budget and delays in the Project's milestones, which were improperly reported to HGC upon submission of the First Capital Call, together with other unsatisfied capital call conditions caused HGC to dispute the capital call notice and request additional information not in its possession. Despite suggestions to the contrary in the Motion, HGC was fully entitled to make such requests under the LLC

3

Agreement because Holdings had not satisfied the requirements of a valid capital call. After multiple information requests and the parties entering into a waiver letter, pursuant to which the Debtors withdrew the First Capital Call, HGC (i) funded $6.1 million for a substantial number of expenses, including a $2 million surplus for ongoing operating expenses, and (ii) conditioned further funding on the Debtors' compliance with a revised Development Budget and a remedial action plan to address the milestone delays. Soon after sending a revised proposed Development Budget with numerous unexplained, material changes, the Debtors issued the Second Capital Call that HGC also disputed because of delayed milestones and substantial variances to the Development Budget.

7.      Notwithstanding the foregoing deficiencies, HGC continued to work in good faith to obtain additional information from the Debtors that would allow it to evaluate the funding requests and the appropriate next steps for the Project, but the information the Debtors provided continually lacked transparency and failed to address HGC's valid requests. HGC's third party consultants, Arup and Alvarez & Marsal, agreed that the Debtors' accounting and financial reporting practices and the lack of information provided by the Debtors raised serious concerns that the Project could be completed in a timely manner consistent with the Development Budget.

8.      Throughout the discussions regarding the delayed milestones and the Development Budget deviations, as exemplified by numerous statements in the Motion, the Debtors' and Energia's position was that they understand the midstream oil and gas industry better than anyone else, and therefore any decision they make—even if in direct contravention of the applicable agreements with HGC—is reasonable and necessary. Unfortunately for the Debtors and HGC, the Debtors' hubris has resulted in cost overruns, delays and the project incurring over $177 million in pipe purchase obligations, twice the amount of the Development Budget, without any ability to

pay. These have undermined the Project's viability, and the only way to maximize value for all stakeholders is through a chapter 11 proceeding in this Court.

9.      Accordingly, on May 4, 2020 (after the April 30, 2020 deadline for the Debtors to obtain project equity financing had passed) HGC validly exercised its rights under the LLC Agreement and (i) removed Energia as the Manager of Holdings, (ii) removed the members of Holdings' Board of Directors appointed by Energia and Conquista, and (iii) appointed Sehwan Park, Howoo Shin, and Haeyoung Lee as members of Holdings' Board of Directors. The new Board then promptly authorized the filings of these Chapter 11 Cases. Because the filing of these cases was approved by a validly appointed Board of Holdings, the Court must deny the Motion.

## BACKGROUND

### A.  Formation of the Debtors

10.     Debtor Permico was originally formed by Energia on October 24, 2017 as a member-managed Texas limited liability company.

11.     Debtor Holdings is a Texas limited liability company formed on February 5, 2019. On April 30, 2019, Energia and Conquista Energy Services, LLC ("Conquista") contributed 100% of the limited liability company interests in Permico to Holdings, effective as of February 5, 2019, pursuant to a Contribution Agreement, dated as of April 30, 2019, by and between Energia and Permico (the "Contribution Agreement").

12.     Contemporaneously with the execution of the Contribution Agreement, (i) Permico and Holdings (collectively, the "Debtors") entered into the Amended and Restated Limited Liability Company Agreement of Permico Midstream Partners LLC, (ii) Holdings, Energia, Conquista, and HGC entered into the Amended and Restated Limited Liability Company Agreement for Holdings (the "LLC Agreement"), (iii) HGC subscribed for 100% of the Series A Membership Interests of Holdings pursuant to the Series A Limited Liability Company

Subscription Agreement (the "Subscription Agreement"), (iv) HGC and Permico entered into the Development Loan Agreement (as amended and in effect on the date hereof, the "Development Loan Agreement"), by and between Permico and HGC, and HGC made a $30 million secured loan to Permico pursuant to that agreement, (v) Permico entered into the Security Agreement in favor of HGC (the "Security Agreement"), and (vi) Energia and Conquista agreed to (a) guarantee Holdings' obligations under the LLC Agreement and the Subscription Agreement, (b) guarantee Permico's obligations under the Development Loan Agreement, and (c) indemnify Holdings and Permico in respect of their indemnification obligations under the Subscription Agreement and the Development Loan Agreement, in each case, pursuant to the Sponsor Guaranty and Pledge Agreement between HGC, Energia, Conquista, and Holdings (the "Sponsor Guaranty and Pledge Agreement").

13.     HGC is a special purpose entity formed to invest in the Holdings/PMP project. HGC is part of the Hanwha group, a Fortune Global 500 company based in South Korea whose business spans many industries, including chemicals and materials, aerospace and mechatronics, solar energy (manufacturing, power plant development and EPC), finance, engineering & construction, and services.

