**THE COURT HAS NOT YET APPROVED THIS PLAN FOR SOLICITATION TO PARTIES ENTITLED TO VOTE ON THE PLAN. THE PLAN PROPONENTS ARE NOT SOLICITING YOUR VOTE ON THIS PLAN AT THIS TIME**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| PERMICO MIDSTREAM PARTNERS | § | Case No. 20-32437 (MI) |
| HOLDINGS, LLC, *et al.*, | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |

### COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF
### PERMICO MIDSTREAM PARTNERS HOLDINGS, LLC, *ET AL.*

**THE COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF PERMICO MIDSTREAM PARTNERS HOLDINGS, LLC, *ET AL.* HAS BEEN SET FOR A FINAL HEARING ON APPROVAL OF THE DISCLOSURE STATEMENT AND A HEARING ON CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF PERMICO MIDSTREAM PARTNERS HOLDINGS, LLC, *ET AL.*, ON AUGUST 20, 2021 AT 10:00 A.M. (PREVAILING CENTRAL TIME), IN COURTROOM 404, UNITED STATES COURTHOUSE, 515 RUSK STREET, HOUSTON, TEXAS, 77002. IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**THE PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS IN IMPAIRED CLASSES RECEIVING BALLOTS TO VOTE TO <u>ACCEPT</u> THE PLAN AS CONTAINED HEREIN.**

**Dated: June 25, 2021.**

---

[1] The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Permico Midstream Partners Holdings, LLC (6374) and Permico Midstream Partners LLC (7902). The location of the Debtors' corporate headquarters and service address is 9301 Southwest Freeway, Suite 308, Houston, TX 77074.

**THE COURT HAS NOT YET APPROVED THIS PLAN FOR SOLICITATION TO PARTIES ENTITLED TO VOTE ON THE PLAN.  THE PLAN PROPONENTS ARE NOT SOLICITING YOUR VOTE ON THIS PLAN AT THIS TIME**

Respectfully submitted,

| **NORTON ROSE FULBRIGHT US LLP** | **ROSENTHAL LAW FIRM, P.L.L.C.** |
|---|---|
| */s/ Jason L. Boland*<br>Jason L. Boland (SBT 24040542)<br>Bob B. Bruner (SBT 24062637)<br>Julie Goodrich Harrison (SBT 24092434)<br>1301 McKinney Street, Suite 5100<br>Houston, Texas 77010<br>Phone: (713) 651-5151<br>Email: jason.boland@nortonrosefulbright.com<br>Email: bob.bruner@nortonrosefulbright.com<br>Email: julie.harrison@nortonrosefulbright.com<br><br>*Counsel to William R. Greendyke,*<br>*Chapter 11 Trustee*<br><br>**PORTER HEDGES LLP**<br><br>*/s/ Aaron Power*<br>Joshua Wolfshohl (SBT 24048592)<br>Aaron Power (SBT 24058058)<br>1000 Main Street, 36th Floor<br>Houston, Texas 77002<br>Phone: (713) 226-6000<br>Email: jwolfshohl@porterhedges.com<br><br>*Counsel for HGC Midstream INV LLC* | */s/ Trent Rosenthal*<br>Trent Rosenthal (SBT 17282300)<br>Joseph S. Cohen (SBT 04503720)<br>675 Bering Drive, Suite 150<br>Houston, Texas 77057<br>Phone: (713) 647-8177<br>Email: trosenthal@rosenthallaw.com<br>Email: jcohen@rosenthallaw.com<br><br>*Counsel to Corpac Steel Products Corp.*<br><br>**ALVAREZ STAUFFER BREMER LLC**<br><br>*/s/ Graig J. Alvarez*<br>Graig J. Alvarez (SBT 24001647)<br>815 Walker St., Suite 1450<br>Houston, Texas 77002<br>Phone: (713) 351-0300<br>Email: Graig.Alvarez@asb-lawfirm.com<br><br>*Counsel for Edgen Murray Corporation*<br><br>**BALCH & BINGHAM LLP**<br><br>*/s/ Lloyd A. Lim*<br>Lloyd A. Lim (SBT 24056871)<br>Rachel Kubanda (SBT 24093258)<br>811 Louisiana Street, Suite 1010<br>Houston, Texas 77002<br>Phone: (713) 362-2550<br>Email: llim@balch.com<br>Email: rkubanda@balch.com<br><br>*Counsel to Permico Energia, LLC and Permico Founders, LLC* |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

THE SOLICITATION ......................................................................................................... 1

ARTICLE I.   DEFINITIONS, RULES OF INTERPRETATION, AND
INCORPORATION OF DOCUMENTS BY REFERENCE .............................. 2

Section 1.1   DEFINITIONS .......................................................................... 2

Section 1.2   RULES OF INTERPRETATION .......................................... 15

Section 1.3   INCORPORATION OF DOCUMENTS BY REFERENCE ................. 16

ARTICLE II.   DEBTORS' HISTORY, ASSETS, LIABILITIES, AND MAJOR
EVENTS .................................................................................................. 16

Section 2.1   Incorporation and Ownership Structure.................................... 16

Section 2.2   Management................................................................................ 16

Section 2.3   Assets and Liabilities of the Debtors as of the Petition Date................. 17

Section 2.4   Events Leading to the Debtors' Bankruptcy Filing. ................ 17

ARTICLE III. MAIN EVENTS IN THE BANKRUPTCY CASES .......................................... 18

ARTICLE IV. CONFIRMATION OF THE PLAN ..................................................................... 23

Section 4.1   Confirmation Procedures ........................................................... 23

Section 4.2   Objection Procedures ................................................................. 23

Section 4.3   Requirements for Confirmation .................................................. 24

Section 4.4   Classifications of Claims and Equity Interests ......................... 24

Section 4.5   Impaired Claims or Equity Interests ......................................... 25

Section 4.6   Feasibility.................................................................................... 26

Section 4.7   The Best Interests Test & Liquidation Analysis ....................... 26

Section 4.8   Voting Procedures and Requirements......................................... 27

ARTICLE V.  CERTAIN RISK FACTORS ............................................................................... 27

ARTICLE VI. SUMMARY OF THE PLAN ............................................................................... 29

Section 6.1   Overview of the Plan ................................................................. 29

Section 6.2   The Project Transaction—The Toggle 1 Plan Scenario .......... 29

Section 6.3   The Sale Transaction—The Toggle 2 Plan Scenario............... 29

ARTICLE VII.CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS ............................................................................................ 31

Section 7.1   Overview of Classification ....................................................... 31

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 7.2 | Identification and Treatment of Unclassified Claims | 31 |
| Section 7.3 | Identification of Classes of Claims | 33 |
| Section 7.4 | Elimination of Classes for Voting Purposes | 44 |
| ARTICLE VIII. | MEANS FOR EXECUTION OF THE PLAN | 44 |
| Section 8.1 | Funding the Plan | 44 |
| Section 8.2 | Equity | 45 |
| Section 8.3 | Released Claims and Causes of Action | 45 |
| Section 8.4 | Release of Liens | 46 |
| Section 8.5 | Vesting of Assets in the Liquidating Trust | 46 |
| Section 8.6 | Effectuating Documents; Further Transactions | 46 |
| Section 8.7 | Deemed Substantive Consolidation of the Debtors | 46 |
| Section 8.8 | Retention of Management | 47 |
| ARTICLE IX. | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 47 |
| ARTICLE X. | RESOLUTION OF CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN | 47 |
| Section 10.1 | Prosecution and Settlement of Claim Objections | 47 |
| Section 10.2 | Objection Deadline | 48 |
| Section 10.3 | Responsibility for Objecting to Claims | 48 |
| Section 10.4 | Distributions to be Made | 48 |
| Section 10.5 | Means of Cash Payment | 48 |
| Section 10.6 | Delivery of Distributions | 49 |
| Section 10.7 | Time Bar to Cash Payments | 49 |
| Section 10.8 | Setoffs | 49 |
| Section 10.9 | No Distribution Pending Resolution of Claims | 49 |
| ARTICLE XI. | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE | 49 |
| ARTICLE XII. | RETENTION OF JURISDICTION | 50 |
| ARTICLE XIII. | DISCHARGE, RELEASES, INJUNCTION, AND RELATED PROVISIONS | 52 |
| Section 13.1 | Discharge of Claims Against and Interests in the Debtors | 52 |
| Section 13.2 | Releases by Holders of Claims and Interests | 52 |

**TABLE OF CONTENTS**
(continued)

**Page**

Section 13.3    Exculpation and Limitation of Liability ................................................... 53

Section 13.4    Limited Discharge of Debtors and Injunction ......................................... 53

Section 13.5    Compromise and Settlement .................................................................... 54

ARTICLE XIV.MISCELLANEOUS PROVISIONS.................................................................... 54

CONCLUSION AND RECOMMENDATION.......................................................................... 55

**THE COURT HAS NOT YET APPROVED THIS PLAN FOR SOLICITATION TO PARTIES ENTITLED TO VOTE ON THE PLAN. THE PLAN PROPONENTS ARE NOT SOLICITING YOUR VOTE ON THIS PLAN AT THIS TIME**

<div align="center">DISCLAIMERS</div>

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE TRUSTEE AND DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. MOREOVER, NEITHER CORPAC, EDGEN NOR HGC MAKE ANY REPRESENTATION AS TO THE ACCURACY OF ANYTHING CONTAINED HEREIN AND DID NOT COMPILE THE INFORMATION NEEDED TO PREPARE THIS COMBINED DISCLOSURE STATEMENT AND PLAN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE PLAN PROPONENTS, THE DEBTORS, OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE PLAN PROPONENTS, THE DEBTORS, OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH HIS/HER/ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE PLAN PROPONENTS, THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS OR PROPERTIES HAVE BEEN AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THIS COMBINED DISCLOSURE STATEMENT

**THE COURT HAS NOT YET APPROVED THIS PLAN FOR SOLICITATION TO PARTIES ENTITLED TO VOTE ON THE PLAN. THE PLAN PROPONENTS ARE NOT SOLICITING YOUR VOTE ON THIS PLAN AT THIS TIME**

AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONAPPLICABLE BANKRUPTCY LAWS. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE V OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

# INTRODUCTION

William R. Greendyke, the Court-appointed chapter 11 trustee (the "Trustee") for Permico Midstream Partners Holdings, LLC and Permico Midstream Partners (collectively, the "Debtors"), HGC Midstream Inv, LLC ("HGC"), Permico Energia, LLC ("Energia"), Corpac Steel Products Corp. ("Corpac"), and Edgen Murray Corporation ("Edgen", and together with the Trustee, HGC, Energia and Corpac, the "Plan Proponents") hereby propose this *Combined Disclosure Statement and Joint Chapter 11 Plan of Permico Midstream Partners Holdings, LLC, et al.* (together with any amendments, modifications, supplements, and exhibits thereto, the "Disclosure Statement and Plan" or "DS/Plan," or, as applicable, the "Disclosure Statement" or the "Plan"), pursuant to sections 1125 and 1129 of the Bankruptcy Code and Bankruptcy Rules 3016 and 3017, for resolution of the outstanding claims against and interests of the Debtors.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of, and holders of interests in, the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan. This Disclosure Statement contains summaries of the Plan, certain statutory provisions, a summary of events that occurred in the bankruptcy cases (the "Bankruptcy Cases") that were commenced on May 4, 2020 (the "Petition Date"), and a description of certain documents related to the Plan.

## THE SOLICITATION

This Disclosure Statement and Plan is submitted by the Plan Proponents to be used in connection with the solicitation of votes on the Plan.

The Plan Proponents have requested that the Bankruptcy Court hold a hearing on approval of this Disclosure Statement to determine whether this Disclosure Statement contains "adequate information" in accordance with § 1125.[2] Pursuant to section 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . ." All holders of Claims and Interests are encouraged to read and carefully consider this DS/Plan in its entirety before voting to accept or reject the Plan.

In making a decision to accept or reject the Plan, each holder of a Claim or Interest must rely on its own examination of the Debtors as described in this DS/Plan, including the merits and risks involved; thus, this DS/Plan shall not be construed to be providing any legal, business, financial or tax advice. Each holder of a Claim or Interest should consult with his, her, or its own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan, or the transactions contemplated thereby. Additionally, confirmation and consummation of the Plan are subject to conditions precedent that could lead to delays in consummation of the Plan. There can be no assurance that each of these conditions precedent will be satisfied or waived or

---

[2] All citations to "§" reference the applicable section of the Bankruptcy Code.

that the Plan will be consummated.  Even after the Effective Date, distributions under the Plan may be subject to delay so that disputed Claims can be resolved.

A hearing to consider the final approval of the Disclosure Statement and confirmation of the Plan has been set for **August 20, 2021, at 10:00 a.m. (prevailing Central time)**, in Courtroom 404, United States Courthouse, 515 Rusk Street, Houston, Texas (the "Confirmation Hearing").  It is anticipated that all persons will appear telephonically and also may appear via video at this Confirmation Hearing.

Objections to the final approval of the Disclosure Statement or objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the counsel for the Plan Proponents listed above to ensure receipt by them on or before **August 16, 2021 at 5:00 p.m. (prevailing Central time)**.  Bankruptcy Rule 3007 governs the form of any such objection.

**THE PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS IN IMPAIRED CLASSES RECEIVING BALLOTS TO VOTE TO <u>ACCEPT</u> THE PLAN.**

**ARTICLE I.  DEFINITIONS, RULES OF INTERPRETATION, AND INCORPORATION OF DOCUMENTS BY REFERENCE**

**Section 1.1     DEFINITIONS**

For purposes of this DS/Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article, the Plan Settlement Term Sheet, or in the text of the DS/Plan, as applicable.  Any term used in this DS/Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.  Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

As used in this DS/Plan, the following terms have the following meanings:

"***Administrative Claim,*** " "***Administrative Expense Claim,***" or "***Administrative Priority Claim***" means a Claim that is entitled to priority under §§ 326, 327, 330, 503(b)(1)-(9), 506(c) or 1103 asserted in this case, which Claims are described and treated in Article VII of this DS/Plan.

"***Administrative Claim Bar Date***" means the date designated by the Bankruptcy Court as the last date to file an application for allowance of an Administrative Claim (other than quarterly U.S. Trustee fees and Professional Fee Claims) which is September 20, 2021.

"***Administrative Expense Claim Escrow***" means with respect to Toggle 1 of the Plan, an escrow account funded on the Effective Date in the amount of $3.5 million for the benefit of holders of Allowed Administrative Expense Claims (including Allowed Professional Fee Claims, the B&B Claims (under Toggle 1 only), and amounts owing under the DIP Loan and the Beicker DIP Loan). The Administrative Expense Claims Escrow under Toggle 1 of the Plan shall be funded from the

HGC Toggle 1 Trustee Payment, the Corpac Toggle 1 Trustee Payment, and the Edgen Toggle 1 Trustee Payment. To the extent Toggle 1 of the Plan is implemented, the Reorganized Debtors shall assume any Allowed Administrative Expense Claims to the extent of any shortfall between the Allowed amount of Administrative Expense Claims and the Administrative Expense Claim Escrow, with any such allowed claims to be paid in full at Financial Close. As to Toggle 2 of the Plan, Administrative Expense Claim Escrow means an escrow account funded on the Effective Date in the amount of $3.75 million for the benefit of holders of Allowed Administrative Expense Claims (including Allowed Professional Fee Claims). The Administrative Expense Claims Escrow under Toggle 2 of the Plan shall be in the amount of $3.75 million and shall be funded from the HGC Toggle 2 Trustee Payment, the Corpac Toggle 2 Trustee Payment (as applicable), and the Edgen Toggle 2 Trustee Payment. Additionally, any unencumbered proceeds from the sale of property other than Pipe under Toggle 2 shall be distributed to the Administrative Expense Claim Escrow (and the balance owing on the DIP Loan shall be paid in full from such Administrative Expense Claim Escrow on a super priority basis prior to the payment of any other Administrative Expense), *provided that*, to the extent any assets subject to the Toggle 2 Sale are encumbered by a valid, perfected, first priority lien, any such lien shall attach to proceeds to the same extent as existed prior to the Petition Dates or as was provided under the Final DIP Order and such proceeds shall be distributed to the holder of such Allowed Secured Claim.

"***Adversary Proceedings***" means, collectively, the Edgen Adversary Proceeding and the Corpac Adversary Proceeding.

"***Affiliate***" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"***Allowed Claim***" means all or a portion of a Claim against one of the Debtors (i) that has been allowed by a Final Order, (ii) that has been Scheduled as a liquidated, noncontingent, undisputed Claim in an amount greater than zero in the Debtors' Schedules, as the same may from time to time be amended in accordance with the Bankruptcy Code, Bankruptcy Rules, or order of the Bankruptcy Court, and with respect to which no contrary Claim has been filed and to which no objection to its allowance has been filed (either by way of objection or amendment to the Schedules), (iii) that is the subject of a timely filed proof of Claim as to which either no objection to its allowance has been filed (either by way of objection or amendment to the Schedules) within the periods of limitation fixed by the Bankruptcy Code or by any order of the Bankruptcy Court, or any objection to its allowance has been settled, waived through payment, or withdrawn, or has been denied by a Final Order, (iv) that has otherwise been previously resolved by the Trustee and the Holder of such Claim prior to the Effective Date, (v) that are allowed pursuant to the terms of the Plan in favor of Corpac and Edgen, without the necessity of the filing of a proof of claim, or (vi) that is expressly allowed in a liquidated amount in the Plan, including the B&B Claim (under Toggle 1 only); *provided, however,* that with respect to an Administrative Claim, "Allowed Claim" means an Administrative Claim (other than a Professional Fee Claim, DIP Claims, the Beicker DIP Loan, or the B&B Claim) as to which a timely request for payment has been made by the Administrative Claim Bar Date and to which (a) a timely objection has not been filed or (b) a timely objection has been filed and such objection has been settled, waived through payment, or withdrawn, or has been denied by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no proof of Claim is or has been timely filed, is not considered Allowed and shall be disallowed and expunged without further action by the Trustee, the Reorganized Debtors, or the Liquidating Trustee, as applicable, and

without further notice to any party or action, approval, or order of the Court.  For the avoidance of doubt, and except as provided herein with respect to a claim of Corpac or Edgen, a proof of Claim filed after the Claims Bar Date or Administrative Claims Bar Date shall not be an Allowed Claim for any purpose whatsoever absent entry of a Final Order allowing such late-filed Claim.

