**EXHIBIT B**

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| PERMICO MIDSTREAM PARTNERS | § | Case No. 20-32437 (MI) |
| HOLDINGS, LLC, *et al.*, | § | |
| | § | (Jointly Administered) |
| Debtors.[3] | § | |

## BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS

**I.   Submission to  the Trustee:**

All submissions for substantially all of the Debtors' Assets (as defined below) are required to be made under these Bidding Procedures and must be directed to each of the following persons unless otherwise provided (collectively, the "Notice Parties"):

**A.** The Trustee, William R. Greendyke, Norton Rose Fulbright US LLP, 1301 McKinney, Suite 5100, Houston, TX 77010;

**B.** Counsel to the Trustee, Norton Rose Fulbright US LLP, 1301 McKinney, Suite 5100, Houston, TX 77010, Attn: Jason L. Boland (jason.boland@nortonrosefulbright.com) and Bob B. Bruner (bob.bruner@nortonrosefulbright.com);

**C.** Investment Banker to the Trustee, Gulfstar Group II, LTD., 700 Louisiana Street, Suite 3800, Houston, TX 77002, Attn: Bryan C. Frederickson (bfrederickson@gulfstargroup.com).

**II.   Potential Bidders**

To participate in the bidding process, a person or entity interested in consummating a sale (a "Potential Bidder") must deliver or have previously delivered the following documents:

     i.   an executed confidentiality and non-disclosure agreement in form and substance acceptable to the Trustee (a "Confidentiality Agreement"), to the extent access to the data room is requested; and

     ii.   if reasonably requested by the Trustee, unless publicly available in a filing under applicable securities laws or regulations, the most current audited and latest

---

[3] The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Permico Midstream Partners Holdings, LLC (6374) and Permico Midstream Partners LLC (7902). The location of the Debtors' corporate headquarters and service address is 9301 Southwest Freeway, Suite 308, Houston, TX 77074.

unaudited financial statements (the "<u>Financials</u>") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets) (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Trustee, and (y) a written commitment acceptable to the Trustee of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the Sale).

## III.   **Qualified Bidders.**

      i.    A "<u>Qualified Bidder</u>" is a Potential Bidder whose Bid is a Qualified Bid (as defined below).  For purposes of these Bidding Procedures, Integra Midstream Partners, LLC or its designee (the "<u>Stalking Horse Bidder</u>") shall be deemed a Potential Bidder and Qualified Bidder;

     ii.    The Trustee may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Trustee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid; *provided* that any Qualified Bid may be amended or modified by an Overbid (as defined below) submitted at the Auction as set forth herein.  Any amended or modified Qualified Bid shall continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

## 4.   **Due Diligence.**

      i.    Only Potential Bidders shall be eligible to receive due diligence information and access to the Trustee's electronic data room, physical data room, and to additional non-public information regarding the Debtors.  **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**. The Trustee will provide each Potential Bidder that satisfies the foregoing with reasonable due diligence information requested by such Potential Bidder in writing as soon as reasonably practicable after such request.  For all Potential Bidders, the due diligence period will end on the Bid Deadline and, subsequent to the Bid Deadline, the Trustee shall have no obligation to furnish any further due diligence information.

     ii.    The Trustee shall not furnish any confidential information relating to the Assets, liabilities of the Debtor, or the sale to any person except to a Potential Bidder or to such Potential Bidder's duly authorized representatives to the extent provided in the applicable Confidentiality Agreement.  The Trustee and his advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided that* the Trustee may decline to provide such information to Potential Bidders who, at such time and in the Trustee's reasonable business judgment (after due inquiry), have not established, or who have raised doubt, that such Potential Bidder has the capacity to consummate the sale.

    iii.    The Trustee also reserves the right to withhold any diligence materials that the

Trustee determines are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Trustee determines is a competitor of the Debtors or that otherwise could materially impair the value of the Assets.

iv.     Notwithstanding anything to the contrary in these Bidding Procedures, no Potential Bidder shall have direct communications with any other Potential Bidder without the prior written consent of the Trustee.

v.      Each Potential Bidder shall comply with all reasonable requests of the Trustee or his advisors for information regarding the ability of the Potential Bidder to consummate the Sale. Other than with respect to the Stalking Horse Bidder, failure by a Potential Bidder to comply with such reasonable requests may be a basis for the Trustee to determine that such bidder should no longer be considered a Potential Bidder or that a Bid (defined below) made by such bidder should not be considered a Qualified Bid (defined below).

vi.     The Trustee and each of his advisors and representatives shall be obligated to maintain in confidence any confidential information received from any Potential Bidder in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

vii.    Notwithstanding the foregoing and the provisions contained in any applicable confidentiality agreement, the Trustee and the Trustee's advisors may disclose confidential information: (i) with the prior written consent of the Potential Bidder providing such confidential information; and (ii) as allowed by any applicable confidentiality agreement with respect to a particular Potential Bidder or as otherwise required by law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

**5.     Stalking Horse Bidder and Protections.**

i.      Pursuant to the Plan Settlement Term Sheet and Plan,[4] Integra Midstream Partners LLC shall serve as a Stalking Horse Bidder, with a $3.5 million cash bid for the Assets (the "Stalking Horse Bid").

ii.     The Stalking Horse Bid shall be subject to the terms of the Asset Purchase Agreement (the "APA"), substantially in the form attached hereto as **Exhibit 1**.

iii.    Pursuant to the Plan Settlement Term Sheet and Plan, if the Stalking Horse Bid is not accepted as the highest and best bid, the Stalking Horse Bidder shall receive a break-up fee and expense reimbursement of up to $175,000 (the "Break-Up Fee"). Nothing herein is intended to modify the rights, interests, or obligations of the

---

[4] All capitalized terms not defined herein shall have the meaning set forth in the Plan.

Trustee or the Stalking Horse Bidder under the Plan, Plan Settlement Term Sheet, or any Order entered by the Bankruptcy Court.

**6.     Bid Requirements.**

A proposal, solicitation, or offer for a purchase and sale of the Assets (each, a "Bid") by a bidder that is submitted in writing and satisfies each of the following requirements (the "Bid Requirements") as determined by the Trustee, in his reasonable business judgment, shall constitute a "Qualified Bid"). For the avoidance of doubt, the Stalking Horse Bid provided for under the Plan and Plan Settlement Term Sheet shall constitute a Qualified Bid for all purposes.

i.     **Assets**. Each Bid must be for all of the Debtors' assets and liabilities of the Debtors that the Qualified Bidder is agreeing to purchase and assume. For the avoidance of doubt, the Debtors' assets do not include retained Estate causes of action, Edgen Pipe, Corpac Pipe, cash, or any proceeds from settlements provided for under the Plan Settlement Term Sheet or Plan. The Sale shall be subject to the terms of the Plan and Plan Settlement Term Sheet in all respects.

ii.    **Purchase Price**. Each Bid must clearly set forth the purchase price in U.S. dollars (the "Purchase Price").

iii.   **Minimum Overbid**. Each Bid must include a cash component of no less than $3.70 million.

iv.    **Deposit**. On or before the Bid Deadline, each Bid must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate cash component of the Purchase Price of the Bid, to be held in an escrow account to be identified and established by the Trustee (the "Deposit").

v.     **Qualified Bid Documents**. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid, as well as all other material documents integral to such Bid (the "Qualified Bid Documents"). Such Qualified Bid Documents must be based on form documents approved or provided by the Trustee, including the APA.

vi.    **Committed Financing**. To the extent that a Bid is not accompanied by evidence of a Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution or lender, documented to the satisfaction of the Trustee, that demonstrates that the Qualified Bidder has received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Trustee in his business judgment.

vii.   **Contingencies; No Financing or Diligence Outs**. A Bid shall not be conditioned

on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

viii. **Identity**. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Qualified Bidder if such Qualified Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid, *provided* that any principal, equity holder or financial backer that is an investment fund or manager need not disclose the identity of the specific funds or investors in the funds. Each Bid must also include contact information for the specific persons authorized to act on behalf of the Qualified Bidder, including financial advisors and counsel, if any.

ix. **Time Frame for Closing**. A Bid by a Qualified Bidder must be reasonably likely (based on availability of financing, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, no less than seven (7) business days after the Bankruptcy Court's entry of an order approving the Sale.

x. **Binding and Irrevocable**. A Qualified Bidder's Bid shall be irrevocable unless and until the Trustee receives Bankruptcy Court approval of the Successful Bid (as defined below) and such Qualified Bidder is not selected as the Backup Bidder (as defined below).

xi. **Expenses; Disclaimer of Fees**. Other than as provided for under the Plan and Plan Settlement Term Sheet with respect to the Stalking Horse Bidder only, each Qualified Bidder must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder, pursuant to the Plan and Plan Settlement Term Sheet) will be permitted to request, or be granted by the Trustee, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

xii. **As-Is, Where-Is**. Each Bid must include a written acknowledgment and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Qualified Bid Documents.

xiii.   **Adherence to Bid Procedures**.  By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit any further Bid or seek to reopen the Auction after conclusion of the Auction.