14.     Pursuant to the Development Loan Agreement, HGC loaned Permico $30 million to finance the development of a Y-Grade transportation and fractionation system connecting the Permian Basin to Corpus Christi and purity product end markets, including gathering pipelines, Y-Grade long-haul pipelines, fractionators, an ethane purity product pipeline, Y-Grade and purity product storage, and an LPG export terminal (the "Project").[3]

---

[3]     In addition to the loan amount, HGC (as the Series A Member of Holdings) also made a capital contribution to Holdings in the amount of approximately $6.1 million on July 1, 2019. HGC declined to make additional capital contributions until Holdings satisfied those conditions that had previously been agreed to in the June 28, 2019

15.     Permico granted to HGC, as security for the loan, a lien on and first priority security interest in, all of Permico's right, title and interest in, to and under the Collateral (as defined in the Security Agreement), including all tangible property of Permico and all Assigned Agreements (as defined in the Security Agreement), including any and all contracts, letters of intent, easements, licenses, rights of way or other agreements granting Permico any option to purchase, or any right to lease or use, real property, or granting to Permico any other right to or interest in real property. *See* Security Agreement, § 2.1.

16.     HGC agreed to provide the bulk of the funding for Holdings' $79.7 million Development Budget (as defined in the Development Loan Agreement), which provides funding for the Development Phase to enable Holdings to achieve Financial Close. As the secured lender under the Development Loan Agreement, HGC loaned Permico $30 million. As a Series A Member under the LLC Agreement, HGC also contributed approximately $6.1 million in capital to Holdings, with a commitment (if all conditions were met) to contribute an additional $39 million. Energia and Conquista, by contrast, contributed only a combined $10 million in capital, with no further commitment to provide additional capital. *See* Development Loan Agreement, § 2.3; *see also* LLC Agreement, §§ 4.5(s) and (t) and Exhibit A. Amendments to the Development Budget require HGC's approval. *See* Development Loan Agreement, § 1.1 (definition of Development Budget); LLC Agreement § 4.5(s).

17.     Holdings' LLC Agreement gives HGC the right to remove and replace Holdings' Manager and the Board of Directors designated by Energia and Conquista in the event that Energia or Holdings materially breaches their obligations under the LLC Agreement, except to the extent

---

Amended Capital Call because of the existing defaults discussed herein and the lack of required information provided by Permico. *See* LLC Agreement, Ex. D, ¶ 1.

that such material breach would not reasonably be expected to result in a material adverse effect and is cured within thirty (30) days after Holdings or Energia has knowledge of the material breach. *See* LLC Agreement, §§ 4.4(c)(iii) and (iv). [4] Furthermore, the failure of the Project Equity Financing to have occurred on or prior to April 30, 2020 (the "Long-Stop Date") without the redemption of HGC's Series A Membership Interests also constitutes a "Removal Event." *See id.* at § 4.4(c)(vii).

### B.  Events of Default and Removal Events under the LLC Agreement

18.     On November 21, 2019, HGC sent the Debtors a Notice of Default and Removal Event (the "Notice of Default"), which provided Holdings and Energia notice of the Events of Default and Removal Events under the LLC Agreement (as well as other agreements) discussed herein that had occurred as of those dates.

### i.  Unauthorized Execution of the Line Pipe Orders and Acquisition of Line Pipe

19.     Section 4.5 of the LLC Agreement defines the actions that "[Holdings] will not take, nor, as applicable, cause or permit any Subsidiary to take . . . without Series A Member Approval." This includes at subsection (v):

> execute, amend, or modify any rights or obligations under any provision of any engineering, procurement and construction agreement, equipment supply agreement, operations and maintenance agreement, technology license agreement, real property agreement, gas transportation agreement; fractionation agreement; tolling agreement; offtake agreement; dedication agreement; gas supply agreement; service agreement; management agreement; or other material agreement with respect to the development, construction, financing, commissioning, ownership or operation of the Project that, in each case, directly requires the payment or receipt of an amount greater than $5,000,000 over the term of such agreement, or any guaranty of any of the foregoing ("Material Contracts"), except to the extent that any such execution, amendment, or modification is in accordance with the Development Budget and would not adversely impact the Project Pro Forma.

---

[4]     In addition to the three Board members originally appointed by Energia and Conquista, HGC also appointed a Board member. *See* LLC Agreement, § 4.1(b).

20.     Although almost completely ignored by Energia in its Motion, in May 2019, less than six weeks after the parties entered into the LLC Agreement and the Development Loan Agreement, Permico executed the following line pipe orders without HGC's consent: (i) three purchase orders dated May 7, 2019 with Corpac Steel Products Corp. ("Corpac") for certain line pipe in the amount of approximately $29,904,520.00, $18,273,193.10, and $47,604,329.74 respectively; and (ii) three purchase orders dated May 14, 2019 with Edgen Murray Corporation ("Edgen") for certain line pipe in the amount of approximately $16,701,102.90, $35,478,460.80, and $29,478,368.00 respectively (collectively, the "Line Pipe Orders"). The Line Pipe Orders total $177.4 million—a figure that is more than double the total Development Budget of approximately $79.7 million for the entire Development Phase of the Project.

21.     Holdings was required to obtain HGC's approval for the Line Pipe Orders before they were executed because they are (i) equipment supply agreements that require payment of an amount greater than $5 million over the term of such agreements, and (ii) not in accordance with the Development Budget and clearly adversely impacted the Project Pro Forma. Holdings did not seek nor did it receive HGC's approval before Permico entered into the Line Pipe Orders.[5] Therefore, Holdings committed an Event of Default[6] when Permico entered into the Line Pipe Orders.