"*Assumed Claim*" means all Claims, liabilities and other obligations of the Debtors, other than any Claims, liabilities and obligations settled or compromised under the Plan, that are assumed by the Reorganized Debtors pursuant to Toggle 1 of the Plan.

"*Avoidance Actions*" means any actions arising under Bankruptcy Code sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553, or under related state, federal, or foreign statutes and common law, including, without limitation fraudulent transfer laws.

"*B&B Claim*" means the claim Balch & Bingham, LLP in the amount of  $500,000, which shall be an Administrative Claim that is deemed Allowed under the Plan, and paid and treated as set forth in Article VII.2 below.  For the avoidance of doubt, there shall not be any allowed B&B Claim under Toggle 2.

"*Bankruptcy Cases*" means the Chapter 11 bankruptcy cases commenced by the Debtors upon the filing of their voluntary petitions on the Petition Date, styled *In re Permico Midstream Partners Holdings, LLC, et al.,* Case No. 20-32437 (MI) (Jointly Administered).

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Bankruptcy Cases.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, where the Bankruptcy Cases are pending.

"*Bankruptcy Estates*" or "*Estates*" means the estates of the Debtors created under section 541 of the Bankruptcy Code upon the filing of the Bankruptcy Cases.

"*Bankruptcy Rules*" mean, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Bankruptcy Cases or proceedings therein, the Local Rules of the Bankruptcy Court, and the Complex Case Rules for the Southern District of Texas, as applicable to the Bankruptcy Cases or proceedings therein, as the case may be.

"*Beicker DIP Loan*" means the administrative expense claim of Mr. Beicker allowed under section 503(b) of the Bankruptcy Code in the amount of up to $57,500.00 in respect of that certain post-petition debtor-in-possession financing loan approved by the Bankruptcy Court pursuant to the *Stipulation and Agreed Order Authorizing Trustee to Obtain Unsecured Debt Allowable Under Section 503(b)(1) as an Administrative Expense*, at Bankr. Dkt. No. 263.

"*Cause(s) of Action*" means any and all actions, suits, claims for relief, causes of action, including claims arising under chapter 5 of the Bankruptcy Code, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated,

-4-

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, whether arising prior to or after the Petition Date, except to the extent that they are released pursuant to the plan. For the avoidance of doubt, "Released Claims and Causes of Action" are not included herein as a "Cause of Action."

"*Claim*" means a claim against any portion of the Debtors' Estates, whether or not asserted, as such term is defined in section 101(5) of the Bankruptcy Code.

"*Claims Bar Date*" means October 21, 2020 (unless otherwise extended by stipulation with the Trustee) for all non-governmental parties to file proofs of Claim, and December 15, 2020 for governmental units to file any such proofs of Claim.  The Claims Bar Date as it relates to Corpac, Edgen and HGC means the bar date for filing proofs of claim as set by stipulation (as amended) between such party and the Trustee and as ordered by the Bankruptcy Court.

"*Claims Objection Deadline*" means one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court, *provided however*, that the Trustee, the Reorganized Debtors, or the Liquidating Trustee, as applicable, may file one or more motions with the Bankruptcy Court on notice and an opportunity for a hearing to extend such deadline from time to time.

"*Class*" means each category or group of holders of Claims or Interests that have been designated as a class in Article VI of this Plan.

"*Confirmation*" means entry by the Bankruptcy Court of the Confirmation Order finally approving this Disclosure Statement and confirming this Plan.

"*Confirmation Date*" means the date of entry by the Bankruptcy Court of the Confirmation Order.

"*Confirmation Hearing*" means the date set by the Court for a hearing to finally approve the Disclosure Statement and confirm the Plan, which has been set for August 20, 2021, at 10:00 a.m. (prevailing Central time) in Courtroom 404, United States Courthouse, 515 Rusk Street, Houston, Texas, as such hearing may be adjourned or continued from time to time.

"*Confirmation Order*" means the order entered by the Bankruptcy Court finally approving the Disclosure Statement and confirming the Plan.

"*Consummation*" means the occurrence of the Effective Date.

"*Contingent*" means, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

"*Corpac*" means Corpac Steel Products Corp.

"*Corpac Adequate Assurance Payments*" means post-Effective Date partial adequate assurance payments in the amount of $100,000, which shall be paid in arrears on the first of the month commencing on the first day of the second month after the Effective Date.

"*Corpac Adversary Proceeding*" means the adversary proceeding initiated by Corpac Steel Products Corp. against the Trustee and HGC, pending in the Bankruptcy Court as Adv. No. 20-03126.

"*Corpac Assumed Obligations*" or *"Assumed Corpac Contracts"* means the obligations assumed by the Reorganized Debtors in accordance with Article VII.3(d) of this Plan.

*"Corpac Cure Payment"* shall have the meaning ascribed in Section VII.3(d) of the Plan.

"*Corpac Effective Date Assumed Allowed Claim*" shall have the meaning ascribed in Section VII.3(d) of the Plan.

"*Corpac Escrow*" means an escrow account established pursuant to the Plan Settlement Term Sheet and Pipe Sale Order, which escrow shall be funded by Corpac with 80% of the proceeds from the sale of Corpac Pipe pursuant to the Pipe Sale Motion and Pipe Sale Order (other than sales proceeds from the initial $8 million sold of Corpac Pipe thereunder), until the Corpac Escrow equals $35 million.

*"Corpac HGC Payment"* means, with respect to Toggle 1 of the Plan and solely to the extent the Initial Contribution is fully funded on the Effective Date, the payment by Corpac to HGC on the Effective Date in the amount of $3 million for the mutual settlement and release of any and all claims by and between HGC and Corpac, including but not limited to their respective claims related to the Corpac Adversary Proceeding and any claims, rights, or interests of HGC in the Corpac Pipe and the Corpac Escrow.

*"Corpac Initial Contribution Payment"* shall have the meaning ascribed in Section VII.3(d) of the Plan, and means the payment to Corpac in the amount of $3.0 million from proceeds of the Initial Contribution on the Effective Date, of which Corpac shall use to fund the Corpac HGC Payment and the Corpac Toggle 1 Trustee Payment (with the remaining balance to be funded by Corpac). In exchange for the Corpac Initial Contribution Amount, the Reorganized Debtors shall receive a credit against the Corpac Effective Date Assumed Allowed Claim.

"*Corpac Pipe*" means that certain pipe which is subject to disputed title and lien interests as asserted in the Corpac Adversary Proceeding.

"*Corpac Contracts*" or *"Existing Corpac Contracts"* shall have the meaning assigned in Section VII.3(d) of the Plan.

"*Corpac Release*" means the release by the Trustee, the Debtors, and the Debtors' Estates of any and all Claims and Causes of Action against Corpac and its Affiliates related to the Corpac Adversary Proceeding, including any claims, rights, or interests of the estate in the Corpac Pipe or Corpac Escrow (including, for the avoidance of doubt, any surcharge rights against the Corpac Pipe), consistent with the Plan, the Plan Settlement Term Sheet and the Pipe Sale Order.

"*Corpac Toggle 1 Trustee Payment*" means, with respect to Toggle 1 of the Plan, the payment made by Corpac on the Effective Date in the amount of $500,000 (which amount shall be paid from a portion of the distribution from the Initial Contribution) to partially fund the Administrative Expense Claim Escrow in exchange for the Corpac Release.

"***Corpac Toggle 2 Trustee Payment***" means, with respect to Toggle 2 of the Plan, a payment made by Corpac on the Effective Date in the amount of $1,250,000 million to partially fund the Administrative Expense Claim Escrow in exchange for the Corpac Release.

"***Corpac Final Allowed Claim***" shall have the meaning ascribed in Section VII.3(d) of the Plan.

"***Creditor***" has the meaning set forth in section 101(10) of the Bankruptcy Code.

"***Cure***" means the amount of cash or other consideration required for the cure and assumption of an Executory Contract or Unexpired Lease pursuant to the provisions of section 365(b) of the Bankruptcy Code.

"***Debtors***" means Permico Midstream Partners Holdings, LLC and Permico Midstream Partners LLC.

"***DIP Facility,***" "***DIP Loan,***" or "***DIP Claims***" means any and all Claims and obligations owed by the Debtors' and their Estates to Integra in respect of that certain post-petition debtor-in-possession financing loan approved by the Bankruptcy Court pursuant to the Interim DIP Order and Final DIP Order.

"***Disallowed***" means, with reference to any Claim or Interest, a finding or determination of the Bankruptcy Court in a Final Order, including the Bar Date Order and Administrative Claim Bar Date Order, or a provision of the Plan or Confirmation Order, providing that a Claim shall not be Allowed, or as to which the Bankruptcy Court has otherwise ruled or ordered that such Claim should be temporarily disallowed pursuant to section 502(d) of the Bankruptcy Code.

"***Disclosure Statement and Plan***", "***DS/Plan***" "***Plan***", or as applicable, the "Disclosure Statement" or the "Plan" means this entire document and all exhibits, addendums, attachments, schedules, supplements, and related documents, whether annexed hereto, filed in connection herewith, or related hereto, including the Disclosure Statement portions and the Plan portions, as amended, supplemented or modified from time to time.

"***Disputed***" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

"***Distribution***" means a distribution to holders of Allowed Claims and/or Interests by the Liquidating Trustee.

"***Edgen***" means Edgen Murray Corporation.

"***Edgen Adequate Assurance Payments***" means the monthly payments to Edgen described in Paragraph 4 of Exhibit C to the Plan Settlement Term Sheet.

"***Edgen Adversary Proceeding***" means the adversary proceeding filed by Edgen Murray Corporation against the Trustee and HGC, pending in the Bankruptcy Court at Adv. Proc. No. 20-03173.

"*Edgen Assumed Obligations*" means the Assumed Edgen Claims as defined in Exhibit C to the Plan Settlement Term Sheet.

"*Edgen Escrow*" means an escrow account established pursuant to the Plan Settlement Term Sheet and Pipe Sale Order, which escrow shall be funded by Edgen with 80% of the proceeds from the sale of Edgen Pipe pursuant to the Pipe Sale Motion and Pipe Sale Order (other than sales proceeds from the initial $8 million sold of Edgen Pipe), until the Edgen Escrow equals $35 million.

"*Edgen HGC Payment*" means, with respect to Toggle 1 of the Plan and solely to the extent the Initial Contribution is fully funded on the Effective Date, the payment by Edgen to HGC on the Effective Date in the amount of $3 million for the mutual settlement and release of any and all claims by and between HGC and Edgen, including but not limited to their respective claims related to the Edgen Adversary Proceeding and any claims, rights, or interests of HGC in the Edgen Pipe.

"*Edgen Initial Contribution Payment*" means the payment to Edgen in the amount of $3.0 million from proceeds of the Initial Contribution on the Effective Date, of which Edgen shall use to fund the Edgen HGC Payment and the Edgen Toggle 1 Trustee Payment (with the remaining balance to be funded by Edgen).  The Reorganized Debtors shall receive a credit against the Edgen Assumed Obligations in an amount equal to the Edgen Initial Contribution Amount.

"*Edgen Pipe*" means that certain pipe which is subject to disputed title and lien interests as asserted in the Edgen Adversary Proceeding.

"*Edgen Purchase Orders*" means Purchase Orders Nos. 18101.1002.0003, 18102.1002.0004, and 18106.1002.0003 issued by Edgen to the Debtors, along with all existing written amendments and modifications thereto.

"*Edgen Release*" means the release by the Trustee, the Debtors, and the Debtors' Estates of any and all Claims and Causes of Action against Edgen and its Affiliates related to the Edgen Adversary Proceeding, including any claims, rights, or interests of the estate in the Edgen Pipe (including, for the avoidance of doubt, any surcharge rights against the Edgen Pipe).

"*Edgen Toggle 1 Trustee Payment*" means, with respect to Toggle 1 of the Plan, the payment made by Edgen on the Effective Date in the amount of $500,000 (which amount shall be paid from a portion of the distribution from the Initial Contribution) to partially fund the Administrative Expense Claim Escrow in exchange for the Edgen Release.

"*Edgen Toggle 2 Trustee Payment*" means, with respect to Toggle 2 of the Plan, the payment made by Edgen on the Effective Date in the amount of $1,250,000 to partially fund the Administrative Expense Claim Escrow in exchange for the Edgen Release.

"*Effective Date*" means the date when all the conditions to the occurrence of the Effective Date set forth in this DS/Plan have been satisfied or waived in accordance with this DS/Plan.  The Effective Date will be no later than September 22, 2021.

"*Energia*" means Permico Energia, LLC.

"***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"***Executory Contract***" shall mean a contract or lease to which one of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"***Final DIP Order***" means that certain *Final Order Authorizing the Trustee to Obtain Post-Petition Financing and Granting Related Relief* [Dkt. No. 180].

"***Final Order***" means an order or judgment of the Bankruptcy Court, as entered on the docket in the Debtors' Bankruptcy Cases, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending and the operation or effect of any such order or judgment has not been stayed.

"***Financial Close***" or "***FID***" means, with respect to Toggle 1 of the Plan, the date on which the following have occurred: (i) the board of the Reorganized Debtors and its investors have affirmatively voted or consented to undertake construction of the Project, (ii) all material Project and Project Transaction agreements have been completed and have been executed and delivered by all parties thereto, (iii) all conditions on those agreements have been met such that construction on the Project can commence and (iv) the closing of, and receipt of the cash proceeds or commitments from, project equity or debt financing sufficient to pay all costs and expenses reasonably expected to be incurred to the complete the development and construction of the Project and satisfy the obligations assumed under the Plan.

"***Financial Close Date***" means March 15, 2022, or an earlier date upon which Financial Close has occurred or as may be agreed by the Reorganized Debtors and Plan Proponents.

"***General Unsecured Claim***" shall mean any unsecured Claim against the Debtors that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date and that is not: (i) an Administrative Claim (including, under Toggle 1 only, the B&B Claim) or an Administrative Priority Claim (including an Assumed Claim), (ii) a Professional Fee Claim, (iii) a Priority Unsecured Tax Claim, (iv) a Priority Unsecured Non-Tax Claim, (v) a Secured Claim, (vi) the HGC Claim, (vii) the Corpac Assumed Obligations, or (viii) the Edgen Assumed Obligations.

"***Governmental Unit***" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

"***HGC***" means HGC Midstream INV, LLC.

"***HGC Claim***" means, with respect to Toggle 1 of the Plan, HGC's stipulated claim in the amount of $35 million, which amount is inclusive of all interest, fees, and costs that are due and owing to HGC under HGC's various agreements with the Debtors and under applicable law.  As to Toggle 2 of the Plan, the HGC Claim means HGC's stipulated claim in the amount of $35 million, plus any additional interest and fees accrued after the Effective Date, subject to credits for any amounts received from the Pipe proceeds and the Adversary Proceedings.

"*HGC Claim Balance*" means, with respect to Toggle 1 of the Plan, $14 million, of which Corpac shall be assigned $1.75 million upon payment of the Corpac HGC Payment and Edgen shall be assigned $1.75 million upon payment of the Edgen HGC Payment. Under Toggle 1 of the Plan, the HGC Claim Balance shall be an assumed obligation of the Reorganized Debtors, as applicable, and paid by the Reorganized Debtors, as applicable, at the Financial Close Date as follows: $10.5 million to HGC, $1.75 million to Corpac, and $1.75 million to Edgen.

"*HGC Initial Payment*" means, with respect to Toggle 1 of the Plan, the payment in the amount of $15 million made to HGC from proceeds of the Initial Contribution.

"*HGC Release*" means the release by the Trustee, the Debtors, and the Debtors' Estates of any and all Claims and Causes of Action against HGC and its Affiliates, whether known or unknown, contingent or unliquidated, asserted or unasserted, that existed from the beginning of time through the Effective Date of the Plan, including (but not limited) all surcharge rights, derivate claims, alter ego claims or otherwise against HGC and its Affiliates.

"*HGC Toggle 1 Trustee Payment*" means, with respect to Toggle 1 of the Plan, the payment made by HGC on the Effective Date in the amount of $2.5 million (which amount shall be paid from a portion of the distribution from the Initial Contribution) to partially fund the Administrative Expense Claim Escrow in exchange for the HGC Release.

"*HGC Toggle 2 Trustee Payment*" means, with respect to Toggle 2 of the Plan, the payment made by HGC on the Effective Date in the amount of $1.250,000 million to partially fund the Administrative Expense Claim Escrow in exchange for the HGC Release. The HGC Toggle 2 Trustee Payment shall be added to the balance of the HGC Claim in the Bankruptcy Cases under Toggle 2.

"*Holder*" or "*Holders*" means the legal or beneficial holder of a Claim or Interest (and, when used in conjunction with a Class or type of Claim or Interest, means a holder of a Claim or Interest in such Class or of such type).

"*Impaired*" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Initial Contribution*" means, with respect to Toggle 1 of the Plan, the contribution by Permico Founders to acquire 100% of the new equity in the Reorganized Debtors, with such initial contribution amount to be no less than $25 million made on the Effective Date, and, except for the $3,500,000 retained by the Reorganized Debtors as working capital as provided herein and in the Plan Settlement Term Sheet, disbursed to the Trustee, HGC, Corpac and Edgen in accordance with the Plan Settlement Term Sheet and this Plan.

"*Insider*" has the meaning set forth in 11 U.S.C. § 101(31) of the Bankruptcy Code.

"*Integra*" means Integra Midstream Partners, LLC, the post-petition lender to the Debtors under the DIP Facility.

"*Interest*" means any ownership interest in the Debtors, as of the Petition Date, including, but not limited to, an interest in any issued, unissued, authorized or outstanding shares or stock and other

equity security of the Debtors together with any warrants, options, or contractual rights to purchase or acquire such interests at any time and all rights arising with respect thereto.

"***Interim DIP Order***" means that certain *Interim Order Authorizing the Trustee to Obtain Post-Petition Financing and Granting Related Relief* [Dkt. No. 163].