xiv.   **Consent to Jurisdiction and Authority of the Bankruptcy Court**.  The Qualified Bidder must submit to the jurisdiction of the Bankruptcy Court, consent to the Court's entry of final orders, and waive any right to a jury trial in connection with any disputes relating to the Trustee's qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale Documents, and the Closing (as hereinafter defined), as applicable.

xv.   **Competing Bid Deadline**.  Each Bid, other than the Stalking Horse Bid, must be transmitted via email (in.pdf or similar format) so as to be **actually received** on or before **5:00 p.m. (CST) on February 15, 2022** (the "Bid Deadline") by:

A.   The Trustee, William R. Greendyke, Norton Rose Fulbright US LLP, 1301 McKinney, Suite 5100, Houston, TX 77010 (willima.greendyke@nortonrosefulbright.com);

B.   Counsel to the Trustee, Norton Rose Fulbright US LLP, 1301 McKinney, Suite 5100, Houston, TX 77010, Attn: Jason L. Boland (jason.boland@nortonrosefulbright.com) and Bob B. Bruner (bob.bruner@nortonrosefulbright.com);

C.   Investment Banker to the Trustee, Gulfstar Group II, LTD., 700 Louisiana Street, Suite 3800, Houston, TX 77002, Attn: Bryan C. Frederickson (bfrederickson@gulfstargroup.com)

## 7.   Credit Bids.

Any party with a valid lien on property of the Debtors that submits a Qualified Bid can include a credit bid with respect to property on which it has a valid lien and to the extent consistent with Bankruptcy Code section 363(k); provided, however, that a Qualified Bid containing a credit bid must include an agreement to pay cash in an amount no less than $3.5 million plus $175,000 necessary to satisfy the Break-Up Fee.  For the avoidance of doubt, to the extent the Trustee seeks approval of a Qualified Bid containing a credit bid at the Sale Hearing, all parties' rights to object to the approval of any such sale, including but not limited to an objection based on the extent, validity, and priority of any lien and/or credit bid, is preserved.

## 8.   Auction.

If the Trustee receives more than one Qualified Bid for the sale of substantially all of the Debtors' Assets, the Trustee will conduct the Auction to determine the Successful Bidder.

i.   **Baseline Bid.**  No later than twenty-four (24) hours after the Bid Deadline, the Trustee will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined by the Trustee's reasonable business judgment (the "Baseline

<u>Bid</u>"), and provide copies of the applicable Qualified Bid Documents supporting the Baseline Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Trustee reasonably deems relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the amount and nature of the total consideration (including the amount of cash paid to or remaining in the estate pursuant to the Bid); (b) the likelihood of the Qualified Bidder's ability to close the Sale and the timing thereof; (c) the net economic effect of any changes to the value to be received by the Debtor's estate from the transaction contemplated by the Qualified Bid Documents; and (d) the tax consequences of such Qualified Bid (collectively, the "<u>Bid Assessment Criteria</u>"). The Trustee may consult with HGC, Edgen, Corpac, and other parties in interest, as appropriate, regarding the determination of the Baseline Bid consistent with the Bid Assessment Criteria.

ii.   **Time and Location of Auction.** The Auction shall take place at **10:00 AM (CST) on February 22, 2022** at the offices of Norton Rose Fulbright US, LLP, 1301 McKinney Street, Suite 5100, Houston, Texas 77010. Under appropriate circumstances and subject to the Trustee's discretion, Qualified Bidders may participate in the Auction through telephonic and/or video media.

iii.   **The Trustee Shall Conduct the Auction.** The Trustee and his professionals shall direct and preside over the Auction. At the start of the Auction, the Trustee shall describe the terms of the Baseline Bid. All incremental Bids made thereafter for a given Asset shall be Overbids and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids on such Asset. The Trustee shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

   Only Qualified Bidders and their legal and financial advisors, and the Trustee, along with his legal and financial advisors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or Bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to Bid at the Auction.

iv.   **Terms of Overbid.** "<u>Overbid</u>" means any Bid at the Auction by a Qualified Bidder subsequent to the Trustee's announcement of the Baseline Bid. Each applicable Overbid must comply with the following conditions.

   a.   <u>Minimum Overbid Increment</u>. Any Overbid following the Baseline Bid or following any subsequent Prevailing Highest Bid (as defined below) for the Assets shall be in increments of value equal to or exceeding $100,000.

   b.   <u>Conclusion of each Overbid Round</u>. Upon the solicitation of each round of applicable Overbids, the Trustee may announce a deadline (as the Trustee may, in his business judgment, extend from time to time, the "<u>Overbid</u>

Round Deadline") by which time any Overbids must be submitted to the Trustee.

    c.  <u>Prevailing Highest Bid</u>. Subsequent to each Overbid Round Deadline, the Trustee shall announce whether the Trustee has identified an Overbid as being higher or otherwise better than the Baseline Bid, in the initial Overbid round, or, in subsequent rounds, the Overbid previously designated by the Trustee as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>"). The Trustee shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Trustee as the Prevailing Highest Bid as well as the value attributable by the Trustee to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

    d.  <u>Overbid Alterations</u>. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtor's estate than any prior Bid or Overbid, as determined in the Trustee's reasonable business judgment, but shall otherwise comply with the Bidding Procedures' terms.

   v.  **Consideration of Overbids.** The Trustee reserves the right, in his reasonable business judgment to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Trustee and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Trustee with such additional evidence as the Trustee, in his reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

   vi.  **Closing the Auction.**

    a.  The Auction shall continue until there is only one Bid on the applicable Assets that the Trustee determines, in his reasonable business judgment, to be the highest or otherwise best Bid. Such Bid shall be declared the "<u>Successful Bid</u>" and such Qualified Bidder shall be declared the "<u>Successful Bidder</u>" with respect to the applicable Assets, at which point the Auction will be closed with respect to the applicable Assets. The Auction for all or any portion of Debtor's Assets, as applicable, shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Trustee of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

    b.  The Trustee shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed

untimely and shall under no circumstances constitute a Qualified Bid.

    c.   As soon as reasonably practicable after conclusion of the Auction, the Trustee shall cause the Qualified Bid Documents for the Successful Bid to be filed with the Court.

vii.   **No Collusion; Good-Faith *Bona Fide* Offer.** Each Qualified Bidder participating in the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

viii.   **Backup Bidder.**  The Qualified Bidder with the second-best Bid (the "Backup Bid") at the Auction shall be required to serve as a backup bidder (the "Backup Bidder").  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder.  If a Successful Bidder fails to consummate its Successful Bid, the Trustee may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Trustee will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Trustee (which forfeiture shall not be in the nature of liquidated damages), and the Trustee specifically reserves the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

## 9.    Highest or Otherwise Best Bid.

When determining the highest or otherwise best Bid, as compared to other Bids, the Trustee may consider the Bid Assessment Criteria and consult with HGC, Edgen, Corpac, and other parties in interest, as appropriate.

## 10.    Reservation of Rights.

The Trustee reserves the right to modify these Bidding Procedures in his reasonable business judgment in any manner that will promote the goals of the Bidding Procedures and the Plan and Plan Settlement Term Sheet, including without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) modifying the deposit requirement, (c) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejection of any Bids.

## 11.    Sale Hearing.

The Trustee will file a motion requesting that the Court hold a hearing to consider approval

of the Sale to the Successful Bidder (the "<u>Sale Hearing</u>") and enter an order, in a form reasonably acceptable to the Trustee and the Successful Bidder, approving the sale as soon as reasonably practicable following the Auction.  Any such order shall be consistent with the terms and provisions of the Plan and Plan Settlement Term Sheet and any prior Order entered by the Bankruptcy Court.

## 12.    Return of Deposit.

The Deposit of the Successful Bidder shall be applied to the Purchase Price at closing.  The Deposits for each Qualified Bidder shall be held in one or more escrow accounts on terms acceptable to the Trustee in his sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) no later than three business days following the approval of the Successful Bid at the Sale Hearing.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Trustee will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Trustee, in addition to any and all rights, remedies, or causes of action that may be available to the Trustee, and the Trustee shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court.

## 13.    Implementation of Toggle 2 of the Plan

These Bidding Procedures and the proposed Sale are provided for under the Plan Settlement Term Sheet, Plan, and Confirmation Order for the purpose of implementing Toggle 2 of the Plan.  These Bidding Procedures are subject to the Plan Settlement Term Sheet, Plan, and Confirmation Order in all respects.

*[Remainder of Page left Intentionally Blank]*

**Exhibit 1**

**Stalking Horse APA**[5]

---
[5] The below Stalking Horse APA remains subject to negotiation between the Trustee and the Stalking Horse Bidder.