---

[5]   Although not discussed in the Motion, Holdings previously contended that it did not require HGC's approval for Permico to enter into the Line Pipe Orders, but this argument contradicts the clear language of section 4.5(v) of the LLC Agreement. Holdings was in fact required to obtain HGC's approval "except to the extent that any such execution, amendment, or modification is in accordance with the Development Budget and would not adversely impact the Project Pro Forma." Holdings' prior assertion that HGC's consent was not required because the line pipe purchase orders were Material Contracts that "do not adversely impact the Project Pro-Forma because they are specifically contemplated in the Project Pro-Forma" completely ignores the first requirement that such Material Contracts be in accordance with the Development Budget.

[6]   The LLC Agreement defines "Event of Default" to include "(iv) the occurrence of any event which could reasonably be expected to result in a material adverse effect on the Company, any Subsidiary or the Project, and, if such event is susceptible of cure, the event is not remedied within 60 days of the Manager receiving knowledge

22.     As a result of Permico's improper execution of the Line Pipe Orders, Permico incurred substantial unapproved expenses, which appeared in the revised Development Budget Holdings submitted to HGC for approval on July 24, 2019—more than two months after Permico had entered into the Line Pipe Orders—as a new line item labeled "line pipe payments and holding fees", in the amount of $9.97 million. This revised Development Budget was never approved.

23.     The true nature of the Line Pipe Orders and the terms contained therein was misrepresented by Holdings to HGC, including during meetings held on August 5 and September 3, 2019. In those meetings, Holdings explained that the holding fee was essentially an option fee, and that if Holdings did not pay this holding fee they would lose the pipe (and there would no longer be an obligation to purchase the pipe). This explanation is inconsistent with the terms of the Line Pipe Orders, which contain firm obligations to purchase the line pipe.

24.     Further, the Line Pipe Orders are problematic because the commitment to purchase $177.4 million of line pipe will undoubtedly have an adverse impact on Holdings' ability to obtain both debt and equity financing, as necessary under the Project Pro Forma. Any future investor would have to take into consideration that Permico has committed itself to a very substantial liability during the development phase of the Project, and a significant portion of any future funds invested would likely have to be spent on this line pipe.

25.     In addition, Permico cannot enter into any contracts (including purchase orders) under which Permico is obligated to pay more than $300,000 over the term of the contract, unless such contract is in accordance with the Development Budget *and* such contract would not

---

thereof, [and] (v) any breach or default of any representation, warranty, covenant, indemnity or agreement of the Company, the Manager, the Sponsor, or Conquista under this Agreement or any other Transaction Agreement and, if such misrepresentation, breach of warranty, covenant, indemnity or agreement is susceptible of cure, such misrepresentation or breach is not remedied within 60 days of the Manager receiving knowledge thereof…."

adversely impact the (i) construction budget, (ii) the debt and equity financing plan, and (iii) the base case financial projections of Holdings, Permico and their subsidiaries for the Project (the "Project Pro Forma"). *See id.* at § 7.7(a); *see also* LLC Agreement, § 4.5(cc).

26.    Permico's execution of the Line Pipe Orders without HGC's consent and acquisition of the line pipe materially breached, among other provisions, sections 4.5(s), (t), (v), and (cc) of the LLC Agreement and section 7.7(a) of the Development Loan Agreement and was not cured within 30 days. Thus, it also constituted a Removal Event under section 4.4(c)(iii) and (iv) of the LLC Agreement.

27.    By email dated October 3, 2019, Holdings further confirmed that all of the Line Pipe Orders had already been manufactured and were already delivered or in the process of being delivered.[7] Accordingly, HGC's first priority lien attached to the pipe when titled passed to Permico upon delivery, and any subsequent attempt to transfer title back to Corpac or Edgen would not be free and clear of HGC's lien and would constitute a preference or fraudulent transfer.

28.    Furthermore, to the extent that these Line Pipe Orders allowed the pipe vendors to obtain a lien on any of Permico's assets, this also constitutes a breach of Section 7.2 of the Loan Agreement, which provides that Permico shall not allow a lien to be created on Permico's property except for Permitted Liens. Permitted Liens include "materialmen's warehousemen's, mechanic's, repairmen's and other similar Liens arising in the ordinary course of business securing payment not yet due or payable or being contested in good faith by appropriate proceedings, which amounts have been appropriately reserved in accordance with GAAP or bonded over in accordance with

---

[7]    Corpac filed an adversary proceeding in this Court (Case No. 20-03126) seeking a declaratory judgment that (i) the pipe is not property of the Debtors' estates, (ii) HGC does not have a security interest in the pipe, and (iii) Corpac has a valid and first priority lien over the Debtors' pipeline and certain other property under Chapter 53 of the Texas Property Code regardless whether the pipe was ever delivered.

Applicable Law, and which will not materially detract from the value of or materially interfere with the current or anticipated use of the Project." Development Loan Agreement, p. 9. Because Permico did not accrue or bond for the amount of Corpac's alleged liens, Corpac's liens were not a "Permitted Lien." This also breaches section 4.5(z) of the LLC Agreement, which requires Series A Member approval to encumber the assets of the Company or any Subsidiary in excess of $250,000.

### ii. Failure to Diligently Pursue Completion of the Project in accordance with the Development Budget

29.     Holdings and Energia have failed to diligently pursue completion of the development of the Project in accordance with the Development Budget, the development schedule, and consistent with the Project Pro Forma as required by section 4.4(b)(i) of the LLC Agreement. As of the Petition Date (as defined below) the Debtors have not yet completed even those milestones listed for completion by July 15, 2019 under the Development Schedule attached to the LLC Agreement.