"*Liquidating Trust*" means the Liquidating Trust established under the Plan and the Liquidating Trust Agreement.

"*Liquidating Trust Agreement*" means the trust agreement approved and entered into in accordance with the Plan pursuant to which the Liquidating Trust will be established and administered.  A copy of the Liquidating Trust Agreement shall be filed with the Plan Supplement.

"*Liquidating Trust Assets*" means (i) the Administrative Expense Claim Escrow which shall be used for the benefit of holders of Allowed Administrative Expense Claims (including the DIP Loan, the Beicker DIP Loan, Allowed Professional Fee Claims, the B&B Claims (under Toggle 1 only), U.S. Trustee Fees, any Allowed substantial contribution claims, and other Allowed post-petition Administrative Claims) and General Unsecured Claims (solely to the extent such funds remain and are not otherwise assumed after payment in full of Allowed Administrative Expense Claims (including the DIP Loan, Allowed Professional Fee Claims, U.S. Trustee Fees, any Allowed substantial contribution claims, and other Allowed post-petition Administrative Claims), pending Financial Close and (ii) all Retained Claims and Causes of Action.  Upon payment in full of all Claims on at the Financial Close Date under Toggle 1, any remaining Liquidating Trust Assets shall be assigned to the Reorganized Debtors, as applicable.  For the avoidance of doubt, the Released Claims and Causes of Action are not Liquidating Trust Assets.  Under Toggle 2, the proceeds from the Sale, the Edgen Toggle 1 and Toggle 2 Trustee Payments, the Corpac Toggle 1 and Toggle 2 Trustee Payments, each as applicable, the Retained Claims and Causes of Action, and any other retained property of the Estates not subject to the Sale shall also constitute Liquidating Trust Assets.

"*Liquidating Trustee*" shall mean William R. Greendyke.

"*Milestone Dates*" means the milestone dates set forth in the Plan Settlement Term Sheet.

"*Milestone Default*" means the failure to satisfy any of the Milestone Dates.

"*Objection(s)*" means any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim).

"*Permico Founders*" means the limited liability company owned 50% by Cascabel Investments, LLC and 50% by T&SE LLC.

"*Person*" means an individual, corporation, partnership, governmental unit, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

"***Petition Date***" means May 4, 2020, the date when the Debtors filed their respective Bankruptcy Cases.

"***Pipe***" means collectively, the Corpac Pipe and the Edgen Pipe.

"***Pipe Sale Motion***" means the *Emergency Motion of William R. Greendyke, Chapter 11 Trustee, for Authority to Commence Pipe Sales Pursuant to Terms of Plan Settlement Term Sheet and Related Relief*, as filed with the Bankruptcy Court on May 26, 2021 [Dkt. No. 243].

"***Pipe Sale Order***" means the *Order Granting Emergency Motion of William R. Greendyke, Chapter 11 Trustee, for Authority to Commence Pipe Sales Pursuant to Terms of Plan Settlement Term Sheet and Related Relief*, as entered by the Bankruptcy Court on May 28, 2021 [Dkt. No. 251].

"***Plan***" means this chapter 11 plan, as it may be altered, amended, modified or supplemented from time to time including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.

"***Plan Documents***" means any documents referenced in, attached to, or related to the Plan (or in any Plan Supplement) that are intended to be executed pursuant to the Plan.

"***Plan Proponents***" means the Trustee, HGC, Energia, Corpac, and Edgen.

"***Plan Settlement Term Sheet***" means the plan settlement term sheet among the Trustee, HGC, Energia, Corpac, Edgen, and Permico Founders dated May 25, 2021, which is attached hereto as **Exhibit A**.

"***Plan Supplement***" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed in the Bankruptcy Cases, and notice of which shall be served no later than August 12, 2021 or such later date as may be approved by the Bankruptcy Court, as may be amended or supplemented by additional documents filed in the Bankruptcy Cases prior to the Effective Date as amendments to the Plan Supplement.

"***Priority Unsecured Non-Tax Claim***" means a Claim asserted under sections 507(a)(3-7 and 9-10) of the Bankruptcy Code against the Debtors' Bankruptcy Estates.

"***Priority Unsecured Tax Claim***" means a Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.

"***Professional Fee Bar Date***" means the deadline for filing all applications for Professional Fee Claims, which shall be forty-five (45) days after the Effective Date.

"***Professional Fee Claim***" means a Claim by the Trustee or any professional retained, employed or to be compensated in the Bankruptcy Cases pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363 and/or 1103 for compensation for services rendered and reimbursement for expenses submitted in accordance with sections 330, 331, 363, or 503(b) of the Bankruptcy Code for fees and expenses incurred after the Petition Date and prior to and including the Effective Date.

-12-

"**Project**" means that certain development project to build (i) pipelines from the Permian Basin and Eagle Ford shale regions to Corpus Christi, Texas, (ii) two fractionator trains, (iii) an NGL salt cavern storage facility, and (iv) one or more export terminals with spurs to the gas liquids storage and trading hub in Mont Belvieu, Texas.

"**Project Transaction**" means the recapitalization transaction with Permico Founders under Toggle 1 of the Plan, as more fully described herein.

"**Released Claims and Causes of Action**" means, with respect to Toggle 1 of the Plan and except as otherwise provided herein, any and all Claims and Causes of Action arising prior to the Effective Date between the Debtors, the Debtors' estates, the Trustee (including for the avoidance of doubt any and all of the Estates' interests in the Corpac Adversary Proceeding and Edgen Adversary Proceeding in exchange for the Corpac and Edgen Toggle 1 Trustee Payments), Corpac, Edgen, HGC, and Energia. For the avoidance of doubt and notwithstanding the foregoing with respect to Toggle 1 of the Plan, HGC and Energia shall not release each other for any Claims or Causes of Action arising prior to the Effective Date solely to the extent that such Claims and Causes of Action are not Claims and Causes of Action belonging to the Debtors and their Estates (which shall be included as Released Claims and Causes of Action). With respect to Toggle 2 of the Plan and in consideration of the Corpac Toggle 2 Trustee Payment and Edgen Toggle 2 Trustee Payment, as applicable, the Trustee (on behalf of the Debtors and their Estates) shall release Corpac and Edgen, as applicable—and Corpac and Edgen shall release the Trustee, the Debtors and the Debtors' Estates—of all Claims and Causes of Action related to either the Corpac Adversary Proceeding or Edgen Adversary Proceedings, as applicable, including any Claims, rights, or interests of the Estates in the Corpac Pipe, Corpac Escrow, Edgen Pipe, or Edgen Escrow as applicable, including, with respect to Corpac and Edgen only, any surcharge rights against either the Corpac Pipe or Edgen Pipe as applicable.   With respect to Toggle 2 of the Plan and in consideration of the HGC Toggle 2 Trustee Payment, the Trustee (on behalf of the Debtors and their Estates) shall give the HGC Release.

"**Released Party**" means, with respect to Toggle 1 of the Plan, each of (a) the Debtors; (b) the Debtors' Estates; (c) the Trustee (d) Corpac; (e) Edgen; (f) HGC; and (g) Energia; with respect to each of the foregoing identified in subsections (a) through (g) herein, each of such Entities' respective shareholders, affiliates, subsidiaries, members, current and former officers, current and former directors, employees, managers, agents, attorneys, investment bankers, restructuring advisors, professionals, advisors, and representatives, each in their capacities as such. For the avoidance of doubt and notwithstanding the foregoing with respect to Toggle 1 of the Plan, HGC and Energia shall not release each other for any Claims or Causes of Action arising prior to the Effective Date solely to the extent that such Claims and Causes of Action are not Claims and Causes of Action belonging to the Debtors and their Estates (which shall be included as Released Claims and Causes of Action). As to Toggle 2 of the Plan, Released Party means each of (a) the Debtors; (b) the Debtors' Estates; (c) the Trustee (d) Corpac;  (e) Edgen, and (f) HGC; with respect to each of the foregoing identified in subsections (a) through (f) herein, each of such Entities' respective shareholders, affiliates, subsidiaries, members, current and former officers, current and former directors, employees, managers, agents, attorneys, investment bankers, restructuring advisors, professionals, advisors, and representatives, each in their capacities as such; *provided however*, that Corpac and Edgen are not providing any releases to each other hereunder.

-13-

"**_Releasing Party_**" means, with respect to Toggle 1 of the Plan, each of (a) the Debtors; (b) the Debtors' Estates; (c) the Trustee (d) Corpac; (e) Edgen; (f) HGC; and (g) Energia; and without limiting the foregoing, each holder of a Claim against or an Interest in the Debtors, in each case other than such a holder that has voted to reject the Plan, is a member of a Class that is deemed to reject the Plan, or has voted to accept the Plan or abstains from voting on the Plan and who expressly opts out of the releases provided by the Plan; and (h) with respect to each of the foregoing parties under (a) through (g), such Entity and its current and former affiliates, and such Entities' and their current and former affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.  For the avoidance of doubt and notwithstanding the foregoing with respect to Toggle 1 of the Plan, HGC and Energia shall not release each other for any Claims or Causes of Action arising prior to the Effective Date solely to the extent that such Claims and Causes of Action are not Claims and Causes of Action belonging to the Debtors and their Estates (which shall be included as Released Claims and Causes of Action).  As to Toggle 2 of the Plan, Releasing Party means each of (a) the Debtors; (b) the Debtors' Estates; (c) the Trustee (d) Corpac; and (e) Edgen; with respect to each of the foregoing identified in subsections (a) through (e) herein, each of such Entities' respective shareholders, affiliates, subsidiaries, members, current and former officers, current and former directors, employees, managers, agents, attorneys, investment bankers, restructuring advisors, professionals, advisors, and representatives, each in their capacities as such; *provided however*, that Corpac and Edgen are not providing any releases to each other hereunder.

"**_Reorganized Debtors_**" mean the Debtors, as they exist after the Effective Date.

"**_Retained Claims and Causes of Action_**" means all Claims, counterclaims, defenses (including setoff, recoupment and all other defenses of the Estates under § 558 of the Bankruptcy Code), and Causes of Action—whether legal or equitable—that the Trustee, the Debtors, or the Debtors' Estates have or may have against any Entity, and all such other Claims or Causes of Action that are defensive in nature in respect of any proofs of claim or proofs of interest that have been filed against the Debtors' Estates, including without limitation all such Claims and Causes of Action identified in the Plan Supplement.  For the avoidance of doubt, Retained Claims and Causes of Action do not include any Claims and/or Causes of Action that are Released Claims and Causes of Action, including any Claims and Causes of Action against HGC, Corpac and Edgen under the HGC Release, the Corpac Release and the Edgen Release hereunder.

"**_Retained HGC Lien_**" means the retained lien rights of HGC under the Pipe Sale Order and Plan which encumbers the Corpac Pipe and the Edgen Pipe to the same extent, validity and priority as existed on the Petition Date until sold and, thereafter, which attaches to the funds held in the Corpac Escrow and Edgen Escrow.  For the avoidance of doubt, the Retained HGC Lien does not attach to that portion of the sales proceeds (*i.e.*, the first $8 million of sales proceeds and 20% of sales proceeds over $8 million) paid to Corpac or Edgen as set forth in the Plan Settlement Term Sheet and Pipe Sale Order.

"**_Sale_**" means, with respect to Toggle 2 of the Plan, the sale of substantially all of the Debtors' assets, other than Estate Causes of Action, the Edgen Pipe and the Corpac Pipe, to Integra or such other higher and better bid in accordance with the Plan Settlement Term Sheet.

"**_Schedules_**" has the meaning ascribed to such term in Article III.C hereinafter.

"**_Secured Claim_**" means a Claim that is secured by a valid, perfected and enforceable lien that is not subject to avoidance under bankruptcy or non-bankruptcy, but only to the extent of the value, as of the Effective Date or such later date as is established by the Bankruptcy Court, of claimant's interest in the Debtor's property securing the Claim as determined by a Final Order of the Bankruptcy Court pursuant to section 506 of the Bankruptcy Code or as otherwise agreed upon in writing by the Trustee and the holder of such Claim.

"**_SOFAs_**" has the meaning ascribed to such term in Article III.C hereinafter.

"**_Substantial Consummation_**" shall have the meaning given to that term in section 1101(2). Substantial Consummation shall occur on the Effective Date.

"**_Toggle 1_**" of the Plan shall mean that certain Project Transaction with Permico Founders as set forth in the Plan Settlement Term Sheet and as described more fully herein.

"**_Toggle 2_**" of the Plan shall mean, in the event of an uncured Milestone Default prior to the Effective Date, a sale of all Estate assets, other than Retained Claims and Causes of Action and any interest, if any, in the Pipe, as set forth in the Plan Settlement Term Sheet and as described more fully herein.

"**_Toggle 2 Rejection Claims Bar Date_**" means the 30th day after the occurrence of the Effective Date, or as to Corpac and Edgen, the 90th day after the occurrence of the Effective Date.

"**_Trustee_**" means William R. Greendyke, the Court-appointed chapter 11 trustee for Permico Midstream Partners Holdings, LLC and Permico Midstream Partners.

"**_Unimpaired Claim_**" means a Claim that is not an Impaired Claim.

"**_Unsecured Claim_**" means a Claim that is not a Secured Claim and that is not entitled to priority under section 507(a)(1-9) of the Bankruptcy Code, but includes the deficiency portions of a Secured Claim.

"**_Voting Deadline_**" means August 16, 2021 at 5:00 p.m. (prevailing Central time), the deadline by which Ballots to accept or reject the Plan must be received by the Trustee.

## Section 1.2   RULES OF INTERPRETATION

For purposes of this DS/Plan, (a) any reference to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) any reference to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise

specified, all references herein to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules, and Exhibits of or to this DS/Plan; (d) the words "herein" and "hereto" refer to this DS/Plan in its entirety rather than to a particular portion of this DS/Plan; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this DS/Plan; and (f) the rules of construction set forth in section 102 and in the Bankruptcy Rules shall apply.

## Section 1.3    INCORPORATION OF DOCUMENTS BY REFERENCE

This DS/Plan incorporates by reference certain documents relating to the Debtors that are not presented herein or delivered herewith.  The documents that have been filed in the Debtors' Bankruptcy Cases are incorporated by reference herein in their entirety, including all amendments thereto filed prior to the date set for confirmation, including the following documents: (a) the Debtors' Schedules of Assets and Liabilities ("Schedules"), (b) the Statements of Financial Affairs ("SOFAs"), including exhibits to the SOFAs, each as filed on June 18, 2020 [Dkt. Nos. 59, 60, 61, and 62] and, if applicable, as amended on June 18, 2020 and July 28, 2020 [Dkt. Nos. 65, 78], and (c) the Pipe Sale Order, entered on May 28, 2021, at Dkt. No. 251.

The Plan Settlement Term Sheet and all Exhibits thereto are attached hereto as **Exhibit A** and incorporated herein by reference in their entirety.  Such documents control to the extent of any inconsistency with the terms of this Plan.

## ARTICLE II. DEBTORS' HISTORY, ASSETS, LIABILITIES, AND MAJOR EVENTS

## Section 2.1    Incorporation and Ownership Structure

Debtor Permico Midstream Partners, LLC ("Permico Midstream") was originally formed by Energia on October 24, 2017, as a member-managed Texas limited liability company.  Debtor Permico Midstream Partners Holdings, LLC ("Permico Holdings") is a Texas limited liability company formed on February 5, 2019.  On April 30, 2019, Energia and Conquista Energy Services, LLC ("Conquista") contributed 100% of the limited liability company interests in Permico to Holdings, effective as of February 5, 2019, pursuant to a Contribution Agreement, dated as of April 30, 2019, by and between Energia and Conquista (the "Contribution Agreement").  HGC is the interim development financier of, and owner of Series A membership interest in, Holdings.

## Section 2.2    Management

As of the Petition Date, the Debtors' commercial management team consisted of the following individuals:

| | |
|---|---|
| Jeffrey Beicker | Chief Executive Officer |
| Charles Craig Janies | Chief Operating Officer and Chief Commercial Officer |
| Ronald Chamness | Vice President of Business Development |
| Michael Sambasile, P.E. | Project Construction Coordinator |
| Jordan Fickessen, CPA | Finance and Accounting |

**Section 2.3      Assets and Liabilities of the Debtors as of the Petition Date**

The Debtors filed their respective Schedules on June 18, 2020 [Dkt. Nos. 59, 61, 65], and Permico Midstream filed amended Schedules on July 28, 2020 [Dkt. No. 78].  Those Schedules provide additional detail about the assets and liabilities of each of the Debtors, and those documents are incorporated herein by reference.

**Assets and Liabilities:**

Based on book value, and as set forth in the Amended Schedules, Permico Midstream's assets totaled approximately $41,634,686.73 as of the Petition Date.  The Trustee has not taken a position on the issue of the estate's title or interest in the Corpac and Edgen Pipe and such issue is pending a determination in the Corpac Adversary Proceeding and Edgen Adversary Proceeding, as applicable.  Based on book value, and as set forth in the Schedules, Permico Holdings' assets totaled approximately $0.00.

Based on book value, Permico Midstream's liabilities totaled approximately $225,391,585.90 as of the Petition Date (which again included liabilities associated with the Pipe that is subject to the title and lien dispute in the Corpac Adversary Proceeding and Edgen Adversary Proceeding).  Based on book value, Permico Holdings' liabilities totaled approximately $31,136,301.00.

**Secured Debt:**

As of the Petition Date, the Debtors' schedules stated that they were each jointly and severally indebted and liable to HGC for $31,136,301.00, secured by a first lien on certain of the Debtors tangible and intangible property, including the equity in Permico Midstream.

**Priority Unsecured Debt:**

As set forth in the Schedules, as of the Petition Date, approximately $307,532.50 of unsecured creditors held priority unsecured claims.

**Unsecured Debt:**

As set forth in the Schedules, as of the Petition Date, the total amount of unsecured claims was $193,937,752.40[3].