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**PERMICO MIDSTREAM PARTNERS HOLDINGS, LLC, AND
PERMICO MIDSTREAM PARTNERS LLC**

**AS SELLER**

**AND**

**INTEGRA MIDSTREAM PARTNERS, LLC**

**AS PURCHASER**

**DATED [   ], 2022**

**EXHIBITS**

Exhibit A    Form of Bill of Sale
Exhibit B    Form of Deed
Exhibit C    Form of Assignment of Intellectual Property

**SCHEDULES**

Schedule 1.1(a)(i)      Assigned Personal Property
Schedule 1.1(a)(ii)     Assigned Real Property
Schedule 1.1(a)(iii)    Assigned Intellectual Property
Schedule 1.1(a)(iv)     Assigned Inventory
Schedule 1.1(a)(v)      Assigned Contracts
Schedule 1.1(a)(vi)     Assigned Licenses
Schedule 1.2            Allocation of Purchase Price

    <u>Definitions</u>.  Capitalized terms used in this Agreement but not defined herein have the meaning given to them in the Purchase Agreement. This Asset Purchase Agreement (this "**Agreement**") dated as of [ ] [   ], 2022, is by and between Integra Midstream Partners LLC ("**Integra**") or its designee (the "**Purchaser***") and Permico Midstream Partners Holdings, LLC and Permico Midstream Partners LLC, Texas limited liability companies (collectively, the "**Seller**").[1]

## RECITALS:

    WHEREAS, on May 4, 2020 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

    WHEREAS, by order of the Bankruptcy Court, dated May 22, 2020, William R. Greendyke (the "**Trustee**") was appointed as Chapter 11 Trustee for Seller;

    WHEREAS, on May 24, 2021, the Trustee, HGC Midstream Inv, LLC, Permico Energia, LLC, Corpac Steel Products Corp., Edgen Murray Corporation, and Permico Founders, LLC (the "Parties"), agreed to a plan settlement term sheet providing for a consensual plan process for these chapter 11 cases (the "Plan Settlement Term Sheet") [Dkt. No. 266-1];

    WHEREAS, on June 25, 2021, the Parties filed their *Combined Disclosure Statement and Joint Chapter 11 Plan of Permico Midstream Partners Holdings, LLC, et. al.* (the "Plan") [Dkt. No. 266], incorporating and implementing the terms of the Plan Settlement Term Sheet;

---

[1] Capitalized terms not defined herein shall have the meanings set forth in <u>Article X</u> or the Plan, as applicable.

WHEREAS, on August 20, 2021, the Court entered its *Findings of Fact, Conclusions of Law, and Order Approving Combined Disclosure Statement on a Final Basis and Confirming Joint Chapter 11 Plan of Permico Midstream Partners Holdings, LLC et al.* [Dkt. No. 324] (the "Confirmation Order");

WHEREAS, the Plan Settlement Term Sheet and Plan provides for a recapitalization of the Debtors (Toggle 1) or, in the alternative, and if certain milestone dates regarding the recapitalization were not met, a sale of substantially all of the Debtors' assets, other than Estate causes of action, Edgen Pipe, and Corpac Pipe, for $3.5 million, to Integra or its designee, free and clear of all rights, titles, liens, Encumbrances, and interests, with any such rights, titles, and interests attaching to proceeds subject to the same, extent, validity, and priority as existed on the Debtors' bankruptcy Petition Date (the "Sale"), subject to higher and better bids, as set forth in the Plan and Plan Settlement Term Sheet (Toggle 2);

WHEREAS, on January 18, 2022, the Trustee filed a *Notice of Milestone Default* [Dkt. No. 380] with respect to the Toggle 1 Plan Milestone Date;

WHEREAS, the Toggle 1 Plan Milestone Date was not cured within the period provided for under the Plan and Plan Settlement Term Sheet, triggering the Toggle 2 sale as provided for under the Plan and Plan Settlement Term Sheet;

WHEREAS, on February 1, 2022, the Trustee filed his Notice of Sale and Bidding Procedures (the "Bidding Procedures") [Dkt. No.     ], pursuant to the Plan and Plan Settlement Term Sheet;

WHEREAS, this  Agreement is entered to pursuant to the Plan, Plan Settlement Term Sheet, and Bidding Procedures;

WHEREAS, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser the Purchased Assets, and in connection therewith, Purchaser has agreed to assume certain liabilities of the Seller as set forth in Section 1.2(a)(i), upon the terms and subject to the conditions set forth herein; and

NOW, THEREFORE, in reliance upon and in consideration of the representations, warranties and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ASSETS

1.1   Purchase and Sale of Purchased Assets.

    (a)   Purchase and Sale. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth herein and the Sale Order, at the Closing, the Seller shall sell,

convey, transfer, assign, grant and deliver to Purchaser, free clear of all Encumbrances (other than Permitted Encumbrances), and Purchaser shall purchase, acquire and accept delivery from the Seller on the Closing Date, all assets of Seller whether tangible or intangible, real or personal, of every kind and nature (other than the Excluded Assets) (collectively, the "**Purchased Assets**"), including, without limitation, the following:

(i)     all machinery, equipment, furniture, office equipment and supplies, tools, spare and replacement parts, prototypes, and other tangible property of any kind or nature (and interests in any of the foregoing) that are owned by the Seller on the Closing Date, other than Assigned Inventory, including, without limitation, all items listed on <u>Schedule 1.1(a)(i)</u> (collectively, the "**Assigned Personal Property**");

(ii)     all real property of any kind or nature (including any improvements to the same) that are owned by the Seller on the Closing Date, including, without limitation, all items listed on Schedule 1.1(a)(ii) (collectively, the "**Assigned Real Property**");

(iii)     (x) all Intellectual Property listed on <u>Schedule 1.1(a)(iii)</u>; (y) all versions thereof, design files, part drawings, assembly drawings, assembly procedures, test and inspection procedures, design history files, distribution records, data rights and documentation, books and records and other written and electronic materials related thereto; and (z) all rights of Seller with respect to the foregoing, remedies against past, present and future infringement, misappropriation or other unauthorized use thereof and rights to protection of interests therein under the applicable Laws of all jurisdictions (collectively, the "**Assigned Intellectual Property**");

(iv)     all items of inventory (including all materials and supplies, all manufactured and processed parts, all work in process and all finished products) of Seller including without limitation those items listed on <u>Schedule 1.1(a)(iv)</u> (collectively, the "**Assigned Inventory**");

(v)     originals, or where not available, copies, of all books and records, including, but not limited to, certifications, licenses, regulatory correspondence, audits or observations, device history files, assembly procedures, bills of materials, purchasing records, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data, sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, and marketing and promotional surveys, material and research and files relating to the Purchased Assets and to products previously sold by Seller; provided however, that Seller shall be entitled to maintain a copy of all such books and records referenced herein;

(vi)    all rights and interests of the Debtors under and with respect to the written, verbal, draft and actual contracts and agreements of the Debtors, including, without limitation, any agreements drafted or negotiated by or on behalf of the Debtors, relating to the Purchased Assets, including without limitation those set forth on Schedule 1.1(a)(v) (collectively, the "**Assigned Contracts**")[2]; and

(vii)    to the extent transferable by Seller, all Licenses relating to the Purchased Assets, including as set forth on Schedule 1.1(a)(vi) (collectively, the "**Assigned Licenses**");

(viii)    all rights, claims or causes of action by or in the right of Seller arising from or relating to the Purchased Assets (but excluding any rights, claims or causes of actions constituting Excluded Assets); and

(ix)    all proceeds and products of any and all of the foregoing Purchased Assets (other than any item listed in Excluded Assets).

(b)    Excluded Assets.  Notwithstanding anything to the contrary herein, it is expressly understood and agreed that the Purchased Assets do not include and Seller shall not sell, convey, transfer, assign, grant or deliver to Purchaser, and Purchaser shall not purchase, acquire or accept delivery or have any rights to purchase, acquire or accept, delivery of the following assets (the "**Excluded Assets**"):

(i)    the articles of incorporation, minute books, stock books and other corporate records of Seller having primarily to do with the corporate organization and capitalization of Seller;

(ii)    all rights of Seller under this Agreement, the Purchase Price hereunder, any agreement, certificate, instrument or other document executed and delivered by Seller or Purchaser in connection with the transactions contemplated hereby, or any side agreement between Seller and Purchaser entered into on or after the date of this Agreement; and

(iii)    any asset included among the Purchased Assets as of Closing that Purchaser advises Seller within thirty (30) days following Closing that it has elected to exclude from among the Purchased Assets;

---

[2] "*Assigned Contracts*" schedule to include the following draft (unexecuted) and existing (executed) contracts: (i) Transportation Services Agreement between PMP West Texas Pipeline, LLC and [Redacted]., (ii) Fractionation Services Agreement between PMP Robstown Fractionator LLC and [Redacted], (iii) Propane Transportation Services Agreement between PMP Purity Product Pipelines LLC and [Redacted], (iv) LPG Terminal Tolling Agreement between PMP LPG Terminal LLC and [Redacted], and (v) Non-Propane Product Purchase Agreement between PMP NGL Marketing LLC and [Redacted].

(iv)    the Corpac Pipe;

(v)    the Edgen Pipe;

(vi)    cash and cash equivalents;

(vii)    escrows and settlement rights and proceeds provided for under the Plan or Plan Settlement Term Sheet;

(viii)    [intentionally deleted];

(ix)    all rights, claims or causes of action by or in the right of Seller against any current or former director or officer of the Seller; and

(x)    all causes of action of the Seller reserved under the Plan or Plan Settlement Term Sheet, including any claims, rights, or actions under Chapter 5 of the Bankruptcy Code.

1.2    <u>Assumption of Liabilities</u>.