30.     Holdings, Energia, and Conquista represented and warranted in section 3.8(h) of the LLC Agreement that "All information relating to the business, assets, liabilities, operations, financial condition and prospects of [Holdings] and/or its businesses furnished by or on behalf of [Holdings] (other than forecasts and projections) to [HGC] has been, when taken as a whole in light of the circumstances under which the information was provided at the time it was furnished, accurate and complete in all material respects and not materially misleading." The Development Budget and the Development Schedule were key elements of the LLC Agreement that HGC relied

on when deciding to invest in the Project, and were designed to ensure the prudent and timely development of the Project.[8]

31.     On June 18, 2019, only six weeks after Holdings provided the Development Budget attached to the LLC Agreement, Holdings issued the First Capital Call (as defined below) that reflected ten delayed milestones (almost a third of the milestones to be completed by June 18, 2019). These substantial delays had occurred even before the First Capital Call had been submitted by Holdings to HGC. The First Capital Call further included a revised Development Budget that totaled the same $79,747,834 set forth in the original Development Budget even though the majority of individual line item amounts had changed, in one instance by as much as $2.3 million. In response, HGC disputed the First Capital Call and sought information from Holdings about the changes and the delays in accordance with the LLC Agreement. Holdings failed to provide clear and meaningful information to explain the budget variations and schedule delays.

32.     Just over a month later, on July 24, 2019, Holdings sent HGC another proposed amended Development Budget (the "July 24 Development Budget"), which this time reflected thirteen delayed milestones (almost a third of the milestones to be completed by July 24, 2019). The July 24 Development Budget again totaled $79,747,834 even though the majority of individual line item amounts had again been changed. For example, in the original Development Budget, the total "Spend Estimate to Financial Close" for the pipeline development and engineering costs associated with the Companero Y Grade and Simpatico was $55,541,084, but the July 24 Development Budget estimate was only $42,636,281. Holdings failed to provide a reasonable explanation for this substantial $13 million variance. Moreover, the July 24 Development Budget

---

[8]     The centrality of the Development Budget and its importance to HGC at the time it entered into the LLC Agreement is reflected throughout the Agreement, including Sections 4.2(a), 4.5(s), 4.5(t), 4.5(v), 4.5(cc), 4.5(dd), 5.2(b), and Exhibits C and D.

included for the first time a $9,965,000 line item for "Line Pipe Payments and Holding Fees." Similarly, the original Development Budget reserved $7,571,887 for "Contingency" expenses. In the July 24 Development Budget, that amount doubled to $15,449,467. And the amount for "Engineering/Program Management" decreased from $15,117,339 in the original Development Budget to $6,503,272 in the July 24 Development Budget.

33.     The same issues occurred in the August 28, 2019 Development Budget that Holdings provided. Despite numerous differences between the August 28, 2019 Development Budget and the July 24 Development Budget, the total Development Budget of $79,747,834 did not change by a single dollar. Holdings explained that "certain modifications were necessary to the Development Budget in order to react to and navigate current realities of the Project" and dismissively responded that, contrary to the representations in the LLC Agreement, "the milestones described in the Development Budget were never intended to be guaranteed dates." However, more troubling than the proposed modifications to the Project milestones was the lack of relevant information provided and any reasonable remedial action plan to account for the material changes and delays.

34.     Further evidencing the failure of Holdings to develop the Project in accordance with the Development Budget and consistent with the Project Pro Forma is Holdings' failure to adequately negotiate the offtake agreements (agreements with producers to transport, store, fractionate and provide other services for their mixed NGL's and purity products), which are critical in order for the Project to reach Project Debt Financing and Project Equity Financing ("Funding"), and thereby reach FID. Holdings' initial estimate for reaching Funding was July 2019. However, in July and August 2019 Holdings was still representing that it was within a few weeks of executing offtake agreements. Then on September 12, Holdings surprised HGC by providing a

further update stating that initial drafts of the agreements had just been sent to two of the five counterparties in early September, and that initial term sheets had been sent to two other counterparties during the last week of August. These failures to successfully negotiate and execute the offtake agreements within the necessary timeframe to achieve timely Funding and FID represented a substantial departure from Holdings' initial representations. To date, HGC has yet to receive confirmation from Holdings that a single offtake agreement has been executed with a counterparty.[9]

35.     Each of the events and modifications to the Development Budget described above (i) constitute a failure by Holdings to diligently pursue completion of the development of the Project in accordance with the Development Budget and consistent with the Project Pro Forma (as required in section 4.4(b)(i) of the LLC Agreement), (ii) could reasonably have been expected to result in a material adverse effect on Holdings or the Project, and as such, constituted an "Event of Default," and (iii) required Energia to notify HGC that an event had occurred that could reasonably have been expected to result in a material adverse effect on the ability of Holdings to achieve the date of Project Debt Finance or Project Equity Finance in accordance with the Project Pro Forma and as required in Section 7.1(b)(v) of the LLC Agreement. Holdings' failure to comply with each of these requirements as they relate to the events described above constitutes a separate Event of Default under the terms of the LLC Agreement, and the failure to diligently pursue completion of the Project in accordance with the Development Budget constitutes a Removal Event under section 4.4(c)(iii) and (iv) of the LLC Agreement.

---

[9]     The Motion asserts that "prior to the filing of the Cases, Debtor PMP had reached terms with a third party on a commercial agreement that, when combined with other commercial agreements that had previously been negotiated and agreed to, would sell enough throughput from the pipeline to make the entire Pipeline Project financially viable." Motion ¶ 46. Not only does the Motion fail to provide any details of this supposed new agreement, it fails to provide any details regarding the supposed previous agreements. To date, the Debtors have not provided HGC with proof of any executed offtake agreements.