**Section 2.4      Events Leading to the Debtors' Bankruptcy Filing.**

The Debtors are Houston-based limited liability companies that are engaged in certain midstream oil and gas operations.  Prior to the Petition Date, the Debtors were in the process of developing the Project, which has an estimated capital cost of over three billion dollars to complete phase one.  When all three phases of the Pipeline Project are completed, the Debtors' commercial management team believes that the Pipeline Project will have a market value of over eighteen

---

[3] This includes the Debtors' estimate of the claims of Corpac and Edgen.

billion dollars.  Debtor Permico Midstream required interim development financing to keep the Pipeline Project moving forward, while it negotiated with multiple lenders to obtain final debt and equity project financing for the Pipeline Project.  Permico Midstream ultimately selected the Hanwha Group, a South Korean conglomerate, over several other competitors to provide the interim development financing in the approximate total sum of $80,000,000.

As of April 30, 2019, Permico Midstream and the Hanwha Group's newly-formed American subsidiary, HGC, entered into a Development Loan Agreement ("Development Loan Agreement"), under which Hanwha would make advances to Permico Midstream in two tranches. The first $30,000,000 tranche was funded at closing.  The second $6,000,000 tranche was made in the form of an equity infusion, which was funded later.  The remaining balance of the $80,000,000—roughly $44,000,000—was to be funded via capital calls made on HGC under the terms of that certain Amended and Restated Limited Liability Company Agreement ("Company Agreement") for Permico Holdings.

HGC also received Series A convertible membership interests in Permico Holdings, in connection with the interim development financing and under the terms of the Company Agreement.

The Company Agreement was executed by the common members, Energia, and Conquista and the Series A Member HGC.  Energia was granted two seats on the Board of Directors, Conquista was granted one seat, and HGC was granted the fourth and final seat.  As part of the Company Agreement, HGC was granted the right to replace the Manager and Board of Directors of Permico Holdings upon the occurrence of certain conditions, one of which was the failure to close on final project financing and redeem HGC's Series A membership interest by April 30, 2020.

Subsequently, a dispute arose between Permico Holdings and HGC, which resulted in HGC purporting to exercise certain rights in replacing the Debtors board with their own appointees. That newly replaced Board ultimately authorized the filing of the Debtors' Bankruptcy Cases. Energia has disputed the validity of HGC's actions.

Corpac and Edgen have no direct knowledge of the matters stated above.

### ARTICLE III.         MAIN EVENTS IN THE BANKRUPTCY CASES

**Joint Administration.**   On May 4, 2020, the Debtors filed a Motion for Joint Administration (the "Joint Administration Motion") [Dkt. No. 2].   Through the Joint Administration Motion, the Debtors sought entry of an order directing joint administration of the Bankruptcy Cases for procedural purposes only.  The Bankruptcy Court granted the relief requested in the Joint Administration Motion on May 4, 2020 [Dkt. No. 6].

**Claims Bar Date.**  Pursuant to the *Notice of Chapter 11 Bankruptcy Cases* [Dkt. No. 57], the deadline for non-governmental parties to file proofs of claim or interests was set for October 21, 2020, and the deadline for governmental units to file proofs of claim was set for December 15, 2020.  The Debtors and HGC, Corpac and Edgen have entered into various stipulations that extended the Claims Bar Date as to each of those parties pursuant to the terms of those stipulations.

**Meeting of Creditors.**  The 341 meeting of creditors was held and concluded on July 23, 2020.

**Appointment of Chapter 11 Trustee.**  At a hearing held on May 12, 2020, Judge Isgur *sua sponte* ordered the appointment of a chapter 11 trustee in these Bankruptcy Cases.

On May 18, 2020, the Office of the United States Trustee (the "U.S. Trustee") filed a *Notice of Appointment of Chapter 11 Trustee* and corresponding *Application for Order Approving Appointment of Chapter 11 Trustee*, seeking approval of Mr. Greendyke to serve as the Trustee in these Bankruptcy Cases [Dkt. Nos. 36 & 37].

On May 22, 2020, the Court entered its *Order Approving Appointment of Chapter 11 Trustee in the Jointly Administered Permico Midstream Partners Holdings, LLC Cases* (the "Trustee Order") approving appointment of Mr. Greendyke as Trustee [Dkt. No. 44].

**Retention of Professionals.**  On June 22, 2020, the Trustee filed his *Application to Employ Norton Rose Fulbright US LLP* ("NRF") as counsel to the Chapter 11 Trustee [Dkt. No. 69].  An order authorizing and approving this application was entered by the Court on October 1, 2020 [Dkt. No. 118].

On August 7, 2020, the Trustee filed an *Application to Employ GulfStar Group II, Ltd as Investment Banker* ("Application") [Dkt. No. 83].  On October 1, 2020, the Court approved the Application [Dkt. No. 118].

**Extension of Deadline to Assume or Reject Unexpired Leases of Non-Residential Real Property.**  On August 31, 2020, November 30, 2020, March 1, 2021, and April 30, 2021, the Trustee filed various *Motions to Extend Time to Assume or Reject Unexpired Leases of Nonresidential Property Pursuant to 11 U.S.C. § 365(d)(4)* (the "Extension Motions") [Dkt. Nos. 88, 140, 208, 234].  As of the filing of this DS/Plan, the deadline to assume or reject unexpired leases of non-residential real property is set for June 29, 2021.  *See* Dkt. No. 241.  The Trustee anticipates filing an additional Extension Motion further extending this deadline to coincide with the Milestone Dates under the Plan Settlement Term Sheet and hereunder.

**Extension of Deadline to Remove Civil Actions.**  On July 29, 2020, October 1, 2020, November 30, 2020, January 15, 2021, March 1, 2021, and April 30, 2021, the Trustee filed various *Unopposed Motions of William R. Greendyke, Chapter 11 Trustee, to Extend Time to Remove Proceedings* (the "Removal Extension Motions") [Dkt. Nos. 80, 116, 141, 174, 208, and 233].  As of the filing of this DS/Plan, the deadline to remove proceedings is set for June 29, 2021 (the "Current Removal Deadline").  *See* Dkt. No. 240.  The Trustee anticipates filing an additional Removal Extension Motion further extending this deadline to coincide with the Milestone Dates under the Plan Settlement Term Sheet and hereunder.

**Post-Petition Financing**.  On December 18, 2020, the Trustee filed an *Emergency Motion for Entry of Interim and Final Orders Authorizing Trustee to Obtain Postpetition Financing and Granting Related Relief* (the "DIP Motion") [Dkt. No. 152], requesting certain authority to borrow $750,000.00 from Integra Midstream Partners, L.L.C. pursuant to section 364 of the Bankruptcy Code and to grant a deed of trust on certain of the Debtors' unencumbered and undeveloped

real property and rights of way. The proposed financing enabled the Trustee to pay general corporate expenses and administrative expenses that were necessary to maintain the Debtors' value and reorganize the Debtors. At that time, the Debtors' current cash balance was less than $2,000, and the Debtors were not expected to generate any revenue before the reorganization.

On January 19, 2021, the Court entered the Final DIP Order, approving the DIP Motion and authorizing the Trustee on a final basis to obtain $750,000.00 in post-petition financing pursuant to terms set forth in the Credit Documents (as defined therein). *See* Dkt. No. 180. The Maturity Date (as defined in the Credit Documents) was originally set for June 26, 2021. That Maturity Date has since been extended by agreement pursuant to that certain *Stipulation and Agreed Order Extending DIP Facility Maturity Date* [Dkt. No. 260], which extended the Maturity Date to September 22, 2021 to coincide with the timing required in the Plan Settlement Term Sheet and this Plan for the Effective Date.

On June 18, 2021, the Court entered the *Stipulation and Agreed Order Authorizing Trustee to Obtain Unsecured Debt Allowable Under Section 503(b)(1) as an Administrative Expense*, at Dkt. No. 263, approving the Beicker DIP Loan, pursuant to which Mr. Beicker agreed to provide up to $57,500.00 in unsecured financing and was allowed and administrative expense claim in the amount of the funds loaned pursuant to the stipulation.

**The Corpac and Edgen Adversary Proceedings**. On June 2, 2020, Edgen filed its *Original Complaint for Declaratory Relief,* commencing the Edgen Adversary Proceeding. On May 12, 2020, Corpac filed its *Complaint for Declaratory Relief, Determination of Validity, Extent, and Priority of HGC's Lien and Determination of Validity, Extent, and Priority of Corpac's Liens*, commencing the Corpac Adversary Proceeding. Those Adversary Proceedings have been abated by agreement of the parties through and including the earlier of (a) the Effective Date of this Plan or (b) seven days after the filing of a Notice of Milestone Default, as provided under the Plan Settlement Term Sheet. *See* Edgen Adversary Proceeding, Dkt. No. 58; *see also* Corpac Adversary Proceeding, Dkt. No. 70.

**Mediation.** On April 13, 2021, the Trustee, HGC, Energia, Corpac, and Edgen (the "Mediation Parties") filed a *Joint Emergency Motion for Entry of an Order Appointing a Mediator* [Dkt. No. 223], seeking entry of an order appointing United States Bankruptcy Judge Christopher Lopez as mediator for the Bankruptcy Cases and the Adversary Proceedings. The Court approved the mediation request on April 14, 2021. *See* Dkt. No. 225. The Mediation Parties commenced mediation on April 27, 2021 and continued to work with Judge Lopez over the ensuing weeks. On May 25, 2021, the Mediation Parties signed the Plan Settlement Term Sheet, providing for a consensual plan process for the Bankruptcy Cases. The Plan Settlement Term Sheet (including exhibits) is attached to this Plan as **Exhibit A**, and is incorporated herein by reference for all purposes. **To the extent of any inconsistency between the terms of the Plan Settlement Term Sheet and this Plan, the terms of the Plan Settlement Term Sheet shall control. The Bankruptcy Court, after notice and opportunity for hearing, shall resolve any dispute as to whether there is any inconsistency.** The Plan Settlement Term Sheet is described further in Article VI below.

**The Pipe Sale Motion and Pipe Sale Order.** On May 26, 2021, the Trustee filed an *Emergency Motion of William R. Greendyke, Chapter 11 Trustee, for Authority to Commence Pipe*

*Sales Pursuant to Terms of Plan Settlement Term Sheet and Related Relief* [Dkt. No. 243], seeking entry of an order authorizing the commencement of sales of the Corpac Pipe and Edgen Pipe under the conditions agreed to by the parties under the Plan Settlement Term Sheet, including the approval of settlements between the Trustee and Corpac, and the Trustee and Edgen. The Court entered its *Order Granting Emergency Motion of William R. Greendyke, Chapter 11 Trustee for Authority to Commence Pipe Sales Pursuant to Terms of Plan Settlement Term Sheet and Related Relief* [Dkt. No. 251] on May 28, 2021. Pursuant to the Pipe Sale Order and related Plan Settlement Term Sheet, the Court authorized the commencement of the sale of Pipe as follows:

a.  Edgen shall be authorized and responsible for selling only Edgen Pipe, with notice to HGC, the Trustee, and/or Liquidating Trustee.

b.  Corpac shall be authorized and responsible for selling only Corpac Pipe, with notice to HGC, the Trustee, and/or Liquidating Trustee.

c.  Corpac may immediately sell up to $8 million of Corpac Pipe and Edgen may immediately sell up to $8 million of Edgen Pipe, each calculated based on the prices set forth in the prepetition Purchase Orders with respect to the Pipe being sold (the "Initial $8 million PO Sale"), and keep all proceeds of such sales free and clear of any liens, claims, and encumbrances of any party, *provided that* all other Corpac Pipe and Edgen Pipe remain subject to the rights, claims, and interests of the respective parties in the Adversary Proceedings through the Effective Date under Toggle 1 and until Final Orders are entered in the Adversary Proceedings under Toggle 2. Corpac and Edgen shall provide copies of all purchase orders, invoices, statements, and payment receipts related to any sales provided for herein to counsel for the Trustee and HGC within 3 business days of receipt or delivery, and further provide any accounting necessary for the parties to identify such Pipe and the value allocated to the same on the prepetition Purchase Orders. The Trustee and HGC shall execute any necessary and reasonable confidentiality agreement in connection with the receipt of the aforementioned documents, to the extent requested by Corpac and/or Edgen. For the avoidance of doubt, if Corpac and/or Edgen are able to sell their respective Pipe pursuant to the Initial $8 million PO Sale under the Pipe Sale Motion for a price that is greater than $8 million in the aggregate, respectively, they shall retain any excess proceeds over and above the face amount of such Purchase Orders free and clear of the claims and interests of HGC and the bankruptcy estates.

d.  Corpac and Edgen may each immediately begin selling Pipe beyond the $8 million PO Sale subject to the escrow and lien provisions set forth in the paragraph immediately below.

e.  All proceeds from any sale of Corpac Pipe and Edgen Pipe, other than from the Initial $8 million PO Sale, shall be distributed 80% to escrow account one for the Corpac matter and 80% to escrow account two for the Edgen matter maintained by a third-party escrow agent (the "Escrow(s)" or, as to Corpac, the "Corpac Escrow" and, as to Edgen, the "Edgen Escrow") and 20% to the seller of the Pipe (i.e., Corpac or Edgen), until the deposits into the respective Escrow account equals $35

-21-

million.  For the avoidance of doubt, Edgen and Corpac shall each fund separate $35 million Escrow accounts funded solely from proceeds from the sale of their respective Pipe.  For purposes of the foregoing distributions with respect to Edgen pipe only, all actual proceeds received from the sale of Pipe shall be used for purposes of calculating the Edgen Escrow.  Once the Edgen Escrow is fully funded, Edgen shall keep all proceeds of any additional sales of Edgen Pipe free and clear of any liens, claims, and encumbrances of any party.  Once the Corpac Escrow is fully funded, Corpac shall keep all proceeds of any additional sales of Corpac Pipe free and clear of any liens, claims, and encumbrances of any party.  For purposes of the foregoing distributions with respect to Corpac pipe only, the value to be used in determining the proceeds from any such sale shall be calculated based on the prices set forth in the prepetition Purchase Orders with respect to the Pipe being sold and not the actual sales proceeds.  To the extent any such Pipe is sold for below the value attributed to such Pipe under the prepetition Purchase Orders, Corpac shall contribute additional funds into the Escrows to make up for any shortfall below 80% of such prepetition Purchase Order value.  As an example, if Corpac sells $10 million worth of prepetition Purchase Order value pipe for only $7 million, it will be responsible for contributing all $7 million in proceeds into Escrow and also contributing an additional $1 million to fulfill the shortfall on the 80% escrow contribution obligation.  Until each of the Escrows is funded with $35,000,000, the Retained HGC Lien will continue to encumber the Corpac and Edgen Pipe to the same extent, validity and priority as existed on the petition date (the "Retained HGC Lien") until sold and, thereafter, will attach to the funds held in the Escrows.  Upon the funding of each escrow in the amount of $35,000,000, the Retained HGC Lien will be released as to the pipe owned by Edgen or by Corpac or by both who have deposited the $35,000,000.  The Retained HGC Lien shall not attach to that portion of the sales proceeds (i.e., Initial $8 million PO Sale; and 20% of sales proceeds) paid to Corpac or Edgen as set forth in this section.  Corpac's lender, who asserts a lien on the Corpac Pipe being sold shall, subject to any existing liens, have a lien on the proceeds in the Corpac Escrow to the same extent and priority as such lender's liens existed on the Corpac Pipe as of the Petition Date.

The Pipe Sale Order also approved certain mutual settlements and releases provided by and between the Trustee and Edgen, and by and between the Trustee and Corpac, in the Plan Settlement Term Sheet, which releases are reincorporated into this Plan.

The Pipe Sale Order provided that in connection with the Pipe sales and consistent with the terms of the Plan Settlement Term Sheet, Corpac and Edgen shall each pay the Estate $500,000 (under Toggle 1) or $1,250,000 (under Toggle 2), and release the Estate of any claims other than with respect to obligations assumed by the Reorganized Debtor (under Toggle 1) or a subordinated Class B rejection damage claims (under Toggle 2) on the Effective Date.[4]  If this Plan is not confirmed by Order of the Bankruptcy Court or the Effective Date does not occur, the Estates'

---

[4] The settlement payment obligation under Toggle 2 shall be subject to the terms and conditions as provided under the Plan Settlement Term Sheet.

mutual settlements and releases with Corpac and Edgen provided for under Toggle 2 (i.e., the terms of the mutual settlements and releases set forth on Pages 13-18 of the Plan Settlement Term Sheet which otherwise are incorporated in the Plan and become effective on the Effective Date) shall become effective upon the earlier of (i) entry of an order denying confirmation of the Plan, (ii) entry of an order converting either or both cases under chapter 7 of the Bankruptcy Code; or (iii) dismissal of either or both cases. For the avoidance of doubt, such Estate settlements shall include a release of any Trustee and/or Debtors' estates claims against Corpac or Edgen, including, as to Corpac and Edgen only, any surcharge rights or interest in any pipe or the Corpac Escrow funded by Corpac or the Edgen Escrow funded by Edgen subject to the HGC Reserved Lien under the Plan Settlement Term Sheet; *provided, further*, for the avoidance of doubt, Corpac shall reserve and retain any liens (if any) on the assets of the Debtors' Estates that Corpac held on the Petition Date and the proceeds of the sale of any such assets, *provided further, however*, that any such lien shall be subordinated to allowed Administrative Expense Claims solely to the extent the settlement payments to the Trustee are insufficient to satisfy such allowed admins (up to $3.5 million). Moreover, any allocation of any amount that may be subordinated between HGC and Corpac based on their respective liens (if any) shall be determined by the Court or the agreement of HGC and Corpac.