(a)    <u>Assumption</u>. Upon the terms and subject to the conditions set forth herein and the Sale Order, at the Closing, upon the consummation of the transactions contemplated by this Agreement, Purchaser shall assume from Seller (and thereafter pay, perform, discharge or otherwise satisfy in accordance with their respective terms), and Seller shall irrevocably convey, transfer and assign to Purchaser, only the following Liabilities of Seller and no other Liabilities whatsoever (collectively, the "**Assumed Liabilities**"):

(i)    the prorated obligation (pursuant to Section 1.3(d)) to pay ad valorem Taxes associated with the Assigned Real Property for calendar year 2022.

(b)    <u>Excluded    Liabilities</u>. Notwithstanding the provisions of Section 1.2(a) or any other provision in this Agreement to the contrary, Purchaser shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). Seller shall remain responsible for all Excluded Liabilities. Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(i)    any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the ancillary

documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of Seller's counsel, accountants, consultants, and advisers;

(ii)     any Liability for (1) Taxes of Seller (or any stockholder or Affiliate of Seller) or relating to the business of Seller for any taxable period prior to the Closing Date; (2) Taxes that arise out of the consummation of the transactions contemplated hereby; or (3) other Taxes of Seller (or any stockholder or Affiliate of Seller) of any kind or description (including any Liability for Taxes of Seller (or any stockholder or Affiliate of Seller);

(iii)     any Liabilities relating to or arising out of the Excluded Assets;

(iv)     any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the business of Seller or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(v)     any product Liability or similar claim for injury to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller prior to the Closing Date;

(vi)     any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments; and

(vii)     any Liabilities of the business of Seller relating or arising from unfulfilled commitments, quotations, purchase orders, customer deposits, customer orders or work orders that are not validly and effectively assigned to Purchaser pursuant to this Agreement.

1.3     Consideration for Purchased Assets.

(a)     Consideration.     The aggregate purchase price shall be $3.5 million, plus the assumption of the Assumed Liabilities (the "**Purchase Price**").  The Purchase Price is inclusive of the amount of any required Deposit.  At the Closing, the Purchase Price, less the amount of the Deposit, shall be paid by Purchaser to Seller by wire transfer of immediately available funds to the bank account designated by Seller (the "**Cash Payment**").  The Purchase Price shall be subject to prorations and adjustment in accordance with subsection (d).

(b)     Deposit.     Integra, as the Purchaser, shall have no obligation to make a good faith deposit (a "**Deposit**").  However, any other Purchaser shall be

required to make any Deposit required by the Bidding Procedures.

(c) <u>Allocation of Purchase Price</u>. Purchaser shall allocate the Purchase Price among the Assigned Real Property, Assigned Personal Property, the Assigned Inventory and any remaining Purchased Assets at or prior to Closing.  Purchaser and Seller shall further reasonably cooperate in taking consistent positions in all tax filings (in accordance with all applicable Treasury Regulations promulgated under Section 1060 of the Code) based on Purchaser's allocation of the Purchase Price among the Purchased Assets.

(d) <u>Taxes and Prorations</u>.  Ad valorem real estate Taxes and personal property taxes on any tangible personal property for calendar year 2022 will be prorated through the date before Closing.  If the amount of such Taxes for the current year cannot be ascertained, rates and values for the previous year will be used with due allowance being made for improvements and exemptions. Any Tax proration based on an estimate will, at the request of either Party, be readjusted upon receipt of current year's tax bill and this provision will survive Closing.

### ARTICLE II
### THE CLOSING

2.1  <u>Time and Place; Effective Time</u>. Subject to Section 6.1, the consummation of the transactions contemplated hereby shall take place at a closing (the "**Closing**") to be held remotely via the exchange of documents and signatures on the date (the "**Closing Date**") on or before seven days after entry of the Sale Order of the Bankruptcy Court (including, without limitation, section 363(m)) that is not subject to a stay, and upon the satisfaction and fulfillment or waiver of the conditions set forth in <u>Article VI</u> (other than conditions to be satisfied simultaneously at the Closing). The sale, transfer, assignment, conveyance and delivery of the Purchased Assets and the assumption of the Assumed Liabilities described in this Agreement will be effective as of the Effective Time.

2.2  <u>Closing Deliveries of Seller</u>. At the Closing, Seller shall deliver, or cause to be delivered, to Purchaser the following instruments, certificates and other documents in order to consummate the transactions contemplated hereby, including the transfer of the Purchased Assets to Purchaser pursuant to <u>Section 1.1</u>:

(a)  a Sale Order;

(b)     a Bill of Sale, substantially in the form attached hereto as <u>Exhibit A</u>, duly executed by the Trustee on behalf of the Seller (the "**Bill of Sale**");

(c)     a Special Warranty Deed, substantially in the form attached hereto as <u>Exhibit B</u>, duly executed by the Trustee on behalf of the Seller the "**Deed**"); and

(d)     such other bills of sale, deeds, endorsements, assignments, affidavits and other goods and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Purchaser, as Purchaser may reasonably request to vest in Purchaser all the right, title and interest in and to the Purchased Assets in form and substance acceptable to Purchaser.

2.3     <u>Closing Deliveries of Purchaser</u>.  At the Closing, Purchaser shall make the payment and deliver to Seller the following instruments, certificates and other documents in order to pay for the Purchased Assets and effect the assumption of all Assumed Liabilities from Seller:

(a)     <u>Cash Payment</u>. The Cash Payment to the accounts designated in writing by Seller at least two (2) Business Days prior to the Closing Date.

(b)     Instruments of Assumption.  Such other instruments as shall be reasonably requested by Seller for the assumption of the Assumed Liabilities by Purchaser in accordance with the provisions of this Agreement.

(c)     <u>Purchaser Resolution</u>.  A copy of the resolutions adopted by the Purchaser evidencing its authorization of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, certified by an officer of Purchaser.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller, to induce Purchaser to enter into this Agreement and to close hereunder, hereby represents and warrants to Purchaser as of the date hereof and as of Closing as follows:

3.1     <u>Organization and Authority of Seller; Enforceability</u>. Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Texas.  Seller has full power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by the Bankruptcy Court and no further action on the part of the Seller is required to authorize the subject transaction.  This Agreement and the documents to be delivered hereunder constitute a legal, valid and binding obligation of the Seller, enforceable against it in accordance with their respective terms.

3.2     <u>Intellectual Property</u>.

(a) <u>Schedule  1.1(a)(ii)</u> sets forth all Intellectual Property of Seller.

(b)   Except as set forth in Schedule 1.1(a)(ii):

(i)   Seller owns or has adequate, valid and enforceable rights to use all Assigned Intellectual Property, free and clear of all Encumbrances;

(ii)   Seller is not bound by any outstanding judgment, injunction, order or decree restricting the use of the Assigned Intellectual Property, or restricting the licensing thereof to any person of entity and no claims have been asserted against Seller by any Person challenging the ownership of or right to use any of the Assigned Intellectual Property; and

(iii)   with respect to the Assigned Intellectual Property listed on Schedule 1.1(a)(ii), (a) all such Intellectual Property is valid, subsisting and in full force and effect and has not been cancelled, expired or abandoned; and (b) Seller has paid all maintenance fees and made all filings required to maintain Seller's ownership thereof through the Closing Date.

(c)   Seller is not aware of any defenses which a party may have to the assignment or sale of the Assigned Intellectual Property to Purchaser.

3.3   No Conflicts; Consents and Approvals.   Except as required by the Bankruptcy Court, the execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not:

(a)   violate or conflict with the certificate of incorporation, by-laws or other organizational documents of Seller;

(b)   violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller or the Purchased Assets;

(c)   conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Seller is a party or to which any of the Purchased Assets are subject; or

(d)   result in the creation or imposition of any Encumbrance on the Purchased Assets. No consent, approval, waiver or authorization is required to be obtained by Seller from any Person (including any Governmental Authority) in connection with the execution, delivery and performance by Seller of this Agreement, and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby and thereby.

3.4   Litigation; Governmental Orders.   Except for Actions in the Bankruptcy Court but excluding the Emergency Motion which shall be dismissed with prejudice in the Sale Order or another Final Order, as of the date hereof, there are no pending or, to the Knowledge of the Seller threatened Actions by any Person or Governmental Authority against or relating to Seller which relate to the business of Seller or Purchased Assets or to which any of the Purchased Assets are subject.

3.5     Title to Purchased Assets.  Subject to the entry of the Sale Order, at the Closing, Seller will obtain good and marketable title to all of the Assigned Real Property and any other Purchased Assets.  At Closing, Seller shall transfer all Purchased Assets to Purchaser free and clear of all Encumbrances, other than Permitted Encumbrances.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser, to induce Seller to enter into this transaction and to close hereunder, hereby represents and warrants to Seller as follows:

4.1     Organization. Purchaser is duly organized, validly existing and in good standing.

4.2     Authority. Purchaser has all requisite power and authority to enter into and deliver this Agreement to perform its obligations hereunder and thereunder, to consummate the transactions contemplated hereby and thereby and to assume and perform the Assumed Liabilities. This Agreement has been duly executed and delivered by Purchaser.  Assuming the due authorization, execution and delivery of this Agreement and subject to the effectiveness of the Sale Order, this Agreement constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

4.3     Consents and Approvals. Except as required by the Bankruptcy Court, the execution, delivery and performance by Purchaser of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not:

(a)     violate or conflict with the certificate of incorporation, by-laws or other organizational documents of Purchaser; and

(b)     violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Purchaser.