### iii. Failure to Close on Project Equity Financing or to Redeem HGC's Membership Interests

36.     As discussed above, the LLC Agreement required Holdings and Energia to take all actions reasonably necessary to obtain the Project Equity Financing and the Project Debt Financing by the Long-Stop Date, and Holdings is required to redeem HGC's Series A membership interests if the Long-Stop Date occurred before Holdings obtained the Project Equity Financing. *See* LLC Agreement, §§ 4.4(b)(iv) and 5.5(a). As of the date of this Objection, neither has occurred. The requirement to obtain the financing by the Long-Stop Date was a critical component of the LLC Agreement because it would ensure the timely completion of the Project, and failure to obtain Project Equity Financing and to redeem HGC's Series A membership interests constitute an express Removal Event. *See id.* at § 4.4(c)(vii).

37.     HGC never received any evidence of a realistic proposal to redeem HGC's Series A membership interests.[10] For example, Todd Culwell, the Debtors' pre-bankruptcy outside counsel, claimed in a March 23, 2020 email that "We have received a proposal for new equity" and further requested an extension of the Long-Stop Date to give Energia "time to finalize documentation and align with the pipe manufacturers." HGC requested that the Debtors provide any documentation (*i.e.* a term sheet or LOI) or emails available relating to this proposal, but nothing further was provided (and no response was received) prior to April 30, 2020.

38.     The only "offer" HGC received was on April 30, 2020, when Holdings sent a non-binding Letter of Intent, which was executed on April 30, 2020, with numerous significant

---

[10]   In the Motion Energia makes contradictory statements regarding the Debtors ability to obtain additional financing or to redeem HGC's Series A membership interests. In paragraph 43 Energia contends that the Debtors sent a proposal from a third party that would have almost paid HGC in full but then later argues, without any evidentiary support, that "Hanwha's funding failures made it impossible for Holdings to obtain final project financing by April 30, 2020." *Cf.* Motion, ¶ 43 with ¶ 54. Whether it was possible or not despite the Debtors' mismanagement and numerous defaults, the key point is that the Debtors did not obtain Project Equity Financing or redeem HGC's Series A membership interests by the Long-Stop Date.

contingencies, including obtaining financing for the transaction, conducting business, financial, tax and environmental due diligence, and negotiating and executing definitive documents, with a target close date within 90 days that may need to be extended. This non-binding "offer" fell well short of the LLC Agreement's requirement that HGC's Series A membership interests must be redeemed on or prior to April 30, 2020 absent Holdings obtaining Project Equity Financing.

### iv.   Failure to Execute, Deliver, and Record Certain Mortgages

39.      Section 2.2 of the Security Agreement provides that the parties' intention was that the description of the Collateral set forth in section 2.1 of the Security Agreement be sufficient to enable HGC, upon exercise of its remedies set forth in the Security Agreement, to (a) take possession of, and foreclose upon, all of the right, title and interest of Permico in and to the Project and any and all real property and personal property of Permico, tangible and intangible, used or usable in connection therewith, and (b) operate, sell, lease, license or otherwise dispose of the entire interest of Permico in and to the Project or any part thereof, in each case, upon the occurrence and during the continuance of an Event of Default under the Security Agreement.

40.      Section 2.8 of the Security Agreement requires Permico to take all such actions and authenticate or sign and file or record such records or instruments, as are necessary or as HGC may request to perfect and establish the priority of the liens granted by the Security Agreement in any and all of the Collateral or to enable HGC to exercise its remedies, rights, powers and privileges under the Security Agreement. In addition, section 2.9 of the Security Agreement requires Permico, at its expense, to (a) promptly execute and deliver all further agreements, instruments and documents, and (b) take all further action, that may be necessary or advisable, or that HGC reasonably determines may be necessary or advisable, in order to create, perfect, or

protect any security interest granted or purported to be granted thereby, or to enable HGC to exercise and enforce its rights and remedies thereunder with respect to the Collateral.

41.     On November 8, 2019, HGC delivered a notice to Permico demanding that Permico, within fifteen (15) days after the date thereof, (a) duly execute and deliver to HGC a mortgage with HGC, as secured party, in form and substance reasonably satisfactory to HGC and in appropriate form for recording, pursuant to which HGC, as secured party, shall obtain, as security for the obligations, a first priority lien (subject only to Permitted Liens (as defined in the Security Agreement)) in all of the rights of Permico in and to (i) all of the interests in real property described on Annex 1 attached thereto and (ii) all other interests in real property, including all leasehold interest options or easements, held by Permico as of the date hereof (the "Mortgages") and (b) make all recordings (including recording the Mortgages in the county recorder's office of the applicable jurisdiction(s) in which any such interests in real property is located) and filings, and pay all fees, charges and taxes necessary to cause such recordings and filings, to perfect such lien. As of the Petition Date, Permico has not executed and delivered the Mortgages to HGC, which constitutes an Event of Default and a Removal Event under section 4.4(c)(iii) and (iv) of the LLC Agreement.