A copy of the Pipe Sale Order is attached to the Plan as Exhibit B and is incorporated herein by reference for all purposes.  **To the extent of any inconsistency between the Plan and the Pipe Sale Order, the Pipe Sale Order shall control.  The Bankruptcy Court, after notice and hearing, shall resolve any dispute as to whether there is any inconsistency.**

## ARTICLE IV.        CONFIRMATION OF THE PLAN

### Section 4.1    Confirmation Procedures

On July [●], 2021, the Court entered the Disclosure Statement Order [Dkt No. [●]].  Among other things, the Disclosure Statement Order approved the adequacy of disclosures in the DS/Plan on a conditional basis and set certain dates and deadlines for the solicitation of the Plan, voting on the Plan, filing objections to the Plan, and a hearing to consider final approval of the Disclosure Statement and confirmation of the Plan.  The final Disclosure Statement and Confirmation Hearing has been scheduled for **August 20, 2021 at 10:00 a.m. (prevailing Central time)**.  The Confirmation Hearing may be adjourned from time to time by the Plan Proponents without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

### Section 4.2    Objection Procedures

Any objection to final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or Confirmation of the Plan must (i) be in writing; (ii) state the name, address and phone number of the objecting party and the nature of the claim of such party; (iii) state with  particularity the basis and nature of any objection; and (iv) be filed, together with proof of service, with the Court no later than August 16, 2021 at 5:00 p.m. (prevailing Central time) (the "Objection Deadline").  Unless an objection is timely filed, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

**Section 4.3     Requirements for Confirmation**

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible.  The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

**Section 4.4     Classifications of Claims and Equity Interests**

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).  The Plan Proponents are also required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Plan Proponents believe that the Plan complies with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.  The Plan Proponents believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the Plan Proponents' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Plan Proponents intend, in accordance with the terms of the Plan and the Plan Settlement Term Sheet, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation.  Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE

DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Plan Proponents as of the date hereof and reflect the Plan Proponents' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Plan Proponents believe that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

**Section 4.5     Impaired Claims or Equity Interests**

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Classes 2A, 2B, 3, 4, 5A, 5B and 5C are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Interests in Class 6 are Impaired and will not receive or retain any property under the Plan on account of such Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN 2A (SECURED HGC CLAIMS), 2B (OTHER SECURED CLAIMS), CLASS 3 (CORPAC CLAIMS), CLASS 4 (EDGEN CLAIMS), CLASS 5A (GENERAL UNSECURED CLAIMS), CLASS 5B (SUBORDINATED

CORPAC CLAIM—TOGGLE 2 ONLY) AND CLASS 5C (SUBORDINATED EDGEN CLAIM—TOGGLE 2 ONLY).

The Plan Proponents will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) to the extent any Impaired Class does not vote to accept the Plan ("Cramdown").

## Section 4.6    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a plan proponent demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  The Plan is structured to provide all parties with the opportunity to be paid in full upon consummation of a Project Transaction, while preserving each party's respective interests until the Project Transaction closes, and further including firm Milestone Dates and an expedited alternative sale path in the event that the Project Transaction is delayed or does not close.  To this point, Toggle 1 of the Plan contemplates committed exit funding of no less than $25 million plus the Reorganized Debtors' assumption of all obligations of the Debtors, other than obligations settled or compromised under the Plan.  In the event of an uncured Milestone Default, however, Toggle 2 of the Plan contemplates a Sale of all Estate assets other than Estate Causes of Action and the Pipe.  Given the Toggle 2 liquidation scenario contemplated hereunder as an alternative Plan structure, the Plan Proponents believe that the Plan meets the feasibility requirements of the Bankruptcy Code.

## Section 4.7    The Best Interests Test & Liquidation Analysis

Whether or not the Plan is accepted by each Impaired Class of Claims entitled to vote on the Plan, in order to confirm the Plan, the Bankruptcy Court must independently determine, pursuant to section 1129(a)(7) of the Bankruptcy Code, that the Plan is in the best interests of each holder of an Impaired Claim or Interest that has not voted to accept the Plan.  This requirement is satisfied if the Plan provides each non-accepting holder of an Impaired Claim or Interest in the rejecting Impaired Class a recovery on account of such holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the Distribution each such holder would receive in a liquidation of the Debtor under chapter 7.  This requirement is commonly referred to as the "Best Interests of Creditors Test."  This Plan easily satisfies the test.

Toggle 1 of the Plan contemplates committed exit funding of no less than $25 million plus the Reorganized Debtors' assumption of all obligations of the Debtors, other than obligations settled or compromised under the Plan.  Thus, Toggle 1 satisfies the best interest test because it would result in payment in full for all holders of Allowed Claims.

Toggle 2 of the Plan will only occur if an uncured Milestone Default occurs under Toggle 1 prior to the Effective Date of the Plan, and contemplates a Sale of all Estate assets other than Estate Causes of Action and the Pipe to Integra and/or its assignee.  That Sale will be subject to receiving higher and better bids[5] in accordance with the timelines set forth in the Plan Settlement

---

[5] Integra and/or its assignee would be entitled to a breakup fee as set forth in the Plan Settlement Term Sheet.

Term Sheet; thus, that open market process will ensure that any Sale maximizes the value and ultimate recoveries to creditors under Toggle 2. Toggle 2 also paves the way for the Estates to receive additional funds via settlements with HGC, Corpac and Edgen that will extract the Trustee, the Debtors and their Estates from any ongoing, protracted and expensive litigation resulting from the Adversary Proceedings. A chapter 7 liquidation, on the other hand, would place the Estates back at ground zero, with no settlements between the holders of approximately 95% of the Claims in these Bankruptcy Cases. A chapter 7 liquidation would also delay if not entirely negate the agreed upon Sale to Integra under Toggle 2; it would burden the Estates with an additional layer of administrative expense associated with the appointment of a chapter 7 trustee and retention of professionals attendant thereto; and it would result in delay in the distributions to holders of Allowed Claims. Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would be more than ninety (90) days following conversion of the case to chapter 7. Thus, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional Claims that were not timely asserted in the Bankruptcy Cases.

In sum, the Plan—under either Toggle 1 or Toggle 2—provides the possibility for a greater recovery to the creditors than such creditors would receive under a liquidation under chapter 7.

## Section 4.8    Voting Procedures and Requirements

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Disclosure Statement Order. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must actually vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT COUNSEL FOR THE CHAPTER 11 TRUSTEE AT MARIA.MOKRZYCKA@NORTONROSEFULBRIGHT.COM.

## ARTICLE V. CERTAIN RISK FACTORS

Before voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in the Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. NEW

FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

*Risk of Non-Confirmation Chapter 11 Plan*.  Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Plan Proponents can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan.  Even if all Voting Classes vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization, liquidation, or conversion.

*Non-Consensual Confirmation and Conversion into Chapter 7 Cases.*  If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  If any Class votes to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes.  While the Plan Proponents believe that the Plan satisfies these requirements, there is no assurance that the Bankruptcy Court will agree.

*Risk of Non-Occurrence of the Effective Date.*  Although the Plan Proponents believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the Effective Date does not occur, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan; the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date; and the Debtors' obligations with respect to Claims and Interests would remain unchanged.  While the Plan Proponents believe they have mitigated this risk with the inclusion of Toggle 2 under the Plan, there is no guaranty that such Effective Date would occur in that scenario.

*Risks Related to Possible Objections to the Plan*.  There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Plan Proponents believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

ARTICLE VI.        SUMMARY OF THE PLAN

**Section 6.1        Overview of the Plan**

The Plan is the result of extensive good faith and arms' length negotiations among the Plan Proponents following an extended mediation among the Mediation Parties, with the Honorable Christopher Lopez of the United States Bankruptcy Court for the Southern District of Texas serving as mediator.

The proposed Plan described herein and agreed to among the Mediation Parties under the Plan Settlement Term Sheet, is a toggle plan, proposing classes and treatments under two scenarios: (i) a Project Transaction with Permico Founders; and (ii) in the event of an uncured Milestone Default prior to the Toggle 1 Effective Date, a Sale of all Estate assets other than Estate Causes of Action and the Pipe. Under both scenarios, and pursuant to the Plan Settlement Term Sheet and Pipe Sale Order, Edgen and Corpac have the immediate right to begin liquidating 100% of the Corpac Pipe and Edgen Pipe, as the case may be subject to certain escrow requirements, distributions, and the Retained HGC Lien as set forth the Plan Settlement Term Sheet, Pipe Sale Order, and described below.

**Section 6.2        The Project Transaction—The Toggle 1 Plan Scenario**

The Project Transaction under Toggle 1 contemplates (i) Permico Founders acquiring 100% of the new equity in the Reorganized Debtors for the Initial Contribution of no less than $25 million to be made on the Effective Date; (ii) Reorganized Debtors' assumption of all obligations of the Debtors unless settled or compromised pursuant to the Plan; (iii) assumption of the Assumed Corpac Contracts and the Corpac Effective Date Assumed Allowed Claim in accordance with the terms of the Plan and Exhibit B to the Plan Settlement Term Sheet, *provided, however*, that the Corpac Pipe shall be "as, is", *further, provided, however that* warranties, if any, shall continue to apply in accordance with the terms of the Corpac Purchase Orders as may be amended; (iv) assumption of the Edgen Purchase Orders and the Edgen Assumed Obligations in accordance with Exhibit C to the Plan Settlement Term Sheet; (v) assumption by the Reorganized Debtors of all obligations to HGC, including payment obligations as of the Effective Date and at FID/Financial Close; and (vi) mutual releases among the Plan Proponents (other than any Claims and Causes of Action by and between Energia and HGC).

**Section 6.3        The Sale Transaction—The Toggle 2 Plan Scenario**

In the event that an uncured Milestone Default occurs prior to the Toggle 1 Effective Date, under Toggle 2 of the Plan substantially all of the Debtors' assets, other than Estate Causes of Action, the Edgen Pipe, and the Corpac Pipe, shall be sold for $3.5 million to Integra Midstream Partners LLC or its designee (the "Buyer"), free and clear of all rights, titles, and interests, with any such rights, title, and interest attaching to the proceeds subject to the same, extent, validity, and priority as existed on the Petition Date, subject to higher and better bids received by the Trustee within 14 days of the filing of the Sale Notice (the "Bid Deadline"). The Trustee shall file a notice of the proposed sale and asset purchase agreement within 7 days of an uncured Milestone Default (the "Sale Notice"). To the extent the Trustee receives one or more higher or better offers prior to the Bid Deadline, the Trustee will hold an auction within 7 days following the Bid Deadline and

select the highest and best bid.  If Integra (Buyer) is not accepted as the highest and best bid, Integra shall receive a break-up fee and expense reimbursement of $175,000 (the "Break-Up Fee") paid out of the proceeds from the Sale at the closing, and Corpac shall be entitled to credit the Break-Up Fee against the Corpac Toggle 2 Trustee Payment.

Under both Toggle 1 and Toggle 2 of the Plan, the sale of Pipe as authorized by the Pipe Sale Order shall continue, with such sales proceeds to be distributed in accordance with the Pipe Sale Order.

The various Classes and estimated recoveries under Toggle 1 and Toggle 2 are below:

| Class | Estimated Claim Amounts[6] | Toggle 1 Estimated Recoveries | Toggle 2 Estimated Recoveries |
|---|---|---|---|
| Class 1 (Priority Non-Tax Claims) | $85,100.00 | 100% | <2.5% |
| Class 2A (HGC Claim) | $31,136,301.00 | 100% | <2.5% to 100% dependent upon resolution of Adversary Proceedings |
| Class 2 B (Other Secured Claims) | $0.00 | 100% | 100% |
| Class 3 (Corpac Claim) | $107,894,622.61+ | 100% | 50% to 100% dependent upon resolution of the Corpac Adversary Proceeding |
| Class 4 (Edgen Claim) | $88,787,424.20+[7] | 100% | 50% to 100% dependent upon resolution of the Edgen Adversary Proceeding |
| Class 5 (General Unsecured Claims) | $7,870,585.29 | 100% | <2.5% |
| Class 5B (Subordinated Corpac Allowed Class 5B Claim) [Toggle 2 Only] | TBD | N/A | <2.5% |
| Class 5C | TBD | N/A | <2.5% |

---

[6] Estimated claim amounts are derived from the Debtors' schedules, at Dkt. No. 65.  Such amounts are estimates only, and the Plan Proponents make no admissions and reserve all rights with respect to the allowance, amount, or priority of any claims other than with respect to claims allowed pursuant to the Plan.

[7] This amount does not include interest.

| (Subordinated Edgen Allowed Class 5C Claim) [Toggle 2 Only] | | | |
|---|---|---|---|
| Class 6 (Interests) | n/a | 0% Interests cancelled | 0% Interests cancelled |

## ARTICLE VII.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### Section 7.1    Overview of Classification

Pursuant to section 1122 of the Bankruptcy Code, a Claim or Equity Interest is placed in a particular Class for purposes of voting on the Plan and receiving Distributions under the Plan only to the extent (i) the Claim or Equity Interest qualifies within the description of that Class; and (ii) the Claim or Interest has not been paid, released, or otherwise compromised before the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including the B&B Claims which shall be paid and treated as other Allowed Professional Fee Claims as provided below), Professional Fee Claims, and Priority Tax Claims are not classified under the Plan and are excluded from the following Classes.

### Section 7.2    Identification and Treatment of Unclassified Claims

(a) Administrative Claims.  As provided under section 1123(a)(1) of the Bankruptcy Code, Administrative Claims are not classified for purposes of voting on, or receiving distributions under, the Plan.  Accordingly, holders of Administrative Claims are not entitled to vote on this Plan.

An Administrative Expense Claims Escrow shall be funded on the Effective Date under Toggle 1 and Toggle 2 of the Plan, as applicable, for the benefit of holders of Allowed Administrative Expense Claims.  The Administrative Expense Claims Escrow under Toggle 1 of the Plan shall be funded from the HGC Toggle 1 Trustee Payment, the Corpac Toggle 1 Trustee Payment, and the Edgen Toggle 1 Trustee Payment.  To the extent Toggle 1 of the Plan is implemented, the Reorganized Debtors shall assume any Allowed Administrative Expense Claims to the extent of any shortfall between the Allowed amount of Administrative Expense Claims and the Administrative Expense Claim Escrow, with any such allowed claims to be paid in full at Financial Close.  The Administrative Expense Claims Escrow under Toggle 2 of the Plan shall be funded from the HGC Toggle 2 Trustee Payment, the Corpac Toggle 2 Trustee Payment, the Edgen Toggle 2 Trustee Payment.  Additionally, under Toggle 2, any unencumbered proceeds from the sale of property other than Pipe under Toggle 2 shall be distributed to the Administrative Expense Escrow (and the balance owing on the DIP Loan from Integra shall be paid in full from such Administrative Expense Escrow), *provided that*, to the extent any assets subject to the Toggle 2 sale are encumbered by a valid, perfected, first priority lien, any such lien shall attach to proceeds to the same extent as existed prior to the Petition Date or as was provided under the DIP Order and such proceeds shall be distributed to the holder of such Allowed Secured Claim.

The estimated Administrative Expense Claims include: (i) the DIP Loan balance; (ii) the Beicker DIP Loan; (iii) Professional Fee Claims; (iv) Trustee fees; (v) the B&B Claim, and (vi) non-professional post-petition administrative expenses.  All Administrative Expense Claims shall be allowed only upon entry of an order of the Court approving such administrative claims; *provided, however,* that: (i) the DIP Loan; (ii) Beicker DIP Loan; and (iii) the B&B Claim (under Toggle 1 only)  are automatically allowed without the need for any further order of the Court.  The DIP Loan and Beicker DIP Loan shall be paid on the Effective Date.  The B&B Claim (under Toggle 1 only) shall be paid the amount of $250,000 on the Effective Date, with the remainder of the B&B Claim to be paid *pari passu* with the Allowed Professional Fee Claims at the time such Allowed Professional Fees are either paid in full or paid their pro rata share of the funds remaining in Administrative Expense Claims Escrow, with any remaining amounts owed to be paid by Permico Founders/Reorganized Debtors at Financial Close as provided in the Plan Settlement Term Sheet.

Holders of Administrative Claims accruing from the Petition Date through the Effective Date, other than Professional Fee Claims, the B&B Claim (under Toggle 1 only),  the DIP Loan, and Beicker DIP Loan, shall file with the Bankruptcy Court and serve on Permico Founders, the Reorganized Debtors, the Trustee, and the Liquidating Trustee requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to actually be received on or before the Administrative Claim Bar Date.  Any such Claim not filed by the Administrative Claim Bar Date shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof.  The notice of Effective Date to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Administrative Claim Bar Date and shall constitute good and adequate notice of such Bar Date.  Permico Founders, the Reorganized Debtors, the Trustee and/or the Liquidating Trustee, as applicable, shall have one hundred twenty (120) days (or such longer period as may be allowed by order of the Bankruptcy Court on motion of Permico Founders, the Reorganized Debtors, or the Liquidating Trustee, as applicable) following the Administrative Claim Bar Date to review and object to Administrative Claims.

Professional Fee Claims are Administrative Claims and all applications for allowance and payment of Professional Fee Claims shall be filed with the Bankruptcy Court on or before the Professional Fee Bar Date.  If an application for a Professional Fee Claim is not filed by the Professional Fee Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof.  The notice of Effective Date to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Professional Fee Bar Date and shall constitute notice of such bar date.

(b) U.S. Trustee Fees.  The U.S. Trustee Quarterly Fees encompasses those fees assessed pursuant to 28 U.S.C. § 1930(a)(6).  The Debtors' Estates shall be responsible for timely payment of the U.S. Trustee quarterly fees incurred pursuant to § 1930(a)(6) without the need for the Office of the United States Trustee to file any request for payment.  Any such fees due as of the Confirmation Date will be paid in full on the Effective Date out of the Administrative Expense Claim Escrow.  The Reorganized Debtors or Liquidating Trustee, as applicable, shall timely pay or cause to be paid post-confirmation quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) out of available funds in that escrow until such time as the Bankruptcy Court enters a final decree closing these Bankruptcy Cases, or enters an order either converting these Bankruptcy Cases to

cases under chapter 7 or dismissing these Cases.  After the Effective Date, the Liquidating Trustee shall file with the Bankruptcy Court and shall transmit to the U.S. Trustee a statement of all disbursements made by the Liquidating Trustee Agent for each quarter, or portion thereof that these Bankruptcy Cases remain open in a format prescribed by the U.S. Trustee.

(c) <u>Priority Tax Claims</u>.  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of Permico Founders, the Trustee, or the Reorganized Debtors, as applicable (i) Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

## Section 7.3    Identification of Classes of Claims

(a)    <u>Treatment of Priority Non-Tax Claims (Class 1)</u>.