No consent, approval, waiver or authorization is required to be obtained by Purchaser from any Person (including any Governmental Authority) in connection with the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby.

4.4     Litigation. There are no pending or, to the knowledge of Purchaser, threatened Actions by any Person or Governmental Authority against or relating to Purchaser (or any Affiliate of Purchaser) or by which Purchaser or its assets or properties are or may be bound which, if adversely determined, would have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement and to assume and perform the Assumed Liabilities or to consummate on a timely basis the transactions contemplated hereby or thereby.

4.5     Brokers. All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Purchaser directly with Seller without the intervention of any Person on behalf of Purchaser in such manner as to give rise to any valid claim by any Person against Seller for a finder's fee, brokerage commission, or similar payment.

4.6    Sufficiency of Funds.  Purchaser has sufficient funds, or at and as of the Closing will have sufficient funds, in an aggregate amount necessary to pay the Cash Payment and to perform the Assumed Liabilities and to consummate all of the other transactions contemplated by this Agreement.

## ARTICLE V
## COVENANTS AND AGREEMENTS

5.1    Access and Information.  Until the Closing, the Seller shall afford to Purchaser and its representatives (including accountants and counsel) reasonable access to all properties, books, records, and Tax Returns of the Seller within the Trustee's reasonable control and subject to a confidentiality agreement and all other information with respect to its respective businesses, together with the opportunity, to make copies of such books, records and other documents and to discuss the business of the Seller with such directors, executive officers and counsel for the Seller as the Purchaser may reasonably request for the purposes of familiarizing itself with the Purchased Assets.

5.2    Further Actions.  Upon the terms and subject to the conditions set forth in this Agreement and subject to the requirements of the Bankruptcy Code and the Bankruptcy Court, Seller and Purchaser shall each use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable under applicable Laws to consummate the transactions contemplated hereby and satisfy the conditions to its obligations to close the transactions contemplated hereby.

5.3    Fulfillment of Conditions by Seller. Seller shall not knowingly take or cause to be taken, or knowingly fail to take any action that would cause the conditions to the obligations of Seller or Purchaser to consummate the transactions contemplated hereby to not be satisfied or fulfilled at or prior to the Closing.

5.4    Fulfillment of Conditions by Purchaser. Purchaser shall not knowingly take or cause to be taken, or knowingly fail to take, any action that would cause the conditions to the obligations of Seller or Purchaser to consummate the transactions contemplated hereby to fail to be satisfied or fulfilled at or prior to Closing.

5.5    Transaction Costs. Purchaser shall pay all transaction costs and expenses (including any legal, accounting and other professional fees and expenses) that it incurs in connection with the negotiation, execution and performance of this Agreement and the consummation of the transactions contemplated hereby. Seller shall pay all transaction costs and expenses (including legal, accounting and other professional fees and expenses) that it incurs in connection with the negotiation, execution and performance of this Agreement and the consummation of the transactions contemplated hereby.

5.6    Bankruptcy Court Approval. Notwithstanding anything in this Agreement to the contrary, this Agreement and the sale of the Purchased Assets are subject to the entry by the Bankruptcy Court of the Sale Order. Purchaser also acknowledges that this Agreement is subject to higher and better offers received by Seller for the Purchased Assets pursuant to, and in

accordance with, the Bidding Procedures and the Sale Order.  Nothing in this Agreement shall prevent Seller from complying with the Bidding Procedures, including the solicitation of additional offers and the acceptance of another offer to purchase the Purchased Assets.

5.7    Updating Schedules. Seller shall immediately update and supplement any Schedule delivered pursuant to this Agreement in writing delivered to Purchaser at any time on or prior to Closing reflecting other matters which occur subsequent to the date hereof in the Ordinary Course of Business, or correcting mistakes made, or adding information missing, in good faith during the Seller' preparation of such Schedule (each such update of supplement, an "**Update**"). In the event that Seller delivers any Update to Purchaser in accordance with the provisions of this Section 5.7, then such Update shall not be (a) deemed to be attached to this Agreement or become a part of this Agreement, or (b) given effect for any purposes under this Agreement, unless such Update (A) reflects a change or circumstance that (i) results or could result in a monetary loss or liability and which loss or liability is paid or otherwise satisfied by Seller prior to Closing, or (ii) results or could result in a non-monetary loss or liability and Seller cures such loss or circumstance no later than the earlier of (x) 20 days from the date of delivery of such Update to Purchaser, and (y) two (2) Business Days prior to Closing; or (B) is accepted by Purchaser in its sole discretion. In the event that an Update is so paid or satisfied by Seller or accepted by Purchaser, then upon such payment, satisfaction or acceptance, (i) such Schedule Update shall be deemed to be attached to this Agreement and become a part of this Agreement, (ii) all references to the Schedules in this Agreement shall refer to the Schedules as updated by such Update, and (iii) such Update shall be given effect for all purposes under this Agreement, including, without limitation, for determining whether the conditions to Closing set forth in Section 6.1(a) have been satisfied. In the event such Update is not so paid or satisfied by Seller or Purchaser does not so accept such Update pursuant to this Section 5.7, then Purchaser shall have the right to terminate this Agreement pursuant to Section 8.1.

5.8    Tax Matters. Purchaser, on the one hand, and Seller, on the other hand, will (i) provide each other with any assistance that may reasonably be requested by the other in connection with the preparation of any Tax Return, audit or other examination by any taxing authority or judicial or administrative proceedings relating to liability for Taxes, (ii) each retain and provide the other with any records or other information that may be relevant to that Tax Return, audit, examination or proceeding, and (iii) provide each other with any final determination of any such audit, examination or proceeding that affects any amount required to be shown on any Tax Return of the other for any period. Without limiting the generality of the foregoing, Purchaser, on the one hand, and Seller, on the other hand, will retain until the applicable statutes of limitations (including any extensions) have expired copies of all records or information that may be relevant to Tax Returns filed by the other for all Tax periods or portions thereof ending before or including the Closing Date. After the expiration of all applicable statues of limitations, such records and information may be destroyed by either party if such party sends to the other party written notice of its intent to destroy such records and information, specifying with particularity the contents of the records and information to be destroyed. Such records and information may then be destroyed after the 30th day after such notice is given unless the party receiving the notice objects to the destruction, in which case the party that provided the notice will deliver, at the objecting party's expense, such records to the objecting party.

5.9   <u>Regulatory Matters</u>.  Purchaser, on the one hand, and Seller, on the other hand, will provide each other with any assistance that may reasonably be requested by the other in connection with the transfer of any Licenses necessary for or pertaining to the Purchased Assets, including, but not limited to, any Assigned Licenses, seismic, environmental, medical, safety or other Licenses from any Governmental Authority or non-governmental regulatory or certifying agency or organization (collectively, the "**Regulators**").   Seller shall provide Purchaser with all records or other information that may be relevant to the Licenses or the transfer or assignment thereof or that are required to be maintained by the Regulators.

5.10   <u>Release of Corpac Toggle 2 Trustee Payment</u>.  In accordance with the terms of the Plan, Seller shall and does hereby release Corpac Steel Products Corp. ("Corpac") from any obligation to make the Corpac Toggle 2 Trustee Payment (as defined in the Plan) upon closing of the Sale to Integra.  To the extent the Purchaser is not Integra, the Trustee will use best efforts to obtain a release of Corpac from the Corpac Toggle 2 Trustee Payment, consistent with the terms of the Plan and Plan Settlement Term Sheet.  Any release shall also be included in the Sale Order.  Corpac is an intended third party beneficiary of this provision entitled to enforce same as a Party.  Nothing herein is intended to modify the terms and provisions of the Plan and Plan Settlement Term Sheet.

5.11   <u>Break Up Fee</u>.  If the Purchased Assets are sold to a higher and better bidder than Integra or its designee, Seller shall pay to Integra the Break Up Fee at the time of the closing of such transaction.

5.12.   <u>Dismissal of Emergency Motion</u>.  Seller shall cause the Emergency Motion to Dismiss Bankruptcy Case filed by Permico Energia, at Docket No. 22 (the "Emergency Motion"), to be dismissed with prejudice in the Sale Order of the Bankruptcy Court or another Final Order.