### C.  Disputed Capital Calls

42.     Pursuant to section 5.2(b)(i) of the LLC Agreement, Holdings was permitted, twice per month, to request capital contributions from HGC for Approved Purposes[11] as long as each of the conditions set forth in Exhibit D to the LLC Agreement were satisfied. Among other conditions

---

[11]  "Approved Purposes" is defined in the LLC Agreement as "project development activities with respect to the Project undertaken in accordance with the Development Budget, including the development activities described in the Development Budget and other development activities not expressly described in the Development Budget, but reasonably necessary for the development of the Project in accordance with the Development Budget. 'Approved Purposes' shall not include any reimbursement of costs of, or for payment of any amounts to, any member of the Sponsor Group or any Related Person, unless approved by Series A Member Approval."

included in Exhibit D (Series A Capital Conditions), (i) Holdings was required to be in compliance with the Development Budget, with any deviated amounts approved by HGC, such approval not to be unreasonably withheld; (ii) all development milestones whose outside completion date set forth in the Development Budget was before the capital contribution date have occurred, or Holdings has complied with any milestone remedial action plan approved by HGC; (iii) no Event of Default shall have occurred under the LLC Agreement and no material default shall have occurred under any other transaction document; and (iv) at least five business days prior to the capital call HGC shall have received a draft of the written report to be issued by the independent engineer of the Project, which draft report shall not indicate any circumstance that is reasonably expected to have a material adverse effect on Holdings' ability to achieve the Project Equity Financing and Project Debt Financing by the Long-Stop Date.

43.     HGC is entitled to dispute any capital call by providing written notice to Energia within three business days after receipt of a capital call. *See* LLC Agreement, § 5.2(b)(ii). The written notice must dispute, in good faith, whether the requirements of section 5.2(b) have been satisfied. *See id.* Upon delivery of a capital call dispute notice, the capital call shall be deemed automatically withdrawn. *See id.*

### i.   June 18, 2019 Capital Call

44.     As discussed above, Holdings issued the first Series A Capital Call Notice on June 18, 2019 (the "First Capital Call"), after the Debtors had already breached the LLC Agreement and the Development Loan Agreement by entering into the Line Pipe Orders over one month earlier.

45.     HGC promptly disputed the First Capital Call in a written notice dated June 21, 2019 pursuant to section 5.2(b)(ii) and Exhibit D of the LLC Agreement because of numerous

defects in the capital call notice (the "<u>First Capital Call Dispute Notice</u>"). HGC objected in good faith to, among other things, (i) the lack of detail in the First Capital Call related to the use of the requested proceeds from HGC,[12] (ii) the revised development milestones because Holdings had not submitted any milestone remedial action plan for approval by HGC, (iii) the modifications to the Development Budget, which had not received HGC's approval and (iv) modifications to disclosure schedules without providing any supporting information or documentation. Because of these deficiencies, in accordance with section 5.2(b)(ii) of the LLC Agreement, HGC requested additional information from Holdings about the unauthorized changes to the Development Budget and the Project milestones and disclosure schedule modifications, however, Holdings failed to provide clear and meaningful information to explain these deviations. Upon delivery of the First Capital Call Dispute Notice, the First Capital Call was deemed automatically withdrawn pursuant to the terms of the LLC Agreement. *See* LLC Agreement, § 5.2(b)(ii).

46.     Although as of June 18, 2019 the Debtors had already entered into approximately $177.4 million of Line Pipe Orders, as noted above, the First Capital Call sought to modify disclosure schedules by mentioning the Corpac orders in the amount of approximately $95.78 million on the final page of the First Capital Call without providing any supporting information or documentation, and without any related revisions to any line items in the Development Budget. As discussed above, the Debtors never sought HGC's approval of the Line Pipe Orders as required by the LLC Agreement.

---

[12]   The First Capital Call simply quoted the definition of Approved Purposes in its description of how the proceeds would be used: "Use of Proceeds: Project development activities with respect to the Project undertaken in accordance with the (a) Development Budget, including the development activities described in the Development Budget and other development activities not expressly described in the Development Budget, but reasonably necessary for the development of the Project in accordance with the Development Budget and (b) the Project Pro Forma." However, Section 5.2(b)(ii) of the LLC Agreement requires "a description in reasonable detail of the Approved Purposes of the Series A Capital Call".

47.     The Motion strangely notes that weeks before Energia issued the First Capital Call the Debtors had discussed the potential first capital call with HGC and no one from HGC objected to the then non-existent capital call, *see* Motion, ¶ 18, as if the failure to object before a capital call was issued somehow negated the provisions of the LLC Agreement governing the requirements of a valid capital call and HGC's ability to dispute a non-conforming capital call. In the Motion Energia also complains that "the new Hanwha team would prove itself to be uninterested in learning about or pursuing the Pipeline Project." *See id.* at ¶ 17. However, the information requests submitted by the HGC Houston team in relation to the modifications to the Development Budget and milestone schedule, HGC's hiring of consultants from Arup and Alvarez & Marsal at its own expense (as further described below), and the frequent communications with the Debtors undermines Energia's allegation that HGC's Houston team was uninterested in learning about or pursuing the Project.