*(1)    Toggle 1 Plan Treatment for the Class 1 Priority Non-Tax Claims*

All Class 1 Allowed Priority Non-Tax Claims are being assumed by the Reorganized Debtors under Toggle 1 of the Plan.  Accordingly, under Toggle 1 of the Plan, on the later of the Financial Close Date or the date such Priority Non-Tax Claims becomes an Allowed Claim, and in full and final satisfaction, compromise, settlement, release, discharge of, and in exchange for, each Holder of an Allowed Priority Non-Tax Claims shall receive either (i) payment in full, in cash, on account of such Allowed Priority Non-Tax Claim or (ii) such other treatment as may be agreed to by such Holder, Permico Founders or the Reorganized Debtors, as applicable.  No interest shall be due on such Allowed Priority Non-Tax Claim.  Prior to the Financial Close Date, Holders of Allowed Priority Non-Tax Claims shall retain all rights with respect to property of the Debtors' Estates vested in the Reorganized Debtors after the Effective Date, if any, in accordance with applicable state law and federal bankruptcy law.  Any such rights and/or liens shall be released upon Financial Close and payment in full of such Allowed Priority Non-Tax Claim.

*(2)    Toggle 2 Plan Treatment for the Class 1 Priority Non-Tax Claims*

Under Toggle 2 of the Plan, except to the extent that the Holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, such Holder shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, a pro rata distribution from the Liquidating Trust Assets (excluding any Distributions from the Administrative Expense Claim Escrow) as soon as reasonably practical on or after the later of (a) the Effective Date, (b) the end of the claims objection period, and (c) such Priority Non-Tax Claim becomes an Allowed Claim.

Class 1 Priority Non-Tax Claims are unimpaired under Toggle 1 and Toggle 2 of the Plan, and thus are entitled to vote on the Plan.

(b)    Treatment of HGC Claim (Class 2A).

(1)    *Toggle 1 Plan Treatment for the Class 2A HGC Claim*

Under Toggle 1 of the Plan, upon the Effective Date, HGC shall be paid the HGC Initial Payment, and the HGC Claim Balance shall be assumed by the Reorganized Debtors.  For the avoidance of doubt, the HGC Claim Balance shall equal $14 million under Toggle 1 only.

On the Effective Date, HGC shall further receive the Corpac HGC Payment from Corpac (paid from the Corpac Cure Payment) in full satisfaction and release of all rights, claims, and interests in the Corpac Pipe and the related Corpac Adversary Proceeding.  Corpac shall be assigned $1.75 million of the HGC Claim Balance upon payment of the Corpac HGC Payment.  HGC shall promptly remit such sum to Corpac as soon as it receives the $1.75 million at Financial Close if such payment is not otherwise paid directly to Corpac.

On the Effective Date, HGC shall further receive the Edgen HGC Payment from Edgen in full satisfaction and release of all rights, claims, and interests in the Edgen Pipe and the related Edgen Adversary Proceeding.  Edgen shall be assigned $1.75 million of the HGC Claim Balance upon payment of the Edgen HGC Payment.  HGC shall promptly remit such sum to Edgen as soon as it receives the $1.75M at Financial Close if such payment is not otherwise paid directly to Edgen.

For the avoidance of doubt, any lien, claim, or interest asserted by HGC against the Corpac Pipe and Corpac Escrow shall be released on the Toggle 1 Effective Date, only, provided and so long as HGC has been paid the Corpac HGC Payment.

For the avoidance of doubt, any lien, claim, or interest asserted by HGC against the Edgen Pipe and Edgen Escrow shall be released on the Toggle 1 Effective Date, only provided and so long as that HGC has been paid the Edgen HGC Payment.

(2)    *Toggle 2 Plan Treatment for the Class 2A HGC Claim*

Under Toggle 2 of the Plan, the rights, claims, and interests of HGC with respect to the Edgen Adversary Proceeding and Corpac Adversary Proceeding, including the Pipe, the Corpac Escrow, and the Edgen Escrow, shall be preserved and resolved in the Adversary Proceedings, except to the extent of any settlement provided for under the Plan or as may be later agreed upon by the applicable parties.

To the extent HGC prevails in the Edgen Adversary Proceeding by a Final Order, HGC shall be entitled to exercise all applicable rights to the Edgen Escrow and the Edgen Pipe.  To the extent Edgen prevails in the Edgen Adversary Proceeding by a Final Order, Edgen shall be entitled to exercise all applicable rights to the Edgen Escrow and Edgen Pipe. For avoidance of any doubt, once the Edgen Escrow is fully funded, Edgen shall keep all proceeds of any additional sales of Edgen Pipe free and clear of any liens, claims, and encumbrances of any party.

-34-

To the extent HGC prevails in the Corpac Adversary Proceeding by a Final Order, , HGC shall be entitled to exercise all applicable rights to the Corpac Escrow and Corpac Pipe. To the extent Corpac prevails in the Corpac Adversary Proceeding by a Final Order, Corpac shall be entitled to exercise all applicable rights to the Corpac Escrow and Corpac Pipe. For avoidance of any doubt, once the Corpac Escrow is fully funded, Corpac shall keep all proceeds of any additional sales of Corpac Pipe free and clear of any liens, claims, and encumbrances of any party.

HGC shall also retain its full claim in the Bankruptcy Cases in the amount of $35 million, plus any additional interest and fees accrued after the Effective Date, subject to credits for any amounts received from the Pipe proceeds/Adversary Proceedings.  To the extent Corpac and Edgen both prevail in the Adversary Proceedings, and/or HGC's Claim is not otherwise satisfied in full based on its liens against the Debtors' non-Pipe assets existing as of the Petition Date, HGC's remaining deficiency claim shall be allowed as an allowed secured claim up to the value of its collateral and, to the extent of any deficiency, an allowed Class 5 General Unsecured Claim.  If Corpac or Edgen prevail in their respective Adversary Proceeding by final, non-appealable judgment, any applicable reserved liens or escrows shall be immediately released to Corpac and/or Edgen, as applicable; *provided, however*, HGC's valid, perfected, first priority lien on any property of the Estate (which shall not include the Pipe), shall attach to the Sale proceeds to the same extent, validity, and priority as existed prior to the Petition Date.  Provided, however, HGC shall subordinate any lien on proceeds of the Sale (if any) to allowed Administrative Claims (up to $3.5 million) and solely to the extent Corpac, Edgen, and HGC settlement payments provide to the Trustee under Toggle 2 are insufficient to satisfy allowed Administrative Claims (up to $3.5 million).

For avoidance of doubt, under Toggle 2 if there is a third-party sale to an entity other than Integra or its designees, Corpac shall retain its liens on the Sale proceeds (if any), but Corpac will subordinate any such liens on proceeds of the Sale to Allowed Administrative Claims (up to $3.5 million) and solely to the extent settlement payments to the Trustee under Toggle 2 are insufficient to satisfy such Allowed Administrative Claims (up to $3.5 million). Moreover, any allocation of the amount to be subordinated between HGC and Corpac based on their respective liens (if any) shall be determined by the Court or the agreement of HGC and Corpac.

Class 2A HGC Claim is impaired under Toggle 1 and Toggle 2 of the Plan, and thus is entitled to vote on the Plan.

(c)     Treatment of Other Secured Claims (Class 2B).

(1)     *Toggle 1 Plan Treatment for the Class 2B Other Secured Claims*

All Class 2 Other Secured Claims, if any, are being assumed by the Reorganized Debtors under Toggle 1 of the Plan.  Accordingly, under Toggle 1 of the Plan, on the later of the Financial Close Date or the date such Other Secured Claims becomes an Allowed Claim, and in full and final satisfaction, compromise, settlement, release, discharge of, and in exchange for, each Holder

of an Allowed Other Secured Claim shall receive either (i) payment in full, in cash, on account of such Allowed Other Secured Claim or (ii) such other treatment as may be agreed to by such Holder and the Reorganized Debtors.  No interest shall be due on such Allowed Other Secured Claim. Prior to the Financial Close Date, holders of Allowed Other Secured Claims shall retain all rights with respect to property of the Debtors' Estates vested in the Reorganized Debtors after the Effective Date, if any, in accordance with applicable state law and federal bankruptcy law.  Any such rights and/or liens shall be released upon Financial Close and payment in full of such Allowed Other Secured Claim.

> *(2)    Toggle 2 Plan Treatment for the Class 2B Other Secured Claims*

Under Toggle 2 of the Plan, except to the extent that the Holder of an Allowed Other Secured Claim agrees to a different treatment, such Holder, if any, shall receive, at the election of the Liquidating Trustee and in full and final satisfaction, settlement, release and discharge of, and in exchange for such Allowed Other Secured Claim, either (i) the return or abandonment of the collateral securing such Allowed Other Secured Claim or (ii) such other treatment as may be agreed to by such Holder and the Liquidating Trustee.  In the event of any deficiency on account of such Allowed Other Secured Claim, such deficiency claim shall be treated as a Class 5 General Unsecured Claim.

Class 2B Other Secured Claims, if any, are unimpaired under Toggle 1 and Toggle 2 of the Plan, and thus are entitled to vote on the Plan.  The Trustee is unaware of any Holders of Class 2B Other Secured Claims, although the Trustee understands that (i) HGC asserts a secured claim in the event it does not prevail in Adversary Proceedings and (ii) Corpac also asserts liens.

> (d)    <u>Treatment of the Corpac Claim (Class 3)</u>.

> *(1)    Toggle 1 Plan Treatment for the Class 3 Corpac Claim*

Under Toggle 1 of the Plan, the Class 3 Corpac Claim shall be treated in accordance with the Plan Settlement Term Sheet and Exhibit B annexed thereto, and as follows:

The Reorganized Debtors and/or any of its Corpac approved assignees shall assume all contracts, including, without limitation, the three (3) separate Purchase Orders dated May 7, 2019, and all existing written amendments and any modifications thereto (the "<u>Existing Corpac Contracts</u>" or "Corpac Contracts").  The Reorganized Debtors and Corpac, shall further agree to modify the assumed Existing Corpac Contracts by adding provisions that, among other things, provide for: (i) final payment to occur at Financial Close; (ii) Third Party Sales (as defined below); and (iii) the release of Corpac's obligation to perform under the assumed Existing Corpac Contracts if the Reorganized Debtors do not reach Financial Close by the Release Date (as hereinafter defined).  The above modifications, among others that may be agreed upon by the parties, is documented in the Modification Agreement attached to the Plan Settlement Term Sheet as Exhibit B and made a part hereof (the "<u>Modification</u>," and together with the Existing Corpac

Contracts, the "Assumed Corpac Contracts").[8]  The Reorganized Debtors shall cure existing financial defaults under the Assumed Corpac Contracts by paying Corpac, on the Effective Date, an amount equal to $3,000,000 (the "Corpac Cure Payment").[9]  Upon receipt of the Corpac Cure Payment, Corpac shall remit the Corpac Cure Payment to HGC, together with the Corpac Toggle 1 Trustee Payment.

Additionally, the Reorganized Debtors and Corpac agree that the total amount owing under the Assumed Corpac Contracts as of the Effective Date (assuming the date is September 22, 2021) is $110,635,438.29, which includes: (i) all accrued, but unpaid, interest specifically set forth in the Corpac Contracts; (ii) all fees, storage fees, ad valorem taxes, insurance, cost of coating the Corpac Pipe, and other charges (a) specifically set forth in the Corpac Contracts, or (b) as otherwise agreed to by Corpac and the Reorganized Debtors; and (iii) a portion of the attorney's fees incurred by Corpac in connection with the Debtors' chapter 11 cases (collectively, the "Corpac Effective Date Assumed Allowed Claim").  Notwithstanding the foregoing, the amount of the Corpac Effective Date Assumed Allowed Claim shall be decreased to account for Third Party Sales (as hereinafter defined) that occur prior to the Effective Date pursuant to the terms of that certain Pipe Sale Order.  The Corpac Effective Date Assumed Allowed Claim could also increase for fees, costs and other charges that may accrue from September 23, 2021, through the Effective Date, which amounts will be added to the Corpac Effective Date Assumed Allowed Claim (and thus be part of the Corpac Final Allowed Claim).  The Bankruptcy Court shall retain jurisdiction to determine any disputes with respect to any decreases or increases to the Corpac Effective Date Assumed Allowed Claim as set forth in the preceding two sentences.

The Reorganized Debtors shall assume full liability for the Corpac Effective Date Assumed Allowed Claim, minus the Cure Payment, and shall assume liability for and pay the Corpac Final Allowed Claim (as hereinafter defined) in full at Financial Close (the "Final Payment").  The Corpac Final Allowed Claim  is defined and calculated as follows: (i) the Corpac Effective Date Assumed Allowed Claim; (ii) minus the Cure Payment; (iii) plus applicable  interest at the rate of 7.5% per annum, based on a 365 day year, from the Effective Date through Financial Close; (iv) plus fees and expenses (including storage fees, ad valorem taxes, and insurance cost actually incurred by Corpac from the  Effective Date through Financial Close) specifically set forth in the Corpac Contracts or as otherwise agreed to by Corpac and the Reorganized Debtors; and (v) minus the Corpac Adequate Assurance Payments (as hereinafter defined) actually paid.[10]  Upon receipt

---

[8] The Modification Agreement contains certain recitals and provisions, among other things, relating to the purported title and delivery of the Corpac Pipe.  Such recitals are not being made or otherwise acknowledged or agreed to by the Trustee, the Debtors' Estates or HGC.  The terms of this Plan (and related Plan Settlement Term Sheet) exclusively govern and resolve the Trustee's, the Estates', and HGC's rights and claims in the Corpac Adversary Proceeding in all respects.

[9]  This number is for compromise purposes only, and claims for the balance of the cure payment that may be due shall be a part of the Corpac Final Allowed Claim and is not waived.

[10] Although not binding on the Trustee, the Debtors' Estates, or Permico Founders/Reorganized Debtors, or HGC, Corpac estimates that the balance due at Financial Close (assuming it is March 22, 2022) is estimated to be $110,635,438.28, assuming interest were paid for the period from the Effective Date through September 30, 2021, and assuming monthly payments were made in the amount of $698,589.01 to cover post-Effective Date interest and costs through the Financial Close, less reductions due for any Third-Party Sales to be calculated as provided herein. Although not binding on the Trustee, Permico Founders/Reorganized Debtors or HGC, Corpac also estimates that the

of payment in full of the Corpac Final Allowed Claim, Corpac shall deliver the Corpac Pipe to the Reorganized Debtors, with such delivery to be as specifically set forth in the Corpac Contracts.

The Reorganized Debtors shall also provide Corpac with adequate assurance of future performance by making partial monthly post Effective Date partial interest payments in the amount of $100,000 per month, which shall be paid in arrears on the first of the month commencing on the first day of the second month after the Effective Date.  The Reorganized Debtor acknowledges and agrees that the adequate assurance payments described in this paragraph do not cover the full amount due to Corpac for post-Effective Date interest and fees set forth in the Corpac Contracts; therefore, as provided in the previous paragraph, such unpaid post-Effective Date amounts will be paid in full at Financial Close.

If Financial Close does not occur by March 15, 2022 (the "Release Date"), Corpac, at its option, shall be released and discharged from any obligation to perform under the Corpac Contracts, and may exercise all of its rights and remedies specifically provided for under the Corpac Contracts and/or applicable state law, including, without limitation, the sale of the Corpac Pipe to third-parties.  To the extent that the Release Date occurs and Final Payment is not received on such date, the Reorganized Debtor and/or any assignee shall remain liable for all amounts due under the Corpac Contracts, subject to Corpac's obligation to mitigate its damages, as specifically set forth in Section 2 of the Texas Business and Commerce Code and the terms of the Corpac Contracts; provided, however, that the Reorganized Debtor shall not receive credit for sale proceeds of Corpac Pipe received in mitigation efforts by Corpac that exceed the price of the Corpac Pipe set forth in the Corpac Purchase Orders.

Notwithstanding anything contained herein to the contrary, Corpac shall, subject to the terms of the Pipe Sale Order for pre-Effective Date Third Party Sales, be allowed at all times to sell the Corpac Pipe to third parties free and clear of all interests, liens and encumbrances of the Reorganized Debtors and the Debtors' Estates (a "Third Party Sale"), and, subject to the terms of the Pipe Sale Order for pre-Effective Date Third Party Sales, Corpac shall retain unencumbered title to and possession of all proceeds from any such Third Party Sale; provided, however, that the Reorganized Debtors' obligation to make the Final Payment shall be reduced in an amount equal to the price set forth in the Corpac Contracts for each item of Corpac Pipe sold, and, provided further, that Corpac shall have no obligation to replace or provide the Reorganized Debtors with a substitute for any such item of Corpac Pipe that is sold. Moreover, the amount owing by the

---

balance due at Financial Close will be $114,226,970.30, assuming interest were paid for the period from the Effective Date through September 30, 2021, and assuming monthly payments were made in the amount of $100,000 as partial adequate assurance payments, less reductions due for any Third-Party Sales to be calculated as provided herein.  Any disputes regarding the amount due at Financial Close, if any, shall be resolved by the Bankruptcy Court.

Notably, this amount does not include an additional approximately $19,000,000 which Corpac asserts will be due as a potential resale loss/restocking fee in the event payment is not made at Financial Close.  In any event, neither Permico Founders nor the Reorganized Debtors are not assuming any obligation to pay a resale loss/restocking fee in the event payment is not made at Financial Close.  Additionally, if the Effective Date occurs sooner or later, Corpac asserts this amount will be increased or decreased at the rate of $22,967.31 per day (subject to further reduction for third party sales as provided herein).  Notwithstanding the foregoing, the above described per diem amount is not binding on the Trustee, Permico Founders, the Reorganized Debtors, or HGC, and the Trustee, Permico Founders, the Reorganized Debtors and HGC reserve all rights with regard to the calculation of the applicable per diem amount.

Reorganized Debtors to Corpac for post Effective Date interest and fees shall be adjusted to account for post-Effective Date Third Party Sales by deducting such amounts for Third Party Sales (such amount to be determined as provided in the preceding sentence) from the Corpac Final Allowed Claim on which the interest is calculated.