**ARTICLE VI**
**CLOSING CONDITIONS**

6.1   <u>Conditions to Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction or fulfillment at or prior to the Closing of the following conditions, any of which may be waived in whole or in part by Purchaser in writing:

(a)   all representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing with the same effect as though such representations and warranties were made at and as of the Closing (other than any representation or warranty that is expressly made as of a specified date, which shall be true and correct in all material respects as of such specified date only);

(b)   Seller shall have performed and complied in all material respects with all the covenants and agreements required by this Agreement to be performed or complied with by it at or prior to the Closing;

(c)   there shall be in effect no Law or injunction issued by a court of competent jurisdiction making illegal or otherwise prohibiting or restraining the consummation of the transactions contemplated by this Agreement;

(d)      Seller shall have obtained Bankruptcy Court approval in the Sale Order;

(e)      nothing in this Agreement shall preclude Seller or Purchaser from consummating the transactions contemplated herein if Purchaser, in its sole discretion, waives the requirement that the Sale Order or any other orders be a Final Order or Orders. No notice of such waiver of this or of any other condition to Closing need be given except to Seller or Purchaser, as explicitly required in this Agreement, it being the intention of the parties hereto that Purchaser shall be entitled to, and shall not waive thereby, the protections of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs prior to the time that any such order has become a Final Order;

(f)      no Governmental Order shall be in effect which restrains or enjoins the consummation of the transactions contemplated by this Agreement;

(g)      Seller shall have delivered to Purchaser all of the certificates, instruments and other documents required to be delivered by it at or prior to the Closing pursuant to <u>Section 2.2</u>;

(h)   ___

(k)      Seller shall have caused the Emergency Motion to be dismissed with prejudice in the Sale Order of the Bankruptcy Court or another Final Order and the Sale Order or other Final Order shall not be subject to a stay.

Purchaser shall have the right, by providing notice to Seller, to extend the Closing Date until the Termination Date to allow the conditions set forth in Section 6.1 to be satisfied.

6.2      <u>Conditions to Obligations of Seller</u>. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction or fulfillment at or prior to the Closing of the following conditions, any of which may be waived in whole or in part by Seller in writing:

(a)      all representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing with the same effect as though such representations and warranties were made at and as of the Closing (other than any representation or warranty that is expressly made as of a specified date, which shall be true and correct in all material respects as of such specified date only);

(b)      Purchaser shall have performed and complied in all material respects with the covenants and agreements required by this Agreement to be performed or complied with at or prior to the Closing;

(c)      there shall be in effect no Law making illegal or otherwise prohibiting or restraining the consummation of the transactions contemplated by this Agreement. There shall not be pending or threatened in writing by any Governmental Authority of competent jurisdiction any proceeding (i) challenging or seeking to restrain, prohibit, alter or materially delay the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement, or seeking to obtain from Purchaser or any of its Affiliates in connection with the

-14-

sale and purchase of the Purchased Assets to be acquired by Purchaser any material damages, or (ii) seeking to prohibit Purchaser or any of its Affiliates from effectively controlling or operating any portion of the business of Seller or the Purchased Assets to be acquired by Purchaser;

(d)     Purchaser shall have delivered to Seller the Cash Payment and all of the certificates, instruments and other documents required to be delivered by Purchaser at or prior to the Closing pursuant to <u>Section 2.3</u>; and

(e)     the Sale Order (finding, among other things, that Seller shall have obtained all required consents) shall have been entered by the Bankruptcy Court, shall have become a Final Order, and no automatic stay of execution, pursuant to Rule 62(a) of the Federal Rules of Civil Procedure, or Rule 6004(h) or 6006(d) of the Federal Rules of Bankruptcy Procedure, or otherwise, shall apply with respect to the Sale Order.

6.3     <u>Non-Survival of Representations and Warranties</u>. None of the representations, warranties, covenants and agreements of Seller contained in this Agreement or other instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations, warranties, covenants and agreements, shall survive the Closing Date; provided that nothing in this Section 6.3 shall limit the remedies of Purchaser after the Closing Date for breaches of representations, warranties, covenants or agreements resulting from fraud by Seller.

## ARTICLE VII
## AS IS SALE

**7.1     <u>As is Sale</u>**. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PURCHASED ASSETS. ACCORDINGLY, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE VIII
## TERMINATION

8.1     <u>Termination</u>. This Agreement and the transactions contemplated hereby may be terminated and abandoned:

a.  by either Seller or Purchaser at any time prior to the Closing with the mutual written consent of the other;

b.  unless the Closing has not occurred as a result of a breach of this Agreement by the party seeking such termination, by Seller or Purchaser,  if the Closing has

not occurred on or prior to 5:00 p.m., Houston, Texas time on June 30, 2022 (the "**Termination Date**");

    c.   by Purchaser if the Purchaser conditions to Close set forth in Section 6.1 shall not have been satisfied at or prior to Closing

    d.   by either Seller or Purchaser if any Governmental Authority with jurisdiction over such matters shall have issued a final and non-appealable Governmental Order permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement; *provided*, *however*, that neither Seller nor Purchaser may terminate this Agreement pursuant to this Section 8.1(c) unless the party seeking so to terminate this Agreement has used commercially reasonable efforts to oppose any such Governmental Order or to have such Governmental Order vacated or made inapplicable to the transactions contemplated by this Agreement;

    e.   by Seller (provided that neither Seller nor any Affiliate thereof is in breach of any of the representations, warranties, covenants or other agreements contained herein), but only if Purchaser shall have breached, in any material respect, any representation or warranty or any covenant or other agreement to be performed by it contained herein, and such breach is not cured within three (3) Business Days of receipt of written notice thereof from Seller;

    8.2   Effect of Termination. In the event of a termination of this Agreement under Section 8.1, this Agreement will become void and of no further force or effect, except for the provisions of (a) Section 8.3 relating to the payment of fees and expenses, and (b) this Section 8.2. Notwithstanding any provision of this Agreement or the documents to be delivered hereunder to the contrary, neither the termination of this Agreement, nor anything contained in this Section 8.2, will be deemed to release any party from any liability due to, or prevent the other party from exercising their rights and remedies under this Agreement or any ancillary document with respect to, the breach by any such party of the covenants or agreements of such party in the Agreement or any ancillary document, in each case, prior to the date of such termination *provided however*, that (i) such right to terminate shall be Purchaser's sole and exclusive remedy for any breach by Seller.

    8.3   Fees and Expenses. Each of the parties hereto will be responsible for and pay its own legal, accounting, engineering, environmental, survey and title charges and other fees and expenses, including, without limitation, reasonable attorneys' and accountants' fees and expenses and the fees and expenses of financial consultants, investment bankers, lenders and environmental consultants, incurred in connection with the transactions contemplated hereby, including, without limitation, the due diligence review, and the negotiation, preparation and execution of this Agreement, any ancillary agreements and any other instrument or documented contemplated hereby.

**ARTICLE IX**
**MISCELLANEOUS**

9.1     <u>Notices</u>. All notices, requests, demands, claims and other communications that are required or may be given pursuant to this Agreement must be in writing and delivered personally against written receipt, by reputable international overnight courier, by telecopy or facsimile or by registered or certified mail, return receipt requested, postage prepaid, to the parties at the following addresses (or to the attention of such other Person or at such other address as any party may provide to the other party by notice in accordance with this <u>Section 9.1</u>):

if to Purchaser, to:

Integra Midstream Partners, LLC
20803 Biscayne Boulevard
Suite 501
Aventura, Florida 33180
Attention: [to be provided]_____


With copies (which will not
constitute notice hereunder) to:

Rosenthal Law Firm, P.L.L.C.
675 Bering Drive
Suite 150
Houston, Texas 77057
Attention:  Trent Rosenthal
Email:        trosenthal@rosenthallaw.com



if to the Seller, to:

Norton Rose Fulbright US LLP
Fulbright Tower
1301 McKinney
Suite 5100
Houston, Texas 77010
Attention:  William R. Greendyke
                 Jason L. Boland
Facsimile:  (713) 651-5246
Email:        william.greendyke@nortonrosefulbright.com
                 jason.boland@nortonrosefulbright.com

Any such notice or other communication will be deemed to have been given (i) if personally delivered, when so delivered, against written receipt, (ii) if sent by first class mail or overnight courier, when so delivered with delivery confirmed by the courier service.

9.2     Amendments and Waiver; Exclusive Remedies. This Agreement may not be modified or amended except in writing signed by the party or parties against whom enforcement is sought.  The terms of this Agreement may be waived only by a written instrument signed by the party or parties waiving compliance.  No waiver of any provision of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise provided. No delay on the part of any party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder. Whenever this Agreement requires or permits consent by or on behalf of a party, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Agreement.  The rights and remedies herein provided shall be the exclusive rights and remedies available to the parties hereto at law or in equity.

9.3     Entire Agreement. This Agreement and the related documents contained as Exhibits and Schedules hereto or expressly contemplated hereby contain the entire understanding of the parties relating to the subject matter hereof and supersede all prior written or oral and all contemporaneous oral agreements and understandings relating to the subject matter hereof. The Exhibits and Schedules to this Agreement are hereby incorporated by reference into and made a part of this Agreement for all purposes.

9.4     Third Party Beneficiaries. Except as otherwise provided for herein, this Agreement is made for the sole benefit of the parties hereto and their respective successors, executors and permitted assigns, and nothing contained herein, express or implied, is intended to or shall confer upon any other Person any third-party beneficiary right or any other legal or equitable rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement (except to the extent that any Affiliates of Seller is expressly covered by an indemnity herein).