48.     After HGC sent the First Capital Call Dispute Notice, the Debtors and HGC continued to discuss the Debtors' funding needs and HGC requested additional information to evaluate the revisions to the Development Budget and the delayed milestones in keeping with its duty to act in good faith with respect to disputing a capital call.[13] Despite the myriad issues with the First Capital Call and the continued delays with the Project, HGC granted a limited waiver of the capital call conditions to permit the funding of $6.1 million on July 1, 2019 to fund certain expenses because HGC was committed to the success of the Project. Holdings agreed in a June 28, 2019 waiver letter to withdraw the First Capital Call and agreed in the Covenants section to provide

---

[13]     HGC never insisted that it would "only meet capital calls in arrears, *after* third party invoices had been presented to [HGC]," Motion, ¶ 19, but in accordance with the Form of Series A Capital Call Notice attached to the LLC Agreement as Exhibit C, both the First and Second Capital Calls provided that the amounts requested were "required for Project costs for Approved Purposes owing during the period that is two (2) weeks following the Contribution Date." Accordingly, any proposed costs that would accrue more than two weeks after the Contribution Date would need to be part of a subsequent capital call.

a revised development schedule and development budget, milestone remedial action plan, material contracts and financial statements, and other project-related data such as a list of all executed material contracts by July 19, 2019.

ii.     **July 24, 2019 Capital Call**

49.     Despite the fact that these ongoing issues were still being resolved and the revised development budget and schedule, and milestone remedial action plan had not yet been approved, the Debtors moved forward with issuing another capital call on July 24, 2019 for an additional $12,040,390 (the "Second Capital Call"). The Second Capital Call again conceded that the Debtors were not in compliance with the development milestones and the Development Budget. On July 26, 2019, HGC submitted a written notice to the Debtors disputing the Second Capital Call pursuant to section 5.2(b)(ii) of the LLC Agreement (the "Second Capital Call Dispute Notice"). Among other things, the Second Capital Call Dispute Notice objected to the failure to meet the development milestones and the unauthorized deviations from the Development Budget.

50.     An additional obstacle to funding Holdings' Second Capital Call arose when HGC learned that Energia had concealed John Porter's claim to an ownership interest in OSI Petro LLC, which is a partial owner of Energia. In addition to constituting a default of the Representations and Warranties contained in section 3.7 of the LLC Agreement, the undisclosed ownership dispute threw into doubt the validity of HGC's ownership interest, the LLC Agreement, and the Development Agreement, and exemplified the lack of information provided by the Debtors and the numerous management issues that distracted the Debtors from timely completing the Project milestones. HGC first learned of the ongoing ownership dispute when it received a letter from Porter's counsel on August 6, 2019. In accordance with the Series A Capital Call Conditions, HGC could not provide funding until this issue was resolved. Despite this ongoing ownership dispute,

HGC nevertheless continued to evaluate in good faith Holdings' Second Capital Call, as evidenced by HGC's continued due diligence throughout August and September 2019. HGC was not notified that this outstanding ownership dispute had been finally settled until September 17, 2019, when a Settlement Agreement was finally reached.

51.     Despite Holdings' apparent inability to deliver a Series A Capital Call Notice that complies with the clear requirements of the LLC Agreement, HGC continued to devote significant time and expense to further the Project. On July 29, 2019, HGC hired Arup Texas Inc. ("Arup"), a global engineering and infrastructure consultancy, to assist with HGC's review of the available project-related documents, financial model, project management performance, and the level of progress achieved to date. Arup quickly got up to speed and attended the August 5, 2019 and September 3, 2019 meetings with the Debtors' management.

52.     On September 18, 2019, Arup submitted a Project review report to HGC (the "Arup Report"). Arup concluded in its report that there was no reason for concern on the over-all design of the Project and the proposed total investment amount was consistent with other similar projects, however, the following issues were noted in the report (i) the management plan, systems, and personnel employed by the Debtors were insufficient for a project of this size and jeopardized timely FID, (ii) the accounting practices and availability of information raised concerns over the ability to close the Project Equity Financing and the Project Debt Financing in a timely manner, (iii) the Debtors had not demonstrated the capability or capacity to properly track and report their financial condition, and (iv) the lack of transparency and realistic awareness of the progress toward FID, especially regarding the progress on commercial agreements, development schedule and budget raises serious concerns as to the viability of the development under the current management.

53.     These findings were further supported by another advisor HGC retained, Alvarez & Marsal, a global consulting firm with substantial experience in the energy industry, on August 26, 2019 to assist with reviewing the Debtors' project management and reporting of the Project from a financial and accounting perspective. Alvarez & Marsal worked together with Arup and similarly found issues with the financial reporting provided by Holdings to HGC, including a lack of detailed information contained within such reports. Additionally, Alvarez & Marsal found the Development Budget to be deficient with respect to its unrealistic timeline and missing and unrealistic costs and expenses.

54.     Despite these various deficiencies, HGC subsequently again offered to waive certain Series A Capital Call Conditions to permit an additional $6.4 million in funding in September 2019, subject to reasonable conditions designed to address issues related to Energia's management of the Project. Energia rejected HGC's offer and failed to ever satisfy the conditions contained in the first waiver letter dated June 28, 2019.

55.     On November 21, 2019, HGC sent the Debtors and Energia the Notice of Default and Removal Event, which included a demand for Holdings to redeem HGC's Series A membership interests as a result of certain Events of Default pursuant to section 5.5(c) of the LLC Agreement. As explained above, Holdings has not redeemed the membership interests, even though the Long-Stop Date has now passed. The Notice of Default also terminated the remaining commitments under section 2.1 of the Development Loan Agreement.