Corpac shall retain all of its liens on pipeline and pipeline related real estate (the "Corpac Liens"), to the extent that the Corpac Liens exist, to the same extent and priority as existed prior to the Petition Date or as is perfected after the filing date in accordance with the provisions of Section 546 of the Bankruptcy Code, until Corpac receives the Final Payment.  To the extent that the Corpac Liens exist, the Reorganized Debtors stipulate that it will not seek to challenge or avoid such Liens.  If Final Payment is not made at Financial Close, Corpac may exercise all of its rights and remedies with respect to the Corpac Liens and the Corpac Pipe under the terms of applicable law and the Corpac Contracts.  Corpac may also exercise its right to seek collection of the balance due, together with any other right and remedy, under the Corpac Contracts against the Reorganized Debtors.

Upon the occurrence of the Effective Date under Toggle 1 and the payment of the settlement payments provided for under Toggle 1 of the Plan to the Trustee and HGC, title and ownership of the Corpac Pipe (covered by the Corpac Contracts) and any amounts in the Corpac Escrow is vested in Corpac, is free and clear of any lien or interest claimed by HGC (including the Retained HGC Lien) or other parties  (except Corpac's lender and other potential unpaid vendors of Corpac).  Upon the occurrence of the Plan Effective Date under Toggle 1 only (which includes funding of the Initial Contribution as specifically set forth in this Plan, HGC's receipt of the Corpac HGC Payment, and the Trustee's receipt of the Corpac Toggle 1 Trustee payment), (i) in accordance with the terms of the Pipe Sale Order and consistent with the Plan Settlement Term Sheet, Corpac shall, and does hereby, receive the Corpac Release; and (ii) HGC and Corpac shall, and do hereby, mutually release any and all claims (including, without limitation, any counter-claims that have been or could have been asserted) by and between HGC and Corpac, including (but not limited to) their respective claims related to the Corpac Adversary Proceeding and any claims, rights, liens, or interests of HGC in the Corpac Pipe and Corpac Escrow; *provided, however*, the foregoing release and any other release that may be contained in the Plan shall not include a release of any claim that Corpac has against HGC related to HGC's assignment of $1.75 million of the HGC Claim Balance to Corpac.  Upon the occurrence of the Effective Date under Toggle 1 and consistent with the settlement set forth herein, the Corpac Adversary Proceeding shall be dismissed without prejudice, without the need for any party to file any further pleadings.

Corpac shall also be paid the Corpac Initial Contribution Payment.  The Corpac Initial Contribution Amount shall be used to fund the Corpac HGC Payment and the Corpac Toggle 1 Trustee Payment, with the remaining $500,000 to be funded by Corpac.  In exchange for the Corpac Initial Contribution Amount, the Reorganized Debtors shall receive a credit against the Effective Date Assumed Allowed Claim.

The above treatment shall be in full satisfaction of any and all claims of Corpac against the Debtors and their Estates, but not against the Reorganized Debtors.

(2)      *Toggle 2 Plan Treatment for the Class 3 Corpac Claim*[11]

Under Toggle 2 of the Plan, the Class 3 Corpac Claim shall be treated as follows:

The terms and provisions, including the releases set forth in the Pipe Sale Order shall remain in full force and effect.  Specifically, the Trustee, the Debtors' Estates, the Debtors, Energia and the Liquidating Trustee hereby release all claims to the Corpac Pipe and Corpac Escrow (subject only to the HGC Reserved Lien), consistent with the terms and provisions of the Pipe Sale Order and the settlement contained therein, which are made a part hereof for all purposes.

The Trustee shall receive the following on the Effective Date from Corpac:  (a) If Integra or its designees is the winning bidder for the Debtors' assets being sold, then the payment by Integra serves as additional consideration for the release of the Corpac Pipe and Corpac shall not be required to make the Corpac Toggle 2 Trustee Payment; or (b) if Integra is not the winning bidder, then Integra is entitled to a "Break Up Fee" of $175,000 and the Trustee shall use best efforts to include a release of the Estates' interests, if any, in the Corpac Pipe for no additional consideration in any order approving sale (or in this Plan if the sale is made a part of the Plan). However, if such release is not included in the order approving any sale, the Trustee shall release Corpac for and in consideration of the payment of the Corpac Toggle 2 Trustee Payment ($1,250,000.00) to the Trustee on the Effective Date.

And, as set forth in the Pipe Sale Order, Corpac shall reserve and retain all of its liens on assets of the Debtors, if any, and may exercise all rights and remedies with respect to such liens, if any.

Under Toggle 2, the Corpac Adversary Proceeding proceeds to a Final Order or settlement, provided, however, the Trustee shall be dismissed from the proceeding, consistent with the terms of the Plan Settlement Term Sheet and the Pipe Sale Order.  Additionally, Corpac shall receive the Corpac release.  Under Toggle 2, nothing in this Plan or the Plan Settlement Term Sheet shall waive, limit, impair, release or otherwise prejudice any rights, claims, and defenses asserted by HGC or Corpac in the Corpac Adversary Proceeding.

In connection with any Sale to Integra, the Trustee shall, and does hereby, release any and all claims and interest in the Pipe and any Corpac Escrow, including any surcharge rights against the Corpac Pipe or Corpac Escrow (the "Release"); the Trustee shall release any and all other claims and causes of action against Corpac; and the Trustee shall be dismissed from the Corpac

---

[11] In the event that the Plan is not confirmed, then notwithstanding any provision in this Plan and associated document or agreement contemplated by or under the Plan (other than the Plan Settlement Term Sheet), (i) nothing in the unconfirmed Plan constitutes an admission by Corpac or the Debtors or a judicial determination that that any of the Corpac Pipe has ever been delivered to the Debtors or that title to, or ownership of the Corpac Pipe has ever passed from Corpac to the Debtors or that the Debtors or the Trustee are making any claim to the Corpac Pipe, and (ii) such issues shall be expressly reserved for determination in the Corpac Adversary Proceeding.

Additionally, if the Plan is not confirmed, or the Effective Date does not occur, or these cases are converted to chapter 7 or dismissed, the releases set forth in the Pipe Sale Order and Plan Settlement Term Sheet shall immediately become effective in accordance with the terms of the Pipe Sale Order and Plan Settlement Term Sheet.

Adversary Proceeding. The Trustee shall use best-efforts to include the Release in any Court order approving a bid from a third-party buyer that exceeds the Integra's $3.5 million bid.

Solely to the extent that the Sale to a buyer affiliated with Corpac does not close or any such sale to a third party does not contain a release in favor of Corpac, any and all claims of the Trustee and the Debtors' estates and Corpac related to the Corpac Adversary Proceeding, including any claims, rights, or interests of the Estate in the Corpac Pipe and Corpac Escrow, including any surcharge rights against the Pipe, are settled and released in exchange for the Corpac Toggle 2 Trustee Payment. The Corpac Toggle 2 Trustee Payment shall be in the amount of $1.25 million.

Any and all claims and causes of action between Corpac, the Trustee, the Debtors, and the Debtors' estates are settled and released, *provided, however*, Corpac may assert a proof of claim as set forth below.

Subject to the Retained HGC Liens, 100% of the Corpac Pipe shall vest free and clear of all rights, claims, and interests of the Debtors and the Debtors' estates on the Effective Date and pursuant to the releases granted by the Trustee.

Corpac shall be allowed a Class 5B General Unsecured Claim in the amount of the Corpac Toggle 2 Trustee Payment, if applicable.

Corpac may also file a proof of claim within ninety (90) days of the Effective Date. The Allowed amount of any such proof of claim, along with the Allowed claim in the amount of the Corpac Toggle 2 Trustee Payment, if applicable, shall be Allowed as a Class 5B General Unsecured Claim (the "Corpac Allowed Class 5B Claim"). Once Allowed Class 5 General Unsecured Claims are paid in full, Corpac's Allowed Class 5B Unsecured Claim, along with Edgen's Allowed Class 5C Unsecured Claim, shall be paid from pro rata distributions from the Liquidating Trust Assets after all other Allowed Class 5 General Unsecured Claims are paid in full.

For avoidance of doubt, under Toggle 2 if there is a third-party sale to an entity other than Integra or its designees, Corpac shall retain its liens on the Sale proceeds (if any), but Corpac will subordinate any such liens (if any) on proceeds of the Sale to Allowed Administrative Claims (up to $3.5 million) and solely to the extent settlement payments to the Trustee under Toggle 2 are insufficient to satisfy such Allowed Administrative Claims (up to $3.5 million). Moreover, any allocation of the amount to be subordinated between HGC and Corpac based on their respective liens (if any) shall be determined by the Court or the agreement of HGC and Corpac.

The Class 3 Corpac Claim is impaired under Toggle 1 and Toggle 2 of the Plan, and thus is entitled to vote on the Plan.

      (e)    <u>Treatment of the Edgen Claim (Class 4)</u>

          *(1)    Toggle 1 Plan Treatment for the Class 4 Edgen Claim*

Under Toggle 1 of the Plan, the Class 4 Edgen Claim shall be treated in accordance with the Plan Settlement Term Sheet and Exhibit C annexed thereto, and as follows:

Provided the Initial Contribution is funded, Edgen shall be vested with title to the Edgen Pipe upon the Effective Date, free and clear of all claims, rights, or interests of the Debtors and the Debtors' Estates.  Upon the funding of the Initial Contribution and payments made to HGC hereunder, including the Edgen HGC Payment, the Edgen Pipe shall further vest free and clear of any claims, rights, or interests of HGC.

The Reorganized Debtors and/or any of their assignees acceptable to Edgen shall assume the Edgen Purchase Orders and Assumed Edgen Obligations.  Assumed Edgen Obligations shall be paid in full on the Financial Close Date consistent with Exhibit C attached to the Plan Settlement Term Sheet.

Edgen shall also be paid the Edgen Initial Contribution Payment.  The Edgen Initial Contribution Amount shall be used to fund the Edgen HGC Payment and the Edgen Toggle 1 Trustee Payment, with the remaining $500,000 to be funded by Edgen.  In exchange for the Edgen Initial Contribution Amount, the Reorganized Debtors shall receive a credit against the Edgen Assumed Obligations.

The Reorganized Debtors shall also provide Edgen with adequate assurance of future performance by making monthly post Effective Date payments in the amount of the Edgen Adequate Assurance Payments, subject to the Edgen Adequate Assurance Monthly Cap, and shall be paid in arrears on the first of the month commencing on the first day of the second month after the Effective Date.  To the extent actual costs incurred exceed the Edgen Adequate Assurance Monthly Cap, any deficiency shall remain an Assumed Edgen Obligation and be paid at Financial Close.

If Financial Close does not occur by the Financial Close Date, Edgen shall be released and discharged from any obligation to perform under the Edgen Purchase Orders, and if not sold by the Financial Close Date, may sell the Edgen Pipe to third-parties.  For avoidance of doubt, Edgen may immediately begin to sell Edgen Pipe under the terms of the Pipe Sale Order.  Prior to Financial Close, Edgen shall retain all rights and/or liens with respect to property of the Debtors' Estates vested in the Reorganized Debtors after the Effective Date, if any, in accordance with applicable state law and as may be agreed by the Reorganized Debtors and Edgen as set forth in Exhibit C attached to the Plan Settlement Term Sheet.  Any such rights and/or liens shall be released upon Financial Close and payment of the amounts set forth herein.  To the extent Financial Close does not occur, Edgen may exercise any such rights against the Reorganized Debtors and their property, as applicable.

The above treatment shall be in full satisfaction of any and all claims of Edgen against the Debtors and their Estates.

*(2)    Toggle 2 Plan Treatment for the Class 4 Edgen Claim*

Under Toggle 2 of the Plan, the Class 4 Edgen Claim shall be treated in accordance with the Plan Settlement Term Sheet and as follows:

The terms and provisions of the Pipe Sale Order shall remain in full force and effect. Specifically, the Trustee, the Debtors' Estates, the Debtors, Energia and the Liquidating Trustee

hereby release all claims to the Edgen Pipe and Edgen Escrow (subject only to the HGC Reserved Lien), consistent with the terms and provisions of the Pipe Sale Order and the settlement contained therein, which are made a part hereof for all purposes. In exchange for the above, the Trustee shall receive the Edgen Toggle 2 Trustee Payment on the Effective Date from Edgen.

Under Toggle 2, the Edgen Adversary Proceeding shall proceed to a Final Order or settlement, provided, however, the Trustee shall be dismissed from the proceeding, consistent with the terms of the Plan Settlement Term Sheet and the Pipe Sale Order. Under Toggle 2, nothing in this Plan or the Plan Settlement Term Sheet shall waive, limit, impair, release or otherwise prejudice any rights, claims, and defenses asserted by HGC and/or Edgen and in the Edgen Adversary Proceeding.

Any and all claims of the Trustee and the Debtors' estates and Edgen related to the Edgen Adversary Proceeding, including any claims, rights, or interests of the Estates in the Edgen Pipe, including any surcharge rights against the Edgen Pipe, are settled and released in exchange for the Edgen Toggle 2 Trustee Payment. The Edgen Toggle 2 Trustee Payment shall be in the amount of $1.25 million.

Any and all claims and causes of action between Edgen, the Trustee, the Debtors, and the Debtors' estates are settled and releases, *provided, however*, Edgen may file a proof of claim as set forth below.

Subject to the Retained HGC Liens, 100% of the Edgen Pipe shall vest free and clear of all rights, claims, and interests of the Debtors and the Debtors' estates on the Effective Date and pursuant to the releases granted by the Trustee.

Edgen shall be allowed a Class 5C General Unsecured Claim in the amount of the Edgen Toggle 2 Trustee Payment, if applicable.

Edgen may file a proof of claim within ninety (90) days of the Effective Date. The Allowed amount of any such proof of claim, along with the Allowed claim in the amount of the Edgen Toggle 2 Trustee Payment, if applicable, shall be Allowed as a Class 5C General Unsecured Claim (the "Edgen Allowed Class 5C Claim"). Once Allowed Class 5 General Unsecured Claims are paid in full, Edgen's Allowed Class 5C Unsecured Claim, along with Corpac's Allowed Class 5C Unsecured Claim, shall be paid from pro rata distributions from the Liquidating Trust Assets after all other Allowed Class 5 General Unsecured Claims are paid in full.

The Class 4 Edgen Claim is impaired under Toggle 1 and Toggle 2 of the Plan, and thus is entitled to vote on the Plan.

(f)    Treatment of General Unsecured Claims (Class 5A, 5B and 5C).

(1)    *Toggle 1 Plan Treatment for the Class 5A General Unsecured Claims*

All Allowed General Unsecured Claims are being assumed by the Reorganized Debtors under Toggle 1 of the Plan. Accordingly, under Toggle 1 of the Plan, on the later of the Financial Close Date or the date such General Unsecured Claims becomes an Allowed Claim, and in full

and final satisfaction, compromise, settlement, release, discharge of, and in exchange for, each Holder of an Allowed General Unsecured Claim shall receive either (i) payment in full, in cash, on account of such Allowed General Unsecured Claim or (ii) such other treatment as may be agreed to by such Holder and the Reorganized Debtors.  No interest shall be due on such Allowed General Unsecured Claims.  Prior to the Financial Close Date, holders of Allowed General Unsecured Claims shall retain all rights with respect to property of the Debtors' Estates vested in the Reorganized Debtors after the Effective Date, if any, in accordance with applicable state law and federal bankruptcy law.  Any such rights and/or liens shall be released upon Financial Close and payment in full of such Allowed General Unsecured Claim.

> (2)  *Toggle 2 Plan Treatment for the Class 5B and 5C General Unsecured Claims*

Under Toggle 2 of the Plan, except to the extent that the Holder of an Allowed General Unsecured Claim agrees to a different treatment, such Holder shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, a pro rata distribution from the Liquidating Trust Assets (excluding any Distributions from the Administrative Expense Claim Escrow) after payment in full of Class 1 Priority Non-Tax Claims and all Allowed Administrative Expense Claims as soon as reasonably practical on or after the later of (a) the Effective Date, (b) the end of the claims objection period, and (c) such General Unsecured Claim becomes an Allowed Claim.

Class 5 General Unsecured Claims are impaired under Toggle 1 and Toggle 2 of the Plan, and thus are entitled to vote on the Plan.

(g)  <u>Treatment of Interests (Class 6)</u>.  On the Effective Date under both Toggle 1 and Toggle 2 of the Plan, all Interests in each Debtor shall be deemed cancelled and of no further force or effect.  Holders of Interests shall neither retain nor receive any property under the Plan on account of such Interests.

Class 6 Interests are impaired, deemed to reject the Plan, and not entitled to vote on the Plan.

**Section 7.4     Elimination of Classes for Voting Purposes**

Any Class of Claims or Interests that is not occupied as of the date of the commencement of the Confirmation Hearing shall be deemed deleted from the Plan for purposes of voting on acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE VIII.     MEANS FOR EXECUTION OF THE PLAN

**Section 8.1     Funding the Plan**

Toggle 1 of the Plan contemplates the acquisition by Permico Founders of 100% of the new equity in Permico Midstream Partners, LLC and Permico Midstream Partners Holdings, LLC for the Initial Contribution of no less than $25 million, plus the Reorganized Debtors assumption of all obligations of the Debtors, other than obligations settled or compromised under the Plan.

If an uncured Milestone Default occurs prior to the Effective Date, Toggle 2 of the Plan contemplates a Sale of substantially all of Debtors' assets, other than Estate Causes of Action, the Edgen Pipe, and Edgen Escrow and the Corpac Pipe and Corpac Escrow, for $3.5 million to Integra or its designee, subject to higher and better bids as provided for in the Plan Settlement Term Sheet.

Further, in connection with both Toggle 1, Toggle 2, and the sale of Pipe pursuant to the Pipe Sale Order, HGC, Corpac, and Edgen have each agreed to pay the Estates certain funds (i.e, the Corpac[12], Edgen and HGC Toggle 1 and Toggle 2 Trustee Payments) in exchange for a release of any and all Estate Claims and Causes of Action.

## Section 8.2    Equity

(a)    **Cancellation of Equity Interests.**  On the Effective Date, all existing Equity Interests in each of the Debtors shall be retired, cancelled, extinguished, and/or discharged in accordance with the terms of the Plan.  Except as otherwise provided in the Plan or the Plan Supplement, on the Effective Date: (1) the obligations of the Debtors under any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest shall be cancelled as to the Debtors, Energia, Permico Founders, the Reorganized Debtors, or the Liquidating Trustee, as applicable, shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released and discharged.