9.5     Governing Law. This Agreement will be governed by and construed and interpreted in accordance with the substantive Laws of the State of Texas, without giving effect to any choice of law or conflicts of Law provision or rule that would cause the application of the Laws of a jurisdiction other than Texas. Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each party at its address specified in Section 9.1.

9.6     Neutral Construction. The parties hereto agree that this Agreement was negotiated fairly between them at arms' length and that the final terms of this Agreement are the product of the parties' negotiations. Each party represents and warrants that it has sought and received legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The parties hereto agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that no provisions of this Agreement should be construed against either party on the grounds that such party drafted or was more responsible for drafting such provision.

9.7    Severability. In the event that any one or more of the provisions or parts of a provision contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or part of a provision of this Agreement or any other jurisdiction, but this Agreement shall be reformed and construed in any such jurisdiction as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provision or part shall be reformed so that it would be valid, legal and enforceable to the maximum extent permitted in such jurisdiction, _provided_ that any such reform or construction does not affect the economic or legal substance of the transactions contemplated hereby in a manner adverse to any party.

9.8    Bulk Transfer Laws. The Sale Order shall provide either that (i) Seller has complied with the requirements of any applicable law relating to bulk sales and transfer or (ii) compliance with the requirement of any applicable laws relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

9.9    Extended Meanings. Words importing the singular include the plural and vice versa and words importing gender include all genders, unless the context otherwise requires.

9.10    Counterparts; Facsimile Delivery. This Agreement may be executed and delivered in one or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument. This Agreement may also be executed and delivered by facsimile, PDF or other electronic file with the same force and effect as if originally executed copies of this Agreement had been delivered by the parties hereto. If this Agreement is executed and delivered in counterparts or by a facsimile, PDF or other electronic file, any party may thereafter require that both parties originally execute and deliver a sufficient number of additional copies of this Agreement so that each party may have two fully executed originals of this Agreement.

9.11    Submission to Jurisdiction. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE INSTITUTED IN THE BANKRUPTCY COURT AND, TO THE EXTENT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT ACCEPT JURISDICTION TO ADJUDICATE SUCH MATTER MAY BE INSTITUTED IN THE FEDERAL DISTRICT COURTS FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION. EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.    SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN WILL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION, OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT.    THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

9.12   <u>Waiver of Jury Trial</u>. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.12</u>.

9.13   <u>Further Assurances</u>. In addition to the actions, documents, files, pleadings and instruments specifically required to be taken or delivered by this Agreement, whether on or before or from time to time after the Closing, and without further consideration, each party hereto shall make commercially reasonable efforts to take such other actions, and execute and/or deliver such other documents, data, pleadings, files, information and instruments, as the other party hereto or its counsel may reasonably request in order to effectuate and perfect the transactions contemplated by this Agreement, including without limitation, such actions as may be necessary to transfer to Purchaser and to place Purchaser in possession or control of, all of the rights, properties, assets and businesses intended to be sold, transferred, conveyed, assigned and delivered hereunder, or to assist in the collection of any and all such rights, properties and assets or to enable Purchaser to exercise and enjoy all rights and benefits of Seller with respect thereto.

9.14   <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by Seller, whether by operation of law or otherwise, provided, however, that the Purchaser shall be entitled to assign in whole or in part its rights, interests and/or obligations hereunder at any time at its sole discretion without any consent and upon such assignment, the assignor shall be released of any and all obligations arising from or relating to this Agreement.  Any assignment in violation of the foregoing shall be null and void.

**ARTICLE X**
**DEFINITIONS**

10.1   <u>Certain Definitions</u>. The following terms, when used herein, shall have the respective meanings set forth below:

*"**Action**"* means any claim, action, injunction, order, judgment, decree, ruling, charge, suit or proceeding, grievance, arbitral action, governmental inquiry, criminal prosecution, hearing or other investigation.

*"**Affiliate**"* means, with respect to any Person, (i) any other Person directly or indirectly

Controlling, Controlled by or under common Control with, such Person, (ii) any other Person that owns or Controls 10% or more of any class of equity securities (including any equity securities issuable upon the exercise of any option or convertible security) of such Person or any of its Affiliates, or (iii) any director, partner, member, officer, manager, agent, employee or relative of such Person and, with respect to the Debtors, expressly includes [PMP West Texas Pipeline, LLC, PMP Robstown Fractionator LLC, PMP Purity Product Pipelines LLC, PMP LPG Terminal LLC, PMP NGL Marketing LLC].

*"Agreement"* has the meaning set forth in the preamble hereto.

*"Assigned Intellectual Property"* has the meaning set forth in Section 1.1(a)(ii).

 *"Assigned Inventory"* has the meaning set forth in Section 1.1(a)(iii).

"*Assigned Licenses*" has the meaning set forth in Section 1.1(a)(vi).

*"Assumed Liabilities"* has the meaning set forth in Section 1.2(a).

*"Assigned Studies"* has the meaning set forth in Section 1.1(a)(v).

 *"Bankruptcy Case"* has the meaning set forth in the recitals hereto.

*"Bankruptcy Code"* has the meaning set forth in the recitals hereto.

*"Bankruptcy Court"* has the meaning set forth in the recitals hereto.

*"Bidding Procedures"* has the meaning set forth in the recitals hereto.

*"Bill of Sale"* has the meaning set forth in Section 2.2(a)(ii).

*"Break Up Fee"* shall have the meaning set forth in the Plan and Plan Settlement Term Sheet.

*"Business Day"* means any day other than Saturday, Sunday or any day on which banks in Texas are required or authorized to be closed.

*"Cash Payment"* has the meaning set forth in Section 1.3(a).

*"Claims"* shall mean all claims, causes of action, choses in action, rights of recovery and rights of set-off of whatever kind or description against any Person arising out of or relating to the Purchased Assets, the business of Seller or relating to Seller.

*"Closing"* has the meaning set forth in Section 2.1.

*"Closing Date"* has the meaning set forth in Section 2.1.

*"Contract"* means any contract, agreement, indenture, note, bond, instrument, lease, conditional sales contract, mortgage, license, franchise agreement, concession agreement, insurance policy, security interest, guaranty, binding commitment, purchase order or other

agreement or arrangement, whether written or oral.

*"Control"* (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with") means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

*"Deposit"* has the meaning set forth in Section 1.3(a).

*"Effective Time"* means 12:01 a.m. Houston, Texas time on the Closing Date.

*"Encumbrance"* means any lien (statutory or otherwise), hypothecation, Liability, claim, security interest, interest, mortgage, pledge, restriction, charge, instrument, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold interest or other right, in favor of a third party or a Seller, to use any portion of the Purchased Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

*"Excluded Assets"* has the meaning set forth in Section 1.1(b).

*"Excluded Liabilities"* has the meaning set forth in Section 1.2(b).

*"Final Order"* means an order, the operation of which has not been reversed, stayed, modified, or amended, and with respect to which the time for filing an appeal or petition for certiorari, rehearing or review has expired, and as to which no appeal, petition for certiorari, rehearing or review is then pending.

*"GAAP"* means United States generally accepted accounting principles, as in effect from time to time.

*"Governmental Authority"* means any government or political subdivision thereof, any governmental entity, quasi-governmental entity, administrative agency, department, commission, board, authority, division, agency or instrumentality, and any court, tribunal or judicial body, in each case whether federal, state, county, provincial, municipal, local or foreign.

*"Governmental Order"* means any Law, judgment, injunction, decree, stipulation or determination issued, promulgated or entered by or with any Governmental Authority of competent jurisdiction.

*"Intellectual Property"* means all worldwide intellectual property rights, registered or unregistered, including any (i) U.S. and foreign patents, patent applications, patent disclosures, inventions, and improvements thereto, including any equivalents, divisionals, continuations, continuations-in-part, reissues, registrations, additions and extensions thereof, (ii) trademarks, service marks, trade dress, logos, labels, advertising and package design, trade names, corporate

names and domain names, the goodwill associated therewith, and any registrations and applications for registration thereof, (iii) copyrights, and any registrations and applications for registration thereof, including copyrights in any Software, (iv) URLs, domain names, and Internet web sites; (v) trade secrets and confidential business information (including ideas, formulas, compositions, proprietary manufacturing processes, alloys, inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, research and development information, Software, drawings, specifications, designs, plans, proposals, technical data, bills of materials, copyrightable works, financial marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, (vi) copies and tangible embodiments thereof (in whatever form or medium), (vii) licenses granting rights with respect to any of the foregoing; and (viii) registrations and applications for registration with respect to any of the foregoing.

*"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended, any successor statute thereto and the rules and regulations promulgated thereunder.

*"Knowledge"* and phrases of similar import mean, with respect to Seller, the actual knowledge, after reasonable investigation of any executive officers.

*"Law"* means any statute, law (including common law), decree, permit, License, ordinance, order, regulation, rule, code or requirement of any Governmental Authority.

*"Liability"* means any indebtedness, obligation or other liability with respect to the business of Seller or the Purchased Assets (whether absolute, accrued, matured, contingent, known or unknown, fixed or otherwise, or whether due or to become due), including any fine, penalty, judgment, award or settlement respecting any judicial, administrative or arbitration proceeding, damage, loss, claim or demand with respect to any Law or Governmental Order.