**D.  Appointment of Board and Authority to File Bankruptcy**

56.     On May 4, 2020, just prior to the filing of the Chapter 11 Cases (as defined below), HGC exercised its right to (i) remove Energia as the Manager of Holdings, (ii) remove the members of Holdings' Board of Directors appointed by Energia and Conquista, and (iii) appoint

Sehwan Park, Howoo Shin, and Haeyoung Lee as members of Holdings' Board of Directors. Thereafter, the new Board of Directors for Holdings authorized the filing of the Debtors' Chapter 11 Cases.

### E.  Chapter 11 Cases

57.     On May 4, 2020 (the "Petition Date"), the Debtors filed voluntary petitions in this Court commencing these cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

58.     After prior management's disregard for the requirement to comply with the Development Budget, unauthorized execution and acquisition of approximately $177 million of line pipe, inability to timely complete the Project, and the failure to obtain Project Equity Financing by the Long-Stop Date, among other defaults that constitute Removal Events, HGC exercised its rights to replace management in an effort to determine whether an orderly liquidation is in the best interest of all creditors. Because title to the pipe has already transferred to the Debtors, HGC believes it is oversecured (as Energia acknowledges in the Motion), and that unsecured creditors could receive a significant recovery in these Chapter 11 Cases—whether by pursuing the Projector through an orderly liquidation.

59.     The oversight of this Court and an independent fiduciary is desperately needed to avoid additional value destructive decisions by the Debtors' prior management and to ensure a process that comports with the interests of all creditors.

## OBJECTION

60.     The sole argument in the Motion is that the Debtors' prior Board members and Manager were improperly removed and replaced by HGC. *See* Motion, ¶¶ 48-51. As discussed in detail above, HGC properly removed and replaced the prior Board members and Manager pursuant to the LLC Agreement because several Removal Events occurred.

61.     Energia tacitly acknowledges that the Debtors breached the LLC Agreement, but contends that HGC materially breached the LLC Agreement first by not disputing the First and Second Capital Calls in good faith, and as a result the lack of funding from HGC caused the Debtors to subsequently breach the LLC Agreement. *See id.* at ¶¶ 52-54. In support of this position Energia cites three unremarkable Texas cases providing that a contract counterparty's material breach or a breach that renders the other party's performance impossible excuses the future performance of the non-breaching party. *See id.* at ¶ 52. While this recitation of black letter law is accurate, it does not support Energia's Motion because even prior to the First Capital Call the Debtors materially breached the LLC Agreement by entering into the Line Pipe Orders in the amount of approximately $177 million without HGC's approval and failing to adhere to the Project's milestones. Thus, to the extent either party was excused from future performance, it was HGC.

62.     The Debtors also never complied with the LLC Agreement's express requirements for valid capital calls (as the Debtors conceded in both the First and Second Capital Calls where they listed various modifications to the Development Budget and missed development milestones), and thus HGC did not breach the LLC Agreement and was never required to fund the capital calls. HGC disputed both the First and Second Capital Calls in good faith and thus pursuant to section 5.2(b)(ii) of the LLC Agreement the capital calls were deemed automatically withdrawn. HGC did not breach the LLC Agreement in any way, and HGC's capital call disputes were proper and in compliance with the LLC Agreement.

63.     The Texas Supreme Court has held that "'bad faith' means more than merely negligent or unreasonable conduct; it requires proof of an improper motive or willful ignorance of the facts." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285 (Tex. 1998).

Energia cannot meet its burden to prove that HGC acted with an improper motive or was willfully ignorant of the facts. To the contrary, HGC continued to seek the information required under the LLC Agreement while the Debtors attempted to obfuscate and delay.

64.     Despite Energia's baseless allegations, there is no requirement in the LLC Agreement or elsewhere that HGC must hire a third party consultant in order to dispute a capital call in good faith, and if the parties had intended such a requirement they would have included it in the extensively negotiated LLC Agreement. Furthermore, many if not all of the requirements of section 5.2(b) of the LLC Agreement do not require the assistance of a third party consultant to determine whether Holdings was in compliance, and Holdings admitted in paragraph 6(b) of the First and Second Capital Calls that not all of the conditions required in Exhibit D to the LLC Agreement had been satisfied.

65.     Bankruptcy is the proper forum to address the Project's issues. For this Project to be financially viable, Energia would have needed to obtain executed commitments from investment grade third parties to fill sufficient throughput capacity in the pipeline and purchase offtake in order for a bank to agree to provide financing. Energia has failed to obtain even a single executed commitment from a producer since this Project began. The only way that the Project has any chance of success is if the Debtors are managed by competent professionals who are transparent about the Debtors' finances and the status of the Project. In this regard, the appointment of a chapter 11 trustee and the oversight of this Court are important safeguards. However, that alone is insufficient because the Debtors need additional financing, which the Debtors are unlikely to obtain absent the protections of the Bankruptcy Code.

66.     The Debtors need to restructure their operations and debts, including resolving the issues raised by Corpac and Edgen, in a chapter 11 proceeding to prepare them for the difficult

task ahead of either completing the Project or conducting an orderly liquidation—especially in light of current industry-wide economic conditions and the existing global pandemic. Accordingly, for the reasons stated herein the Court should deny the Motion.

Dated: May 29, 2020 Respectfully submitted,

**Porter Hedges LLP**
*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl (TX 24038592)
Aaron J. Power (TX 24058058)
M. Shane Johnson (TX 24083263)
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002-2764
Telephone: (713) 226-6000
Facsimile: (713) 226-6295

**COUNSEL FOR HGC MIDSTREAM INV, LLC**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on May 29, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Joshua W. Wolfshohl*
Joshua W. Wolfshohl