(b)    **Issuance of New Equity.**  Solely under Toggle 1 of the Plan, on the Effective Date, 100% of the new equity of the Reorganized Debtors shall be issued to Permico Founders free and clear of all Liens, Claims, Interests, and encumbrances of any kind, except as otherwise provided in the Plan and Plan Settlement Term Sheet.  All the shares of new equity issued pursuant to the Plan shall be duly authorized, validly issued, and fully paid.  On the Effective Date under Toggle 1, none of the new equity will be listed on a national securities exchange.  Permico Founders may take all necessary actions, if applicable, after the Effective Date, to suspend any requirement to (i) be a reporting company under the Securities Exchange Act; and (ii) file reports with the Securities and Exchange Commission or any other entity or party.

## Section 8.3    Released Claims and Causes of Action

On the Effective Date, all Released Claims and Causes of Action shall be deemed waived, discharged, forgiven, and forever compromised, and all other Retained Claims and Causes of Action shall be vested in and retained by the Liquidating Trust.  For the avoidance of doubt, all Released Claims and Causes of Action are not Liquidating Trust Assets.

---

[12] To be paid only if due pursuant to the terms herein and the Plan Settlement Term Sheet.

**Section 8.4      Release of Liens**

Except as otherwise provided in the Plan, Plan Settlement Term Sheet, or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all Liens against the property of any Estates will be fully released, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, shall attach to and be enforceable solely against any net proceeds of sales of such assets.  For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

**Section 8.5      Vesting of Assets in the Liquidating Trust**

On the Effective Date, the Liquidating Trust shall be deemed duly formed and the Trustee/Debtors shall be deemed to have irrevocably transferred and assigned (in accordance with any applicable tax laws) to the Liquidating Trust, the Liquidating Trust Assets, to hold in trust for the benefit of all Holders of Allowed Claims with respect to the Debtors pursuant to the terms of this Plan, the Plan Settlement Term Sheet, and the Liquidating Trust Agreement.  Except as otherwise provided by this Plan and the Plan Settlement Term Sheet, upon the Effective Date, title to the Liquidating Trust Assets shall pass to the Liquidating Trust free and clear of all Claims and Interests, in accordance with § 1141 of Bankruptcy Code.

**Section 8.6      Effectuating Documents; Further Transactions**

On and after the Effective Date, Permico Founders, the Reorganized Debtors or the Liquidating Trustee, as applicable, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the transactions contemplated thereby, in each case, in the name of and on behalf of the Reorganized Debtors and the Liquidating Trust, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

**Section 8.7      Deemed Substantive Consolidation of the Debtors**

The Plan constitutes a motion for the substantive consolidation of the Debtors, and their respective Estates solely for purposes of voting on the Plan, confirming the Plan, and making Distributions pursuant to the Plan.  Voting on the Plan shall be counted on a consolidated basis. On the Effective Date, solely for purposes of voting on the Plan, objecting to the allowance of Claims provided for under the Plan, and making distributions under the Plan: (a) the Assets of the Debtors will be pooled for the purpose of paying Allowed Claims against the Debtors; (b) any Claim filed or asserted against any of the Debtors will be deemed a Claim against all of the Debtors; (c) all Claims of each Debtor against any other Debtor will be eliminated; and (d) any obligation of any of the Debtors and all guarantees thereof executed by any of the Debtors will be deemed to be an obligation of each of the Debtors.  Additionally, Holders of Allowed Claims or Allowed Interests who assert identical Claims against or Interests in multiple Debtors shall be

entitled to only a single satisfaction of such Claims or Interests, and any such duplicate Claims shall be deemed disallowed, expunged, and void as against the Debtors without need for the filing of a Claim Objection or further order of the Court and such duplicate Claims or Interests shall receive no distribution under the Plan.

## Section 8.8    Retention of Management

Upon the Effective Date under Toggle 1 of the Plan, the Debtors' existing commercial management team shall, at the sole discretion of Permico Founders, enter into employment agreements with the Reorganized Debtors on terms and conditions satisfactory to Permico Founders.  Upon the Effective Date under Toggle 2 of the Plan, the Debtors' existing commercial management team's employment shall be deemed terminated.

## ARTICLE IX.         TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Under section 365, the Trustee has the right, subject to Bankruptcy Court approval, to assume or reject any executory contracts or unexpired leases.  Under Toggle 1 of the Plan, and except as to the contracts being assumed hereunder for the creditors in Class 3 (Corpac) and Class 4 (Edgen), the Reorganized Debtors shall have thirty (30) days from the Plan's Effective Date to file a Motion to Reject all executory contracts and unexpired leases of the Debtors that have not been assumed pursuant to this Plan or previously rejected.  Upon the expiration of the above thirty (30) day period, all executory contracts and unexpired leases of the Debtors that have not been assumed pursuant to this Plan or previously rejected and which are not otherwise subject to a pending motion to reject, shall be assumed and assigned to the Reorganized Debtors, with the Reorganized Debtors paying all cure amounts and assuming all obligations thereunder.

Under Toggle 2 of the Plan, on the Effective Date all executory contracts and unexpired leases of the Debtors shall be deemed rejected, and shall be treated as if such contracts/leases had been breached on the date immediately preceding the Petition Date.  Under Toggle 2, any such contract/lease counterparty shall file any rejection damage claims by the Toggle 2 Rejection Claims Bar Date.  Such rejection damage claims shall be classified as a Class 5 General Unsecured Claim.  To the extent that such rejection damage claim is not timely filed by the Toggle 2 Rejection Claims Bar Date, then such Claim will be forever barred and unenforceable against the Debtors' Estates.

## ARTICLE X. RESOLUTION OF CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN

## Section 10.1   Prosecution and Settlement of Claim Objections

After the Effective Date, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall be authorized to commence or continue any suit or other proceeding for the enforcement of any Retained Claim and Causes of Action which the Debtors had or had power to assert immediately prior to the Effective Dates, the Reorganized Debtors or the Liquidating Trustee, as applicable, may also, pursuant to Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code, settle and compromise any and all Retained Claims and Causes of Action and any Claim

Objections (including without limitation executing any necessary documents, stipulations and/or releases) without further motion or application to the Court.

**Section 10.2   Objection Deadline**

Unless a different date is set by order of the Bankruptcy Court, all Claim Objections shall be served and filed no later than the Claims Objection Deadline; provided, however that such deadline may be extended pursuant to a motion filed with the Court by Permico Founders, the Reorganized Debtors, or the Liquidating Trustee, as applicable.  Any proof of Claim filed after the Bar Date shall be of no force and effect, shall be deemed disallowed and expunged, and will not require objection.  All contested Claims shall be litigated to Final Order, *provided, however*, that Permico Founders, the Reorganized Debtors or the Liquidating Trustee, as applicable, may compromise and settle any contested Claim without seeking Court approval, and the claims register shall be adjusted accordingly.

**Section 10.3   Responsibility for Objecting to Claims**

Until the Effective Date, all parties identified by the Bankruptcy Rules may file objections to Claims.  From the Effective Date and beyond, the Reorganized Debtors, or the Liquidating Trustee, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims, including without limitation, any objections to Claims filed by the Debtors prior to the Effective Date.

**Section 10.4   Distributions to be Made**

The Reorganized Debtors or Liquidating Trustee, as applicable, shall be responsible for making Distributions required to be made under the Plan.  To the extent required by applicable law, the Reorganized Debtors or Liquidating Trustee, as applicable, shall comply with all tax withholding and reporting requirements imposed on him/her by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Liquidating Trustee may require any holder of an Allowed Claim entitled to a distribution under the Plan to furnish its, his, or her employer or taxpayer identification number (the "TIN") assigned by the Internal Revenue Service.  Any Distribution under the Plan may be conditioned on the receipt of such TIN.  If any holder of an Allowed Claim entitled to a Distribution hereunder fails to provide a requested TIN within thirty (30) days after the request hereof, then such failure shall be deemed to be a waiver of such holder's interest in such Distribution, including the right to receive any future Distributions.  The Liquidating Trustee may but shall not be required to make any distribution of less than $50.00.

**Section 10.5   Means of Cash Payment**

Payments of cash to be made by the Reorganized Debtors or Liquidating Trustee, as applicable, pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

**Section 10.6    Delivery of Distributions**

Distributions and deliveries to holders of Allowed Claims shall be made at the addresses set forth on the Debtors' Schedules and/or proofs of claim filed by such holders (if such proofs of claim have been filed), or at the last known addresses of such holders if no proof of claim is filed; or if the Reorganized Debtors or Liquidating Trustee, as applicable, has been notified of a change of address, at the address set forth in such notice.

**Section 10.7    Time Bar to Cash Payments**

Checks issued by or at the direction of the Reorganized Debtors or Liquidating Trustee, as applicable, in respect of Allowed Claims shall be null and void if not cashed within sixty (60) days of the date of delivery thereof.  After such date, the Liquidating Trustee shall be entitled to stop payment on such check.  Checks issued by or at the direction of the Liquidating Trustee in respect of Allowed Claims that are returned as undeliverable shall be deemed unclaimed property and shall be null and void.  Any unclaimed property held on account of such voided or returned checks shall vest back to the Liquidating Trust free and clear of all claims and interests and shall be made available for distribution to the other holders of Allowed Claims in accordance with the Plan.

**Section 10.8    Setoffs**

The Reorganized Debtors or Liquidating Trustee, as applicable, may, but shall not be required to, set off against any Claim (and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim) of any nature whatsoever that the Debtors may have had against the Holder of such Claim; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors or Liquidating Trustee of any such Claim that the Reorganized Debtors or Liquidating Trustee has or may have against such Holder; provided, further, that the Claims held by HGC, Corpac and Edgen shall not be subject to setoff.

**Section 10.9    No Distribution Pending Resolution of Claims**

Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Claim until all such Claims become Allowed Claims.

**ARTICLE XI.        CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

Under Toggle 1, the occurrence of each of the following events shall be a separate condition to the Effective Date; *provided however*, that any of the following conditions may be waived by agreement of the Plan Proponents:

(a)    The Confirmation Order shall have been signed by the Court and duly entered on the Court's docket in form and substance acceptable to the Plan Proponents, and shall include, among other things, findings of fact and/or conclusions of law that:

1)   approves the terms of the Plan, as it may be amended or modified, and all other agreements contemplated by the Plan;

-49-

2)   reserves the jurisdiction of the Bankruptcy Court in accordance with Article XII below; and

3)   provides, pursuant to section 1125(e) of the Bankruptcy Code, that persons who have solicited acceptances or rejections of the Plan have acted in good faith and in compliance with the provisions, and are not liable on account of such solicitation or participation for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

(b)      The Confirmation Order shall either have become a Final Order, or such condition shall have been waived by an order of the Bankruptcy Court.

(c)      The funding and disbursement of the Initial Contribution in accordance with the terms of the Plan and Plan Settlement Term Sheet.

(d)      The Administrative Expense Claim Escrow, the Corpac Escrow, and the Edgen Escrow have been established and funded in accordance with the Plan and Plan Settlement Term Sheet, and the Pipe Sale Order.

(e)      All settlement payments provided for under Toggle 1 shall have been paid and received.

Under Toggle 2, the Effective Date shall occur upon an uncured Milestone Default, each of the events set forth under subsections (a), (b), and (d) immediately above, and, the closing of the Sale provided for under Section IV.3 of the Plan and the payment and receipt of all settlement payments provided for under Toggle 2.

Any of the following conditions may be waived only by agreement of the Plan Proponents

## ARTICLE XII.          RETENTION OF JURISDICTION

Under 11 U.S.C. §§ 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and passage of the Effective Date, the Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Bankruptcy Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim or Priority Claim or the resolution of any objections to the allowance or priority of Claims or Interests;

(b)      hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which the Debtors are a party or with respect to which the Debtors or Reorganized Debtors may be liable, including, if necessary, the liquidation or allowance of any Claims arising therefrom;

(c)     effectuate performance of and payments under the provisions of the Plan, and to resolve any disputes between Corpac, Edgen, HGC, and the Reorganized Debtors arising from or related to the post-Effective Date treatment of their claims;

(d)     enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(e)     hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

(f)     consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(h)     enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(i)     hear and determine any matters arising in connection with or relating to the Plan (including the Plan Settlement Term Sheet), the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(j)     hear and determine all adversary proceedings (including the Corpac Adversary Proceeding and Edgen Adversary Proceeding), contested matters, and related matters filed by or on behalf of the Liquidating Trustee or Reorganized Debtors, as applicable, including any Claim Objections, to the extent provided for by applicable law;

(k)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Debtors' Case;

(l)     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(m)     hear and determine all matters related to the property of the Debtors' Estates from and after the Effective Date;

-51-

(n)     hear and determine such other matters as may be provided in the Confirmation Order and as may be authorized under the provisions of the Bankruptcy Code; and

(o)     hear and determine all matters concerning or otherwise related to any Professional Fee Claims and related fee applications; and

(p)     enter a final decree(s) closing the Debtors' Cases.

## ARTICLE XIII.        DISCHARGE, RELEASES, INJUNCTION, AND RELATED PROVISIONS

### Section 13.1    Discharge of Claims Against and Interests in the Debtors

Upon the Effective Date under Toggle 1 only  and in consideration of the Distributions to be made hereunder, except as otherwise expressly provided under the Plan or Plan Settlement Term Sheet, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any Affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date. Upon the Effective Date under Toggle 1, all such Entities shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in or against the Debtors, the Reorganized Debtors or the Liquidating Trustee, or any of their Assets or property, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.  Notwithstanding the foregoing, any such discharge does not release, discharge or effect any rights or claims of Corpac, Edgen and HGC against the Reorganized Debtors.

### Section 13.2    Releases by Holders of Claims and Interests

**As of the Effective Date and in consideration of the Distributions to be made hereunder, except as otherwise expressly provided under the Plan or Plan Settlement Term Sheet, each Releasing Party is deemed to have released and discharged each Debtor and each Released Party from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, causes of action, and liabilities of any kind, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, then-existing or thereafter arising, at law, in equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts (including any orders entered in connection therewith), the formulation, preparation, dissemination, negotiation, or filing of this DS/Plan, the Bankruptcy Cases, the filing of the Bankruptcy Cases, the pursuit of confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, indebtedness under which any Debtor is or was a borrower or guarantor, event, or other occurrence taking place on or before the Effective**

-52-

**Date related or relating to the foregoing;** *provided, however*, **the foregoing releases shall not release claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence. For the avoidance of doubt, and notwithstanding the foregoing, with respect to Toggle 1 of the Plan, HGC and Energia shall not release each other for any Claims or Causes of Action arising prior to the Effective Date solely to the extent that such Claims and Causes of Action are not Claims and Causes of Action belonging to the Debtors and their Estates (which shall be included as Released Claims and Causes of Action). For avoidance of doubt, the foregoing release shall not include a release of any claims held by Corpac and Edgen against HGC with respect to the assignment of $1.75M of the HGC Claim Balance to each of Edgen and Corpac pursuant to the terms of the Plan.**

**Section 13.3   Exculpation and Limitation of Liability**

Neither the Trustee, the Debtors, the Debtors' Estates, nor the Plan Proponents will have or incur any liability to any holder of a Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the solicitation of votes to accept the Plan, the Debtors' Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their fraud, gross negligence, or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

No holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, will have any Claim, Cause of Action, or right of action against the Trustee, the Debtors, the Debtors' Estates, the Plan Proponents, or any of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the solicitation of votes to accept the Plan, or the pursuit of confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except as provided by the Plan or by law.

**Section 13.4   Limited Discharge of Debtors and Injunction**

THE CONFIRMATION ORDER SHALL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY, OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, LOSSES, OR LIABILITIES RELEASED PURSUANT TO THE PLAN, INCLUDING THE CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES RELEASED OR EXCULPATED IN THE PLAN OR THE CONFIRMATION ORDER.

**Section 13.5 Compromise and Settlement**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

## ARTICLE XIV. MISCELLANEOUS PROVISIONS

*Severability of Plan Provisions*. If, prior to confirmation, any term or provision of the Plan is held by the Court to be invalid, void or unenforceable, the Court, at the request of a party in interest, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

*Binding Effect*. The Plan shall be binding upon all present and former holders of Claims and Interests and their respective successors and assigns. To opt-out of the release and exculpation provisions herein, Holders of Claims must either (a) file an objection with the Court specifically stating your intention to opt-out by the deadline set by the Court for filing and serving objections to approval of the Plan and Disclosure Statement or (b) opt-out of such release and exculpation provisions in the Ballot.

*Successors and Assigns.* The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

*Consummation of Plan.* The Confirmation Order shall include (a) a finding by the Bankruptcy Court that FED. R. CIV. P. 62(a) shall not apply to the Confirmation Order; and (b) the Bankruptcy Court's authorization for the Plan Proponents to consummate the Plan immediately after entry of the Confirmation Order.

*Governing Law.* Unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and Bankruptcy Rules, (i) the construction and implementation of the Plan

and any agreements, documents, and instruments executed in connection with the Plan, and (ii) corporate governance matters shall be governed by the laws of the state of incorporation, without giving effect to the principles of conflicts of law thereof.

*Payment of Post-Confirmation Quarterly Fees.*  The Liquidating Trustee or Reorganized Debtors, as applicable shall continue to report to the U.S. Trustee regarding post-confirmation distributions made by the Estates so that the U.S. Trustee can determine the fees incurred pursuant to 28 U.S.C. §1930(a)(6), and timely pay same until the clerk of the Court closes the Bankruptcy Cases.

*Modifications and Amendments.*  The Plan Proponents may alter, amend, or modify the Plan or any exhibits thereto under section 1127(a) at any time prior to the Confirmation Date. After the Confirmation Date and prior to the Effective Date, the Plan Proponents may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of holders of Claims or Interests under the Plan; *provided however,* that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

## CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that Confirmation of the Plan is desirable and in the best interests of all holders of Claims and Interests.  The Plan Proponents therefore urge you to vote to accept the Plan and to evidence such acceptance by returning the Ballot(s) so they will be received by the Voting Deadline.