*"Licenses"* shall mean any of the licenses, permits, certificates, exemptions, registrations, and other authorizations necessary or proper for the use or operation of the Purchased Assets.

*"Ordinary Course of Business"* shall mean the ordinary course of business of Seller substantially consistent with past custom and practice.

*"Permitted Encumbrances"* means the Assumed Liabilities.

*"Person"* means any individual, general or limited partnership, firm, corporation, limited liability company, association, trust, unincorporated organization, Governmental Authority or other entity.

*"Personal Property"* has the meaning set forth in Section 1.1(a)(i).

*"Petition Date"* has the meaning set forth in the recitals hereto.

 *"Purchase Price"* has the meaning set forth in Section 1.3(a).

*"Purchased Assets"* has the meaning set forth in Section 1.1(a).

*"Purchaser"* has the meaning set forth in the preamble hereto.

*"Sale Order"* means a Final Order of the Bankruptcy Court in the form and content approved by Purchaser, including, without limitation, provisions that approves the sale of the Purchased Assets free and clear of all Encumbrances, determines that the Purchased Assets are property of the estate under Section 541 of the Bankruptcy Code, and enjoins all entities from interfering with Purchaser's right, title, interest and use of the Purchased Assets.

*"Seller"* has the meaning set forth in the preamble hereto.

*"Software"* means computer programs, including any and all software implementations or algorithms, module and methodologies whether in source code, object code or other form, databases and compilations, including any and all data and collections of data, descriptions, flow charts and other work product used to design, plan, organize and develop any of the foregoing and all documentation, including user manuals and training materials related to any of the foregoing, used in the business of Seller or relating to the Intellectual Property.

*"Subsidiary"* means, with respect to any Person, any corporation, general or limited partnership, limited liability company, joint venture or other legal entity of any kind of which such Person (either alone or through or together with one or more of its other Subsidiaries) owns or controls (by contract or otherwise), directly or indirectly, more than 50% of the stock or other equity interests, the holders of which are (a) generally entitled to vote for the election of the board of directors or other governing body of such legal entity or (b) generally entitled to share in the profits or capital of such legal entity.

*"Tax"* means any federal, state, county, provincial, local or foreign income, gross receipts, sales, use, ad valorem, employment, severance, transfer, gains, profits, excise, franchise, property, capital stock, premium, minimum and alternative minimum or other taxes, fees, levies, duties, assessments or charges of any kind or nature whatsoever imposed by any Governmental Authority (whether payable directly or by withholding), together with any interest, penalties (civil or criminal), additions to or additional amounts imposed by, any Governmental Authority with respect thereto.

*"Tax Return"* means a report, return or other information required to be supplied to a Governmental Authority with respect to any Tax.

*"Termination Date"* has the meaning set forth in <u>Section 8.1(b)</u>.

*"Trustee"* has the meaning set forth in the recitals hereto.

*"Update"* has the meaning set forth in <u>Section 5.7</u>.

10.2   <u>Interpretation</u>. For purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (i) words using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other genders, (ii) references herein to "Articles," "Sections," "subsections" and other subdivisions without reference to a document are to the specified Articles, Sections, subsections and other subdivisions of this Agreement, (iii) a reference to a subsection without further reference to a Section is a reference to such subsection as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions within a Section or subsection, (iv) the words "herein," "hereof," "hereunder," "hereby" and other words of similar import refer to this Agreement as a whole and not to any particular provision, (v) the words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation", (vi) the word "or" shall not be exclusive, (vii) all references to any period of days (other than references to a period of "Business Days") shall be deemed to be to the relevant number of calendar days, (viii) all accounting terms used and not expressly defined herein have the respective meanings given to them under GAAP and (ix) all references to "$" shall be deemed to mean U.S. dollars.

[S<small>IGNATURE</small> P<small>AGES TO</small> F<small>OLLOW</small>]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**PURCHASER:**

Name:
Title:

**SELLER:**

**PERMICO MIDSTREAM PARTNERS HOLDINGS, LLC AND PERMICO MIDSTREAM PARTNERS LLC**

Name: William R. Greendyke
Title:  Chapter 11 Trustee for *Permico Midstream Partners Holdings, LLC and Permico Midstream Partners LLC*

**EXHIBIT A**
**FORM OF BILL OF SALE**

## BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Permico Midstream Partners Holdings, LLC and Permico Midstream Partners LL Texas limited liability companies ("Seller"), do hereby grant, bargain, transfer, sell, assign, convey and deliver to [   ] ("Purchaser"), all of its right, title, and interest in and to the Assigned Personal Property, the Assigned Inventory, as such terms are defined in the Asset Purchase Agreement, and any other tangible personal property included in the Purchased Assets, dated as of [   ], 2021 (the "Purchase Agreement"), by and between Seller and Purchaser, to have and to hold the same unto Purchaser, its successors and assigns, forever.

Purchaser acknowledges that Seller makes no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Purchaser, Seller will execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Purchaser in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Purchaser, its successors and assigns, title to the assets sold, conveyed, and transferred by this Bill of Sale.

IN WITNESS WHEREOF, Seller has duly executed this Bill of Sale as of [    ], 2022.

Date: [   ], 2022

**SELLER**:

By:_____

Name: William R. Greendyke_____

Title: Chapter 11 Trustee for *Permico Midstream Partners Holdings LLC, and Permico Midstream Partners LLC*

**EXHIBIT B**
**FORM OF DEED**

**EXHIBIT C**
**FORM OF ASSIGNMENT OF INTELLECTUAL PROPERTY**

**ASSIGNMENT OF INTELLECTUAL PROPERTY**

This Assignment of Intellectual Property (this "**Agreement**"), is entered into as of [____], 2021, by Permico Midstream Partners Holdings, LLC and Permico Midstream Partners, Texas liability companies (collectively, the "**Assignor**") and [____] (the "**Assignee**"), pursuant that certain Asset Purchase Agreement, by and between the Assignor and the Assignee, dated [__], 2021 (the "**Purchase Agreement**").  The Assignor and the Assignee are each referred to individually as "**Party**," and collectively as "**Parties**."

The Assignor and the Assignee desire to ensure that the Assignee is the sole owner of all right, title and interest in, to and under all Assigned Intellectual Property (as defined in the Purchase Agreement).

In consideration of the mutual promises contained in this Agreement and the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      <u>Definitions</u>.  Capitalized terms used in this Agreement but not defined herein have the meaning given to them in the Purchase Agreement.

2.      <u>Assignment</u>.  The Assignor hereby, absolutely and unconditionally, conveys, sells, assigns, transfers, grants and sets over unto the Assignee, all of such Assignor's worldwide rights, title and interest and benefit in and to the Assigned Intellectual Property owned by such Assignor including without limitation those items set forth on Schedule 1, together with all rights of action, both at law and in equity with respect thereto, including without limitation all rights to sue, settle any claim, and collect all damages for any past, present, or future infringement or misappropriation of such Assigned Intellectual Property, including without limitation the goodwill of the businesses connected to the use of any of such Assigned Intellectual Property, the same to be held and enjoyed by the Assignee, its successors and assigns forever, as fully and entirely as the same could have been held and enjoyed by the Assignor if this sale had not been made and the Assignee does hereby accept such sale, assignment, transfer, grant, conveyance and set over.

3.      <u>Warranties</u>.    Each Party represents, warrants, and covenants to the other Party that: (i) such Party has the full power, authority and legal right to enter into and perform this Agreement; and (ii) this Agreement is a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms.

4.      <u>Recordation</u>. The Assignor authorizes and requests the U.S. Patent and Trademark Office, or any foreign equivalent thereto, and any other Governmental Authority (as defined in the Purchase Agreement), to record the Assignee as owner of the Assigned Intellectual Property and of the entire title and interest in, to and under the same, for the use and enjoyment of the Assignee, its successors, assigns and other legal representatives.

5.     Cooperation.  The Assignor hereby covenants and agrees that it will communicate to the Assignee, its successors, legal representatives and assigns, any material facts (including, but not limited to, information relating to use or non-use, enforceability, or infringement of the Assigned Intellectual Property) known to it with respect to the Assigned Intellectual Property and testify in any legal proceeding, sign all lawful papers, execute all applications (including, but not limited to, powers of attorney, specific assignments, transfers and assurances), make all rightful oaths and use its reasonable best efforts at the request of the Assignee to aid the Assignee, its successors, legal representatives and assigns in obtaining and enforcing protection for such Assigned Intellectual Property and in enjoying the full benefits thereof.  The Assignor hereby constitutes and appoints the Assignee the true and lawful attorney of the Assignor to act as the Assignor's attorney-in-fact solely for the purpose of executing any documents and taking all necessary steps to cause the Assignor to perform any of its obligations set forth in this Agreement.

6.     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

7.     Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

8.     Governing Law. This Agreement and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based upon, arising out of, or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the United States and the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction).

*(Signature page follows)*

- 5 -

Date: [    ], 2022

**ASSIGNOR:**

By:_____

Name: William R. Greendyke

Title: Chapter 11 Trustee for *Permico Midstream Partners Holdings LLC, and Permico Midstream Partners LLC*

**ASSIGNEE:**

_____

Name:

Title: